# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| CONOPCO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## VERIFIED COMPLAINT

Plaintiff Ben & Jerry's Homemade, Inc. ("Ben & Jerry's," the "Company," or the "Plaintiff"), by and through its undersigned attorneys, as and for its complaint (the "Complaint") against defendant Conopco, Inc. ("Unilever," or the "Defendant"), hereby alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This dispute concerns the autonomy of Ben and Jerry's Independent Board of Directors (the "Board"), and the core values the Company has spent the last forty-four years establishing.

2.      From its stances on migrant justice and LGBTQ+ rights to Black Lives Matter and climate change, the Ben & Jerry's brand is synonymous with social activism. The Company's core values of advancing human rights and dignity, supporting social and economic justice for historically marginalized communities, and protecting and restoring the Earth's natural systems are integral to Ben and Jerry's identity.  So much so that when the Company entered into an Agreement and Plan of Merger with Unilever in 2000 ("Merger Agreement"),

Ben & Jerry's expressly reserved the "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" with an Independent Board of Directors.[1] These terms were subsequently memorialized in a Shareholders Agreement between Ben & Jerry's and Unilever.[2]

3.      Pursuant to the terms of the Merger Agreement and Shareholders Agreement, Unilever agreed to a unique corporate governance structure that preserved the independence and autonomy of Ben & Jerry's Board of Directors.  Specifically, an Independent Board of Directors was created and expressly authorized to protect against actions that, in its discretion, pose a risk to the integrity of the essential elements of the Ben & Jerry's brand name.  Although the chief executive officer of the Company, appointed by Unilever, has certain authority over financial and operational matters, his/her authority is subject to a critical limitation.  As part of its primary responsibility for safeguarding the integrity of the Ben & Jerry's brand, the Independent Board of Directors is authorized to "prevent any action by the CEO in the areas of . . . the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand." Exh. A, § 6.14(f); Exh. B, § 1(f).

4.      In May 2021, the Independent Board of Directors determined that it would be inconsistent with the essential elements of Ben & Jerry's brand integrity for Ben & Jerry's to be sold in the West Bank.  In response, Unilever issued a public statement declaring that it had "*always recognised the right* of the brand and its independent Board to take decisions about its

---

[1] *See* Exhibit A, Merger Agreement, § 6.14(f).
[2] *See* Exhibit B, Shareholders Agreement.

social missions."[3]  And, in April 2022, Unilever reiterated that Ben & Jerry's "would clearly be harmed if forced to provide a license . . . against its will."[4]

5.  On June 29, 2022, Unilever abruptly reversed course, announcing that Ben & Jerry's "will be sold" in the West Bank through a third-party distributor.[5]  *See* Exhibit E. Unilever's unilateral decision was made without the consent of Ben & Jerry's Independent Board of Directors, the entity contractually empowered with protecting Ben & Jerry's brand.  An injunction restraining Unilever from violating the express terms of the Merger Agreement and Shareholders Agreement is essential to preserve the status quo and protect the brand and social integrity Ben & Jerry's has spent decades building.

## PARTIES

6.  Plaintiff Ben & Jerry's is a Vermont corporation with its principal place of business in Burlington, Vermont.

7.  Defendant Conopco, Inc. is a New York corporation headquartered in Englewood Cliffs, New Jersey.

## PERSONAL JURISDICTION AND VENUE

8.  This Court has personal jurisdiction over the Defendant because the Defendant has consented to personal jurisdiction in any federal court located in the State of New York under Section 9.10 of the Merger Agreement and Section 7 of the Shareholders Agreement.  This Court also has personal jurisdiction over the Defendant because domestic corporations are subject to general personal jurisdiction in New York.  *See* N.Y. C.P.L.R. § 301.

---

[3] *See* Exhibit C (emphasis added), "Unilever Statement on Ben & Jerry's Decision." Available at: https://www.unilever.com/news/press-and-media/press-releases/2021/unilever-statement-on-ben-and-jerrys-decision/.
[4] *See* Exhibit D, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 5.
[5] *See* Exhibit E, "Unilever reaches new business arrangement for Ben & Jerry's in Israel." Available at: https://www.unilever.com/news/press-and-media/press-releases/2022/unilever-reaches-new-business-arrangement-for-ben-jerrys-in-israel/.

9.      Venue lies within this District under 28 U.S.C. § 1391(b)(1) because the Defendant resides and/or may be found in this District and is a resident of New York State.  On information and belief, venue also lies in this District under 28 U.S.C. § 1392(b)(2) because the Defendant conducts, transacts, and/or solicits substantial business in New York.  Venue is further established under Section 9.10 of the Merger Agreement and Section 7 of the Shareholders Agreement.

## SUBJECT MATTER JURISDICTION

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity between the parties and the matter in controversy exceeds, exclusive of interests and costs, the sum of $75,000.   Specifically, Ben & Jerry's public image and brand integrity is likely to suffer damages in excess of $75,000 as a result of Defendant's conduct, described below.  Additionally, Ben & Jerry's is entitled to recover its reasonable attorney's fees.

## FACTUAL BACKGROUND

11.      Ben & Jerry's is an American institution.  An institution that is known for the principled, progressive stances it takes on various societal issues, both domestically and internationally.  This social integrity is as important to Ben & Jerry's as the ice cream it makes, which it began producing in 1978.

**A.      1978-1999:  Ben & Jerry's Establishes a Brand Synonymous with Social Activism.**

12.      Ben Cohen and Jerry Greenfield grew up in Merrick, New York and have been friends since childhood.  In the late 1970s, Mr. Cohen and Mr. Greenfield decided to start an ice-cream business.  They took a $5-correspondence course on ice-cream making from Pennsylvania State University's creamery.  Soon after, the pair formed Ben & Jerry's and, on May 5, 1978, opened their first ice cream parlor in a renovated gas station in downtown Burlington, Vermont.

13.     In the early 1980s, as Ben & Jerry's grew, Mr. Cohen and Mr. Greenfield decided they wanted their business to be more than just an ice-cream company.  So, they adopted a unique corporate model based on the concept of "linked prosperity."  As part of that model, Ben & Jerry's formally adopted a three-part mission, which incorporated the Company's core values and became its guiding ethos.  In essence, Ben & Jerry's would seek to make high-quality ice-cream (the "Product Mission"); operate the Company on a sustainable financial basis (the "Economic Mission"); and engage in progressive social change (the "Social Mission").

14.     When the "linked prosperity" model was originally being developed, there were internal company discussions regarding the hierarchy of the three missions.  After some debate, Ben & Jerry's ultimately decided that each mission would be of equal importance, with profit, quality, and social impact serving as co-equal principles.  These principles have driven the Company' decision making for more than four decades:



15.     Ben & Jerry's stayed true to its linked prosperity model.  As the Company became more financially successful in the late 1980s, it began reciprocally expanding its social platform, taking leading stances on a number of societal issues.

16.    In 1988, for example, Mr. Cohen became disturbed by the Reagan administration's exorbitant spending on nuclear weapons, while one in five American children lived in poverty.  He thus founded "1% for Peace," which advocated for the United States to redirect 1% of its defense budget to peace-promoting projects.  In support of "1% for Peace," Ben & Jerry's launched a new product, the "Peace Pop," which included a wrapper directly challenging Cold War spending policy:

   

17.    Ben & Jerry's outspoken social advocacy continued throughout the 1990s.

18.    In 1990, for example, Ben & Jerry's printed "Support Farm Aid" messages on eight million ice-cream pints in support of grassroots efforts to keep family farmers on their lands.  That same year, Ben & Jerry's co-sponsored a full-page ad in the *New York Times* opposing the United States' imminent invasion of Kuwait.  And, in 1990, Ben & Jerry's also started collaborating with Greyston Bakery, a bakery based in Yonkers, NY that provides the homeless and others who struggle to find employment with jobs making brownies, cheesecakes, and torts, among other baked goods.  Greyston Bakery uses profits to provide transitional

housing, counseling, and training for its employees to break the cycle of homelessness and continues to provide the brownies Ben & Jerry's uses in its ice cream to this day.

19.     In 1991, Ben & Jerry's became an outspoken advocate for LGBTQ+ rights and began offering benefits to the same-sex partners of its employees.  Three years later, in 1994, Ben & Jerry's highlighted its dedication to social activism by honoring eight famous advocates of social change—Pete Seeger, Michelle Shocked, Buffy Sainte-Marie, Dolores Huerta, Daniel Berrigan, Bobby Seale, Spike Lee, and Carlos Santana—in a new advertising campaign:



20.     Nearly two decades after its inception, Ben & Jerry's "linked prosperity" corporate model came full circle in 1998 when the Company successfully lobbied the Vermont legislature to pass a law that authorizes corporate directors to consider issues beyond shareholder

wealth maximation when making company decisions (often referred to as the "Ben & Jerry's Law").

21.    Ben & Jerry's social integrity resonated with its customers.  In 1999, a national survey found that Ben & Jerry's ranked fifth among *all* companies in the United States in terms of reputation, a startling fact given that "the top four finishers (Johnson & Johnson, Coca-Cola, Hewlett-Packard, and Intel) were so much larger."[6]  This loyal following made Ben & Jerry's attractive to potential suitors, including Defendant Unilever.

**B.    2000: Ben & Jerry's Enters into a Merger Agreement with Unilever, Which Expressly Established an Independent Board of Directors.**

22.    In 1999, several potential buyers became interested in acquiring Ben & Jerry's, including industry rivals Dreyer's Ice Cream and Defendant Unilever.

23.    Unilever knew that in order to beat out the competition for Ben and Jerry's, it had to respect the brand's unique social integrity.  Ronald Soiefer (General Counsel of Unilever USA and Chief Counsel in 2000) was instructed that his "job was to collaborate with" Ben and Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."[7]

24.    During the next year and a half of negotiations, Ben and Jerry's made clear that any potential merger must expressly include contract language that reflected the brand's social mission and provide for the creation of an independent board of directors.  The resulting Merger Agreement, executed in the summer of 2000, was described by Richard Goldstein (former Chief Executive Officer of Unilever North America) as the "most unique" deal he had ever been involved in: "I never did another deal that was remotely like it."[8]

---

[6] *See* Exhibit K, Excerpts from BRAD EDMONSON, ICE CREAM SOCIAL:  THE STRUGGLE FOR THE SOUL OF BEN & JERRY'S (2014), at 150.
[7] *Id*. at 170.
[8] *Id*. at 156, 172.

25.     The Merger Agreement's unique governance structure is primarily reflected in Section 6.14 of the agreement, which expressly empowers an Independent Board of Directors:

- Section 6.14(e) provides that the Board "shall have *primary responsibility* for *preserving and enhancing* the objectives of the historical *social mission* of the Company . . . ."

- Section 6.14(f) prescribes that the Board "shall be the *custodians of the Ben & Jerry's-brand image* and shall have *primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name* (the 'Essential Integrity of the Brand')." And, that "[a]s part of this responsibility, *the Company Board may prevent any action* by the CEO in the areas of … the *licensing or other use of the Ben & Jerry's trademark that*, in each case, a majority of the Company Board reasonably determines to be *inconsistent with the Essential Integrity of the Brand*." Exh. A, § 6.14(f).

- Section 6.14(d) provides that although Ben & Jerry's will be managed by a Unilever-appointed CEO, that management is expressly "[*s]ubject to* Sections 6.14(e) and 6.14(f), which place *primary responsibility* for *Social Mission* priorities and the *Essential Integrity of the Brand* . . . *with the Company Board*." Exh. A, § 6.14(d).

- And, although Defendant is provided certain "financial and operational" authority over Ben & Jerry's under Section 6.14(j), **Section 6.14(i)** bars Unilever from taking any action that may prevent the Independent Board of Directors from "fulfilling its obligations." Exh. A, § 6.14(i).

- Finally, Section 9.10 provides the "[e]nforcement" mechanism for breaches of Section 6.14, stating that "irreparable damage would occur in the event that any of the provisions of [the Merger Agreement] were not performed in accordance with their specific terms" and that Ben & Jerry's would "be entitled to an injunction" to "prevent breaches" and "enforce specifically the terms and provisions" of the Merger Agreement. Exh. A, § 9.10.

26.     The Merger Agreement recognized that Ben & Jerry's business reputation and the substantial goodwill associated with its name depended on fidelity to Ben & Jerry's historical Social Mission and preservation of the Essential Integrity of the Brand.  Moreover, the Merger Agreement also recognized that the mechanism for preserving Ben & Jerrys business reputation and goodwill was to maintain the autonomy of the Independent Board of Directors over all matters regarding the Social Mission and Essential Integrity of the Brand.

27.     The Merger Agreement also acknowledged that a breach of Unilever's obligation to preserve the autonomy and authority of the Independent Board of Directors would cause irreparable harm to Ben & Jerry's business reputation and goodwill.   Section 9.10 provides the "[e]nforcement" mechanism for breaches of Section 6.14, stating that "irreparable damage would occur in the event that any of the provisions of [the Merger Agreement] were not performed in accordance with their specific terms" and that Ben & Jerry's would "be entitled to an injunction" to "prevent breaches" and "enforce specifically the terms and provisions" of the Merger Agreement.  Exh. A, § 9.10.

28.     Following the execution of the Merger Agreement, mirror-image provisions of Section 6.14 were incorporated into a Shareholders Agreement between Defendant and Ben & Jerry's, which formalized these protections as a fundamental part of the corporate governance of the Company.  *See* Exh. B, Section 1.

29.     Unilever understood and expressly acknowledged the importance and effect of these provisions.   As Richard Goldstein, Unilever's then Chief Executive Officer of North America, described: "The only reason we were successful in the acquisition is because Ben and Jerry became convinced that Unilever would honor its word. There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."[9]   Similarly, Unilever's then Chief Counsel, Soiefer, recognized: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away.  They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent.  It isn't like Unilever can run out the clock."[10]

---

[9] Exhibit K at 159.
[10] *Id*. at 170.

30.     Goldstein and Soiefer's analyses are echoed by Ben & Jerry's current CEO, Matthew McCarthy (a Unilever appointee):

> We may disagree at times, but this acquisition, which happened 20 years ago, has been so successful in part because Unilever got a good schooling from [co-founder] Jerry [Greenfield] and Ben about what they had created and what we're still trying to drive forward. They were also very smart, shrewd guys who put into the sales agreement a certain level of autonomy that would exist in perpetuity, including the creation of an independent board of directors that I sit on and am also partly accountable to. So, there's a certain level of independence baked in.[11]

31.     Since the execution of the Merger Agreement and the Shareholders Agreement, Ben and Jerry's Independent Board of Directors have actively worked to "safeguard[] the integrity of the essential elements of the Ben & Jerry's brand-name," per their contractual mandate.

**C.     2000-2021: The Independent Board of Directors Continues Ben & Jerry's Social Mission.**

32.     Following the 2000 acquisition by Unilever, Ben & Jerry's Independent Board of Directors continued the Company's long history of social activism and began asserting its rights under the Merger Agreement and Shareholders Agreement.

33.     For instance, in 2008, the Ben & Jerry's CEO—a Unilever appointee—proposed to close the Ben & Jerry's plant in Waterbury, Vermont, which was the Company's first factory, built in 1985.  The closure of that plant would have devastated the local economy.

34.     The Independent Board of Directors determined that the planned closing of the Waterbury plant was inconsistent with the Company's Social Mission and expressed its objection to Unilever.  Unilever respected the Independent Board of Director's judgment, shelving plans to shut down the Waterbury plant.  Today, Waterbury is one of the Company's most efficient plants.

---

[11] *See* Exhibit F, Alison Beard, *Why Ben & Jerry's Speaks Out* (Jan. 13, 2021). Available at: https://hbr.org/2021/01/why-ben-jerrys-speaks-out.

35.     The Board also progressed Ben & Jerry's social activism in other areas.  In 2009, for example, Ben & Jerry's initiated a five-year plan to ensure that all its ingredients would be free of genetically modified organisms (GMOs), a goal it accomplished in 2014.  That same year, Ben & Jerry's joined the "Fight for the Reef" campaign, a partnership with the Australian Marine Conservation Society to help protect the Great Barrier Reef.

36.     Three years later, in 2017, Ben & Jerry's continued its international social activism—and its longstanding advocacy for LGBTQ+ rights—by announcing it would no longer serve two scoops of the same ice-cream flavor in Australia due to the Australian government's refusal to legalize same-sex marriage.  According to Ben & Jerry's, if no same-sex marriage in Australia, then no same-scoop ice cream in Australia:[12]



---

[12] *See* Exhibit G, "Ben & Jerry's Bans 'Same-Flavor Scoops' in Australian Same-Sex Marriage Push." https://www.nbcnews.com/feature/nbc-out/ben-jerry-s-bans-same-flavor-scoops-australian-same-sex-n764791.

37.     Ben and Jerry's social activism continued into the next decade.  In 2020, after the murder of George Floyd, Ben & Jerry's became one of the most prominent brands to speak out in support of Black Lives Matter.  The Company delivered a blunt message:



38.     Ben & Jerry's vocal, unequivocal support for the Black Lives Matter movement drew praise: "Among the flood of bland and empty corporate platitudes, the post stood out.  It was no viral fluke but the product of decades of brand development around social activism."[13] As a result of its decades of advocacy, Ben & Jerry's had become the "gold standard" for corporate activism.[14]

**D.     2021: The Independent Board of Directors Determines Selling Ben & Jerry's in the West Bank is Inconsistent with The Brand's Essential Integrity; Unilever Publicly Acknowledges the Board's Authority to Make Such a Decision.**

39.     As early as 2013, the Ben & Jerry's Independent Board of Directors had begun receiving complaints regarding the human rights implications of selling its products in the West Bank.  The Independent Board did not take the issue lightly, choosing instead to organize

---

[13] *See* Exhibit H, "Ben & Jerry's Showed America What Real Corporate Activism Looks Like," https://www.huffpost.com/entry/ben-jerry-ice-cream-corporate-activism_n_5f1b11dec5b6296fbf423019 .
[14] *Id.*

multiple visits to the region, and appointing a special committee in 2018 to investigate the issue thoroughly.

40.     Following the appointment of the special committee, a group of Ben & Jerry's representatives organized a factfinding mission in 2019.   The group included:   Matthew McCarthy (CEO); Mike Graning (Chief Financial Officer); Dave Rapp (Global Social Mission Officer); and, Anuradha Mittal (Board Chair).   These representatives met with a variety of stakeholders, including members of the Israeli government, human rights organizations such as Human Rights Watch, former Israeli soldiers, local farmers, Palestinian representatives, and UN agencies.

41.     After the visit, the Independent Board determined—as custodians of Ben & Jerry's Social Mission and brand—that it would be inconsistent with the essential elements of the brand's integrity to continue selling Ben & Jerry's products in the West Bank.   The Independent Board's decision was unanimous.   Kevin Havelock, Unilever's appointee to the board, joined in supporting the decision.

42.     The Independent Board's decision was also consistent with the founders' original Social Mission.   As Mr. Cohen and Mr. Greenfield, themselves, explained in a July 28, 2021 guest essay for the *New York Times*, they "unequivocally support[ed] the decision of the company . . ."[15]   The Ben & Jerry's founders further added that they were "proud" of the Company's action; believed "it is on the right side of history"; and viewed it as "one of the most important decisions the company has made in its 43-year history."[16]

43.     Ten days prior to the *New York Times* piece, Unilever had published its own statement confirming it had "*always recognised the right* of the brand and its independent Board

---

[15] *See* Exhibit I, "We're Ben and Jerry. Men of Ice Cream, Men of Principle." Available at: https://www.nytimes.com/2021/07/28/opinion/ben-and-jerry-israel.html.
[16] *Id.*

to take decisions about its social missions."[17]  And, in April 2022, after Ben & Jerry's distributor in the West Bank sued the Company and Unilever over the decision, Unilever responded that the distributor's claim was meritless, emphasizing in public court filings that Ben & Jerry's "would clearly be harmed if forced to provide a license . . . against its will."[18]  Unilever's statements simply acknowledged what Unilever and Ben & Jerry's had agreed to in their  Merger Agreement, a unique corporate structure which had governed their 22-year relationship.

**E.   2022: Unilever Reverses Course, Disregards the Agreement, and Upsets the Equilibrium the Parties Had Maintained for More Than Two Decades.**

44.   Abruptly, on June 23, 2022, Unilever notified the Chair of Ben & Jerry's Independent Board of Directors that it planned to transfer certain Ben & Jerry's trademarks and brand rights to a third-party purchaser, who would use the Ben & Jerry's namesake to sell products in the West Bank.  Stunned, the Chair of the Independent Board attempted to engage in discussions with Unilever, requesting a copy of the transfer agreement and time for the Independent Board to review.  She received neither.

45.   On June 29, 2022, Unilever unilaterally announced that Ben & Jerry's "will be sold" in the West Bank through a third-party distributor.[19]

46.   Unilever's decision was made without the approval of Ben & Jerry's Independent Board of Directors, the "custodians of the Ben & Jerry's-brand image" and the entity with "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" per the 2000 Merger Agreement.

---

[17] *See* Exhibit C.
[18] *See* Exhibit D.
[19] *See* Exhibit E.

47.     On Friday, July 1, 2022, the Board held a special meeting in response to Unilever's decision.  In a 5-2 decision (with the two Unilever appointees dissenting), Ben & Jerry's Independent Board of Directors authorized this litigation.[20]

## CAUSES OF ACTION:

## COUNT I:  BREACH OF THE MERGER AGREEMENT

48.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

49.     Plaintiff and Defendant entered into the Merger Agreement in 2000.  The parties have cooperatively worked under the Merger Agreement for the last 22 years.

50.     Subject to Section 6.14 of the Agreement, Ben & Jerry's Independent Board of Directors are the "custodians of the Ben & Jerry's-brand image," and primarily responsible for "preserving and enhancing the objectives of the historical social mission of the Company" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name."

51.     Defendant deprived Plaintiff of these contractually bargained for rights via its June 29, 2022 announcement, attempting to usurp the Board's contractual authority and nullify its previous decision prohibiting the sale of Ben & Jerry's products in the West Bank.

52.     Defendant also seeks to deprive Plaintiff of these contractually bargained for rights by transferring certain Ben & Jerry's trademarks and brand rights to a purchaser for the express purpose of selling Ben & Jerry's products in the West Bank.

53.     Without Plaintiff's authorization and with knowledge of Plaintiff's well-known and publicly-acknowledged rights, Defendant breached Section 6.14 of the Merger Agreement when it unilaterally decided to engage in a deal directly infringing on the "essential elements of the Ben & Jerry's brand-name."

---

[20] *See* Exhibit J, Resolutions of the Board of Directors of Ben & Jerry's Homemade, Inc., dated July 1, 2022.

54.     Defendant has also breached Section 6.14 of the Merger Agreement by promising to sell Ben & Jerry's trademarks and brand rights to an entity who will then sell Ben & Jerry's products in the West Bank.

55.     In addition to depriving Plaintiff of its rights under Section 6.14, Defendant has breached its obligation under Section 6.14(i), pursuant to which Defendant agreed not to prevent Plaintiff from fulfilling its obligations under Section 6.14.

56.     Defendant's breaches undermine the parties' intent expressed in the Merger Agreement and destroy the brand and social integrity Ben & Jerry's has spent decades building. The Merger Agreement recognized that Unilever's breach of Section 6.14 would cause irreparable harm to Ben & Jerry's business reputation and its goodwill, and therefore would be grounds for injunctive relief.

57.     Based on Defendant's actions as alleged herein, Plaintiff is entitled to injunctive relief, damages for the irreparable harm that Plaintiff has sustained and will sustain as a result of Defendant's breaches of contract, and all gains, profits, and advantages obtained by Defendant as a result thereof, enhanced discretionary damages, reasonable attorney's fees and costs, and any other remedies as the Court deems appropriate.

**COUNT II:  BREACH OF THE SHAREHOLDERS AGREEMENT**

58.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

59.     Ben & Jerry's entered into a Shareholders Agreement with Defendant dated August 3, 2000.  Pursuant to Defendant's obligations in the Merger Agreement, the Shareholders Agreement adopted the corporate governance standards of Section 6.14 of the Merger Agreement.  Consistent with Paragraph 6.14 of the Merger Agreement, the Shareholders

Agreement delegated to the Ben & Jerry's Board of Directors authority for:  (i) "preserving and enhancing the historical social mission of the Company as they may evolve from time to time consistent therewith ('Social Mission Priorities')"; and (ii) "safeguarding the integrity of the essential elements of the Ben & Jerry's brand name ('Essential Elements of the Integrity of the Brand')."

60.     The parties also recognized that Defendant's breach of the Shareholders Agreement would pose irreparable harm to Ben & Jerry's.   Section 7 of the Shareholders Agreement thus provides that:

> The  parties agree that irreparable damage would occur in  the event that any of the provisions of  this Agreement  were not performed  in accordance  with their specific terms or  were otherwise breached.   It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

61.     The Shareholders Agreement was adopted by reference in the Company's Articles of Incorporation and its By-Laws, and thus represents the operative source of corporate governance.

62.     Defendant's actions as described in the foregoing allegations constitute a breach of the Shareholders Agreements.  Defendant's breach of the Shareholders Agreement threatens immediate and significant irreparable harm to Ben & Jerry's business reputation and its goodwill, and therefore is grounds for injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ben & Jerry's respectfully requests judgment in its favor and against Defendant:

1.      That Defendant, its affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

      a.  Transferring Ben & Jerry's trademarks and brand rights to American Quality Products, Ltd., or to any other entity, who would permit the sale of Ben & Jerry's products or the use of Ben & Jerry's marks that is contrary to the Ben & Jerry's Board's determination that it is inconsistent with the essential elements of Ben & Jerry's brand integrity for Ben & Jerry's ice cream to be sold in the West Bank, without prior approval of the Ben & Jerry's Independent Board;

      b.  Taking any further action with American Quality Products Ltd., or any other entity, that would permit the sale of Ben & Jerry's products or the use of Ben & Jerry's Marks in the West Bank without prior approval of Ben & Jerry's Independent Board;

      c.  Taking any action to cause the distribution or sale of Ben & Jerry's products or the use of Ben & Jerry's Marks in the West Bank without prior approval of Ben & Jerry's Independent Board;

      d.  Acting in any other manner that is contrary to Section 6.14 of the Merger Agreement without prior approval of Ben & Jerry's Independent Board.

2.      Entry of an Order that Unilever:

      a.  Dissolve any agreement that would cause the distribution or sale of Ben & Jerry's products or the transfer or use of Ben & Jerry's Marks in the West Bank; and

    b.   Take all steps necessary to prevent links between the Plaintiff and the Defendant's unilateral, illegal, and infringing decision.

3.    That Plaintiff be awarded its reasonable attorney's fees and costs; and

4.    Award any and all other relief that this Court deems just and proper.

Dated: July 5, 2022
New York, New York

Respectfully submitted,

**COHEN & GRESSER LLP**

By: <u>Mark Cohen</u>
Mark S. Cohen
Jeffrey I. Lang
Drew S. Dean
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514

**AHMAD, ZAVITSANOS & MENSING PC**

Shahmeer Halepota
John Zavitsanos (*pro hac vice* to be filed)
Joseph Y. Ahmad
Jane Robinson (*pro hac vice* to be filed)
Daryl Moore (*pro hac vice* to be filed)
Kelsi White (*pro hac vice* to be filed)
Thomas Frashier (*pro hac vice* to be filed)
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone:  (713) 655-1101
Fax:  (713) 655-0062

*Attorneys for Plaintiff Ben & Jerry's
Homemade, Inc.*

**VERIFICATION**

I, Anuradha Mittal, Chair of the Board of Directors of Ben & Jerry's Homemade, Inc., verify and affirm that I have reviewed the foregoing Verified Complaint, and believe that the facts stated therein are true and accurate to the best of my knowledge, information and belief.

I verify under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on <u>July 4, 2022</u>
           Date

*Anuradha Mittal*
_____
Anuradha Mittal
Chair of Board of Directors of
Ben & Jerry's Homemade, Inc