# Exhibit B

EXECUTION COPY

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of August 3, 2000, between CONOPCO, INC., a New York corporation ("Conopco" or the "Shareholder"), and BEN & JERRY'S HOMEMADE, INC., a Vermont close corporation (the "Company").

WHEREAS Conopco is the sole shareholder of the Company and wishes to further the Company's three-part mission through implementation of the governance structure as set forth in this Agreement;

WHEREAS pursuant to Section 6.15 of the Agreement and Plan of Merger dated as of April 11, 2000, as amended and restated as of July 5, 2000, among Conopco, Vermont All Natural Expansion Company and the Company (the "Merger Agreement") immediately prior to the Effective Time (as defined in the Merger Agreement) the Company contributed $5 million to the The Ben & Jerry's Foundation, Inc.;

WHEREAS pursuant to the provisions of the Merger Agreement, the Amended and Restated Articles of Incorporation (the "Articles of Incorporation") of the Company permit the shareholders of the Company to regulate the corporate powers and the management of the business of the Company and authorizes the limitation and restriction of the powers and functions of the Board of Directors of the Company (the "Company Board") in an agreement signed by all shareholders of the Company; and

WHEREAS in furtherance of such objectives, Conopco has elected to have the Company become a close corporation under the Vermont Business Corporation Act (the "Act") and to enter into this Agreement pursuant to Section 20.09 of the Act with the Company.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1. (a) This Agreement regulates the exercise of corporate powers and the management of the business and affairs of the Company and limits and restricts as provided herein the powers and functions of the Company Board. In the exercise of powers and the management of the business and affairs of the Company, the Company Board shall have only those powers and functions expressly granted to it in this Agreement. All other powers and functions are reserved to the Shareholder.

(b) The Shareholder hereby delegates authority to the CEO to manage the affairs of the Company, in the form of Exhibit A. The Shareholder shall review on an annual basis the proper scope of such delegation and shall make a new delegation to the CEO as of January 1 of each year. Within the scope of the authority delegated by the Company (through the action of the Shareholder pursuant to the exercise of the powers reserved to it herein) to the CEO, the CEO may act without obtaining the prior approval of the Shareholder or the Company Board. The Company Board shall not alter or challenge in any way the scope of any delegation of authority to the CEO.

(c) Decisions with respect to the appointment, compensation and removal of the CEO shall be made by Conopco after good faith consultation with, and the participation in discussions of, an advisory committee of the Company Board (the "Appointment Committee") consisting of Ben Cohen ("B.C.") and Jerry Greenfield ("J.G."); provided, however, that, if from time to time one or both of B.C. or J.G. is not a member of the Company Board, then a majority

of the Class I Directors then in office shall appoint one or two, as the case may be, Class I Directors or Class M Directors to the Appointment Committee.

(d) Subject to Sections 1(e) and 1(f), which place primary responsibility for Social Mission Priorities and the Essential Integrity of the Brand (each as defined below) with the Company Board, the Company shall be managed by the CEO in accordance with an annual business plan. Each year the CEO shall present a business plan for the following year to Conopco and the Company Board. Conopco and the Company Board, in good faith consultation with each other, shall review the proposed annual business plan and Conopco, the Company Board and the CEO shall use good faith efforts to reach agreement on such business plan. If such parties are unable to reach agreement on an annual business plan, the ultimate determination of such plan shall be by Conopco. Once adopted, the annual business plan may be modified following the principles set out in the previous two sentences.

(e) The Company Board shall have primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith ("Social Mission Priorities"). The Company Board shall work together with the CEO to integrate Social Mission Priorities into the business of the Company. The Company Board shall have an advisory committee (the "Social Venture Committee") that shall oversee the Social Venture Fund (as defined below) consisting of one Class M Director, appointed by a majority of the Class M Directors then in office, and B.C., or, if B.C. is not a member of the Company Board, J.G., or, if neither B.C. nor J.G. is a member of the Company Board, a Class I Director appointed by a majority of the Class I Directors then in office. Exhibit B contains an illustrative list of Social Mission Priorities of the Company as of the date hereof.

(f) The Company Board shall be the custodians of the Ben & Jerry's-brand image and shall have primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name (the "Essential Integrity of the Brand"). The Company Board shall work together with the CEO to provide that the business of the Company is conducted in a manner that preserves and enhances the Essential Integrity of the Brand. As part of this responsibility but subject to the provisions of this Agreement, the Company Board may prevent any action by the CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand.

(g) The Company and Conopco shall work together to develop and mutually agree to a set of measures of the social performance of the Company ("Social Metrics"). The Company, under the direction of the Company Board, shall seek to have the Social Metrics of the Company increase at a rate in excess of the rate of sales increases of the Company.

(h) The Company shall make contributions, for a minimum of ten years from the date of this Agreement, of $1.1 million per year adjusted annually (i) by multiplying such amount by the ratio of the U.S. Producer Price Index for the month of December of the year in which the determination is made to the U.S. Producer Price Index for December 1999 and (ii) by multiplying the product of such calculation by the ratio of the equivalent gallon sales of Products bearing the Principal Licensed Mark (each as defined in the License Agreement by and between the Company and Ben & Jerry's Homemade Holdings, Inc., on the one hand, and Unilever N.V. ("Unilever") and Unilever PLC, on the other hand, dated as of April 11, 2000 (the "License Agreement")), sold by any person in such year to the equivalent gallon sales of Products sold in 1999; provided, however, that such ratio shall never be less than one. To the extent that a material portion of the Company's business consists of activities other than the manufacture and sale of Products, as that term is defined in the License Agreement, as set forth in Section 2 below, Conopco and the Company shall agree on an appropriate equivalent measure of sales

volume for clause (ii) with respect to such non-Product activities. The Company Board shall have the responsibility for allocating annual contributions among The Ben & Jerry's Foundation, Inc. (the "Foundation"), local community charitable initiatives with the support and oversight of employee Community Action Teams and charitable institutions selected by the Office of the CEO. The Company Board may allocate a portion of such contributions to the Foundation so long as (i) the Foundation does not significantly change its charitable purpose, (ii) none of the trustees of the Foundation disparages the Company, its products or its management and (iii) any replacement or additional trustee of the Foundation is reasonably satisfactory to Conopco. After such ten-year period, the Company shall continue to make contributions as calculated in accordance with the first sentence of this Section 1(h) unless the activities and performance of the Foundation cease to be reasonably acceptable to Unilever and provided that the Foundation meets the other requirements set out in the previous sentence.

(i) Conopco shall not prevent the Company from fulfilling its obligations under this Section 1.

(j) Conopco shall have primary responsibility for the financial and operational aspects of the Company and the other aspects of the Company not allocated to the Company Board pursuant to this Section 1. Each member of the Company Board and all employees of the Company shall agree to abide by the Unilever Code of Business Conduct, and all employees of the Company shall agree to abide by Unilever's financial, accounting and legal procedures.

(k) The Company shall establish a new product development unit responsible for special projects to be headed by B.C., for so long as B.C. is a member of the Company Board and an employee of the Company. The role of such unit shall include the test-marketing of new products to a reasonable extent, provided that such test-marketing is performed in conjunction with the Company's marketing department to ensure that proper measures are utilized to determine the success or failure of such test-marketing.

(l) The rights, powers and authority of the Company Board are set forth in their entirety in this Agreement, and the Company Board shall not have any rights, powers or authority, express or implied, except as specifically set forth in this Agreement. All rights, powers and authority not specifically granted pursuant to this Section 1 are reserved to the Shareholder. This Agreement constitutes a shareholder agreement made and entered into in accordance with the provisions of 11A V.S.A. Section 20.09.

(m) The Company shall establish a fund (the "Social Venture Fund"), to be administered by the Social Venture Committee, to provide venture financing to (a) vendors owned by women, minorities or indigenous people, (b) vendors which give priority to a social change mission, and (c) such other third-party entrepreneurial businesses within the scope of the Company's Social Mission Priorities. The Company shall fund such entity pursuant to an agreement to be made between the Company and the Social Venture Fund on such terms and conditions as they and the Company shall approve. The Company shall make available to the Social Venture Fund an aggregate amount of $5 million. The terms of all venture financings approved by the Social Venture Committee to be made by the Social Venture Fund shall limit the financial responsibility of the Company in the aggregate to the foregoing cash contribution.

SECTION 2. Interpretation. When a reference is made in this Agreement to a Section or Exhibit such reference shall be to a Section of this Agreement unless otherwise indicated. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 3. Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so

long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

SECTION 4. Entire Agreement; No Third-Party Beneficiaries. This Agreement (a) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the matters set forth herein, and (b) is not intended to confer upon any person other than the parties any rights or remedies, except as set forth in the immediately succeeding sentence. The provisions of Article 7 of the Articles of Incorporation ("Article 7") relating to the removal of directors may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Article 7, and the provisions of Article 7 relating to the appointment of a director may be enforced by any individual who was a member of the Company Board immediately prior to the alleged breach of Article 7 or by any individual nominated for appointment in accordance with the provisions of Article 7 but not so appointed by the Shareholder.

SECTION 5. Governing Law. This Agreement and any dispute arising out of or relating to the transactions contemplated by this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

SECTION 6. Termination. This Agreement may only be terminated with the consent of the holders of all outstanding shares of the common stock of the Company. This Agreement will terminate automatically if the Company is no longer a "close corporation" under Chapter 20 of the Act.

SECTION 7. Enforcement. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any New York state court or any Federal court located in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity. In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any New York state court or any Federal court located in the State of New York in the event any dispute arises out of this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it will not bring any action relating to this Agreement in any court other than any New York state court or any Federal court sitting in the State of New York and (d) waives any right to trial by jury with respect to any action related to or arising out of this Agreement.

## EXHIBIT A

### Form of Delegation of Authority to CEO

1  Conopco and the Company Board retain authority with regard to the following matters, among others; as between Conopco and the Company Board the allocation of responsibility between them shall be as provided in Section 1 of this Agreement. References herein to "the Agreement" are to the Shareholders Agreement dated as of August 3, 2000:

(a) Approval on an annual basis for the upcoming year of:

 (i) the Company's Strategic and Operating Plan to include: Marketing, Sales and Social Mission
 (ii) the Financial Plan/Budget to include: Statement of Income, Balance Sheet and Statements of Cash Flows (including an Operating Budget, Statement of Projected Financial Positions, Balance Sheet and Flow of Funds Forecasts)
 (iii) the Capital Expenditure Budget and Operating Lease Budget
 (iv) the Company's draft and final audited financial statements
 (v) Trade Credit Policy: Conopco approval for Trade Credit extended to any customer in excess of $1 million

(b) Selection of

 (i) Corporate Counsel
 (ii) Independent Auditors

 Approval of

 (i) the principal Banking Institution(s) with which the Company maintains deposit, borrowing or other relationships
 (iii) any Investment Banking Institution
 (iv) Public Relations and Advertising Agencies
 (v) Consultants with a contract value in excess of $175,000 or to whom payments are expected to exceed $175,000 in the aggregate
 (vi) any insurance agent, broker or similar party

(c) Any transaction involving

 (i) the sale or encumbrance of assets with a book value over $100,000
 (ii) the sale of stock or assets of a subsidiary
 (iii) the acquisition of stock or assets of another company
 (iv) loans in excess of $30,000 made outside the ordinary course of business not to exceed $150,000 outstanding at any time
 (v) a single purchase of Inventory in excess of $5 million or any opening of Letters of Credit in excess of $2 million (in the aggregate of excess over and above $2 million or singular opening of Letter of Credit above $2 million)
 (vi) transactions with any parties related to any officer of the Company
 (vii) the sale or purchase of the Company's capital stock
 (viii) the declaration and payment of dividends
 (ix) the approval of any other contract (including all real property leases, joint venture, partnership or similar contracts with vendors) with a value in excess of $250,000 per year with terms not to exceed five years or any

        other non-ordinary course payment or purchase orders (including the settlement of litigation claims involving payments by the Company) in excess of $250,000

(d) Total compensation (including Bonuses) of any employees at or above the level of Officer and/or any other employees exceeding $200,000 annually.

(e) Employment termination or appointments of any employee with a base salary at or above $200,000.

(f) Any change in employee benefit plans with an annual aggregate cost increase in excess of $300,000.

(g) Any amendments of the By-laws of the Company.

(h) Any amendment or alteration of the borrowing authority of the Company or renegotiation, prepayment of or amendment to any lending arrangement.

(i) Approval of authorized signatures and signing authorities on all bank accounts for check signing, money transfer authorities, etc.

(j) The delegation of authority to individuals other than officers (e.g., buyers) of the Company to execute contracts or other agreements on behalf of the Company.

(k) Any amendment or new collective bargaining or other labor agreements.

(l) all matters not covered by the delegation in Section 2 below and any matters requiring, as a matter of law, a specific vote of the Board of Directors or of the Shareholder, pursuant to the powers reserved to the Shareholder under the Agreement, as the case may be, in addition to the votes establishing the below delegation.

2    The Company, by action of the Shareholder pursuant to the exercise of the powers reserved to it in the Agreement, delegates to the Chief Executive Officer the authority to set upon the following matters with the required written concurrence of the Chief Financial Officer:

(a) Capital Expenditures within the Capital Budget up to $700,000 per project; provided, that the total value of capital expenditures does not exceed the amount authorized in the Budget.

(b) Capital Expenditures not in the Capital Budget up to $350,000 per project, but not over $750,000 in the aggregate. In no event will total capital expenditures exceed the total value of capital expenditures authorized in the Capital Budget.

(c) Disposal or encumbrance of assets with a book or fair market value of no more than $150,000 per transaction.

(d) Operating Leases within Operating Lease Budget up to a total commitment of $500,000 per transaction.

(e) Operating Leases not in Operating Lease Budget, with a total commitment of $150,000 per year in total commitment per lease with a term not to exceed five years, but not over $450,000 annually in the aggregate.

    (f)    Administration of the details of the Company's Compensation Program (applying its general compensation philosophy as previously developed) for all employees (other than those covered in 1(c) above).

    (g)    Administration of the Employees Benefit Program, including approval of changes with an aggregate annual cost up to $300,000.

    (h)    a.    Execution of contracts within the ordinary course with an individual value of up to $500,000 that do not require special approval by 1(c) above.

            b.    Other non-ordinary payments in an amount up to $150,000 that also do not require special approval by 1(c) above.

3    Conopco and the Company will be provided with a comprehensive review of the following matters by the Chief Executive Officer, or other members of the management on a regular basis, or more often if issues create the need:

    (a)    As soon as practical:

        (i)    Status of material tax matters as they arise.
        (ii)    Status of material legal matters as they arise.
        (iii)    Any material change in vendor relations.
        (iv)    Any material change in the operating or financial performance of the Company.
        (v)    Any contact made by potential buyers who may be interested in purchasing the Company and/or its assets.
        (vi)    Notices of default or acceleration under loan agreements, notes or significant contract.

    (b)    Monthly:

        (i)    Financial and operating results, including managements analysis in writing
        (ii)    Update/reconciliation of actual vs. budgeted Capital expenditures.

    (c)    Quarterly:

        (i)    Status of legal matters
        (ii)    Competition update
        (iii)    Information systems
        (iv)    Report on all banking relationships
        (v)    Product Quality

    (d)    Annually:

        (i)    Independent accountant management letters
        (ii)    Other tax matters
        (iii)    Officers salary, bonus and wages adjustment recommendations
        (iv)    Property/Casualty and employee benefit insurance programs
        (v)    Advertising and Public Relations programs
        (vi)    Officer performance appraisals
        (vii)    Union relationships

## EXHIBIT B

### Ben & Jerry's Social Mission Priorities

The following list contains certain Social Mission Priorities of the Company as of the date hereof. Following each priority is an example of the Company's current activities and views.

1. *Continue packaging improvement efforts with the ultimate objective of achieving a compostable pint.*

   Early in 1999 the Company launched the eco-pint. The Company has transitioned one-third of its pint packaging to "unbleached" kraft paper with a nontoxic coating on the outside. With paper bleaching being one of the largest causes of dioxins and toxic water pollution in the United States this initiative is a step in the right direction. The packaging, which is brown inside has been well received. The Company will continue to seek to create the economic and market conditions for suppliers to cost effectively produce this packaging. Efforts will also continue to research other technologies to achieve a fully compostable package (e.g., starch based packaging, alterative glues and inks).

2. *Continue the ongoing compliance with CERES principles and efforts toward creation of a sustainability "footprint" for the business.*

   The Company was the first public company to adopt the CERES principles ("Coalition for Environmentally Responsible Economies"). It has filed an annual, public environmental report with CERES. At the present time the Company is reviewing CERES compliance with our manufacturing operations in Canada and Israel.

   The Company is engaged in a process of documenting its environmental "footprint". Simply stated, this is a process of analyzing hat we take, what we make, and what we waste. We have a strong environmental ethic across the Company that will continue to be encouraged and supported. Specific and continual improvement goals in wastewater, solid waste and energy use reduction are a regular part of our annual planning process. We compost dairy waste, recycle shrink wrap and cardboard and recently initiated an innovative program with a few of our suppliers to receive ingredients in returnable totes.

3. *Continue sustainable agriculture efforts.*

   We define sustainable agriculture as a continuum of agricultural production practices that meet the objectives of reducing environmental degradation, maintaining the productivity of the land over time and promoting economic viability for the farm and rural communities.

   We have determined that as a food business, reliant on dairy farming, our priority must be to reduce adverse impacts on water from farm run-off. Struck by the polar debate between outmoded, traditional farming methods on one end and organic farming on the other, we have launched an innovative project to provide greater sustainability gains at the farm level, especially through reduced phosphorous and nitrogen run-off, through a Whole Farm Nutrient Management Program. We are using a model developed at Cornell University that has proven to yield both environmental and economic gains. Planning for a pilot project with the St. Albans Cooperative, Cornell University, the University of

Vermont and the State Agriculture Department is underway.

4   *Continue the long-term relationship with the St. Albans Cooperative.*

All our milk and cream is provided by the 500+ family farm members of the St. Albans Cooperative. Vermont has been losing dairy farms at an alarming rate. Farming is a cornerstone of the Vermont economy. Many of the farms of the St. Albans Cooperative surround St. Albans Bay, an environmentally fragile part of Lake Champlain.

5   *Continue the brand's position of opposing the use of rBGH and continue the "We oppose rBGH" pledge and premium.*

The Company opposes the use of rBGH (recombinant bovine growth hormone) which is injected in cows to increase milk production. With no shortage in the milk supply, rBGH is in our view a biotechnological solution to a problem that does not exist. In addition, as the manufacturer's production information notes rBGH causes increased mastitis and other health problems for cows.

When the FDA approved rBGH they allowed voluntary labeling but left the issue of a labeling standard and decision to the states. Our label says: "We oppose recombinant bovine growth hormone. The family farmers who supply our milk and cream pledge not to treat their cows with rBGH. The FDA has said no significant difference has been shown and no test can distinguish between milk from rBGH treated and untreated cows." Despite our use of the FDA disclaimer, four states refused our label (Illinois, Nevada, Hawaii and Oklahoma). Because we felt strongly that our customers had a right to know how our products are produced and because we were making a truthful statement on our label, we brought a First Amendment commercial free speech lawsuit against the State of Illinois. This suit was eventually settled in our favor, and we have carried the above-noted label on our products since 1997.

6   *Support the brand's position to have GMO free products available.*

We believe being GMO free is consistent with our brand image and values. We have been following the backlash against GMO food that is occurring around the world and view this as much as a political movement as a scientific one. We believe there should be more public input into GMO food policy issues, and impacts on ecosystems need to be more fully studied. We also recognize that biotechnology could be used to help feed desolate parts of the world. We are working on reformulating an alternative sourcing for potential GMO corn or soy ingredients in our products starting with products for international markets. Consistent with our activities around rBGH, we support labeling and consumers right to know how their food is produced.

7   *Continue to expand and support the Company's unique PartnerShop Program.*

We have eight existing PartnerShops. We intend to greatly expand this program under which Ben & Jerry's ScoopShops are owned and operated by nonprofits. In general, the model works best with programs that serve youth. The most celebrated of our stores is the PartnerShop in Times Square. It is owned and operated by Common Ground, a New York City nonprofit organization focused on housing and training for people without homes or needing support. The store played a role in the renovation of Times Square to a more family friendly neighborhood and has been featured on "60 Minutes" and in numerous other media outlets. In the PartnerShop Program the Company waives the franchise fee and allocates more staffing and resources.

8   *Continuation of innovative purchasing relationships as well as consideration of*

*further development of sourcing relationships consistent with our social mission and goals.*

We have used procurement and licensing agreements to further social and environmental goals. Since 1988, the Greyston Bakery in Yonkers, New York, has been a supplier of brownies. The bakery is owned by the Greyston Foundation, a provider of numerous social services in Yonkers, New York. These include housing for homeless people and for people with AIDS, day care and work programs. We are consulting with the bakery in the relocation and expansion of its operating facility and in developing additional customers for its products. Aztec Harvest Cooperative, a worker-owned cooperative, provides our coffee extract. In conjunction with our vanilla supplier, the Virginia Dare Company, we use a blended vanilla extract that includes vanilla beans from a Costa Rican organization that works on rain forest renewal. In addition to other social and environmental usefulness, these relationships usually create stories that enhance the brand image of the Company.

We also see licensing as an opportunity to fulfill a social purpose. For example, we pay a licensing fee to the band Phish for Phish Food with the fee directed to a foundation that supports projects to cleanup Lake Champlain. We seek to source both licensed and other products that we sell in our stores in a socially responsible manner.

9. *Provide ongoing support for Partnerships with Non-profits.*

In the past we have worked with The Children's Defense Fund and Greenpeace. We tend to work with groups that are not likely corporate partners whose focus is on issues of environmental degradation or social injustice and poverty.

10. *Continue ongoing contribution for philanthropy and support for site community projects.*

The Company currently donates a portion of its pre-tax profits through employee-led philanthropy to non-profit organizations committed to positive social change. This contribution was $1.1 million in the aggregate in 1999.

11. *Continue the Social Audit/Assessment and Reporting.*

The Company sets annual social mission goals as part of the annual planning process and conducts a social audit around its performance. The audit is completed internally with an outside auditor retained to review and report on results. The complete social performance assessment is published in our annual report. We have for the past 11 years conducted social performance assessments.

## Addendum

The following list contains certain further aims. It is the current intention of Conopco, subject to economic viability, to conduct the business of the Company in a manner consistent with the following aims. Economic viability shall be as mutually agreed in good faith by the Company Board and Conopco.

(i) significant women and minority representation on the Company Board;

(ii) affirmative programs to identify and provide technical assistance to vendors owned by minorities and indigenous peoples;

(iii) affirmative programs to identify and to provide financial and technical assistance to

vendors which give priority to a social change mission;

(iv) the expansion of the number of PartnerShops and franchises owned by women, minorities and indigenous peoples;

(v) the Company's headquarters and primary production facilities remaining in Vermont;

(vi) the purchase of non-RBGH milk and cream primarily from Vermont farms;

(vii) the use of unbleached and recyclable packaging, to the extent available at commercially reasonable prices;

(viii) the purchase of key commodities (such as vanilla, coffee and cocoa) according to fair trade practices, to the extent available at commercially reasonable prices; and

(ix)   the continued advocacy of positive social changes on packaging, such as non-partisan campaign finance reform, national budget priorities, sustainable energy etc.

IN WITNESS WHEREOF, the Shareholder and the Company have duly executed this Agreement, each as of the date first written above.

CONOPCO, INC.,

by: _____
Name: Mart Laius
Title: Vice President

BEN & JERRY'S HOMEMADE, INC.,

by: _____
Name: Perry D. Odak
Title: Chief Executive Officer