# Exhibit K

v-05681-ALC Document 1-11 Filed 07/05/22



# Brad Edmondson

# ICE CREAM SOCIAL

## The Struggle for the Soul of Ben & Jerry's

Foreword by Annie Leonard

Epilogue by Jeff Furman, Chairman, Ben & Jerry's Board of Directors

# ICE CREAM SOCIAL
## The Struggle for the Soul of Ben & Jerry's

### Brad Edmondson

Foreword by Annie Leonard
Epilogue by Jeff Furman, Chairman,
Ben & Jerry's Board of Directors



Berrett–Koehler Publishers, Inc.
San Francisco
*a BK Business book*

Ben & Jerry's also took steps in 1999 to integrate the social mission into its overseas operations. It adopted global operating guidelines aimed at protecting the brand's image and the three-part mission in other countries. The company said it would look at each country's human-rights record and take steps to address any issues, and it would also try to express its activism in ways that respected local cultures. "We tried to imagine how we would translate the mission to other countries back then," said Helen Jones. "We had so few resources that we didn't really have a chance to test our theories. But we talked about all kinds of things."

At the end of 1999, the company tried to tie all these ideas together at a higher level. Senior employees from the international division joined others from marketing, purchasing, public relations, research and development, information systems, finance, human resources, retail operations, sales, environmental, and the Ben & Jerry's Foundation in an interdepartmental values council, which was charged with reviewing the company's progress on social initiatives, generating new ideas, and encouraging cross-departmental cooperation. The council's first quarterly meeting happened in December.

Also in 1999, a national survey found that Ben & Jerry's was one of the best-regarded companies in the United States. The public gave it the fifth-best reputation in the country, which was particularly significant because the top four finishers (Johnson & Johnson, Coca-Cola, Hewlett-Packard, and Intel) were so much larger. Coca-Cola probably spent more on public relations than Ben & Jerry's spent on salaries. Ben & Jerry's was a small company whose impact was huge.

In the 1999 annual report, social auditor James Heard said, "Ben & Jerry's most impressive achievement regarding its social mission is the way in which it has institutionalized the company's values into decision-making. The company's

The rest of the meeting hadn't been any fun, either. The company was losing market share to Häagen-Dazs. Dreamery was expected to take away more market share, starting immediately. The company's distribution agreement with Dreyer's had just expired, and after thirteen years, it was not renewed. The stores Dreyer's had serviced would be covered temporarily by Ice Cream Partners, but this was not a viable long-term plan. The company's sales director had been researching alternative forms of distribution. He reported that a patchwork system of smaller distributors would have big gaps, and filling in those gaps would be expensive. Switching to a warehouse distribution system would probably mean significant declines in product quality, as well as a 40 percent decline in sales.

Richard Goldstein, the chief of Unilever North America, said that the social mission and the split on the board of directors "came up in my early discussions with Perry. When he explained to me the complexity of the situation, and the social mission, and the this and the that, I had to go through an educational process. I really had to spend some time understanding what we were talking about."

Goldstein knew that the company's value would be greatly reduced if he could not gain the support of its charismatic cofounders. "Without Ben and Jerry, the company would not be worth buying," he said. But he also needed to craft a deal that would get past his bosses in London and Rotterdam. "I did a considerable number of acquisitions for Unilever," he said. "The Ben & Jerry's acquisition was fairly small, relative to the other companies we bought, but it took me almost two years. I never did another deal that was remotely like it."

Vermont-based corporation, and Unilever does not control every aspect of its operation. Ben & Jerry's has a three-part mission, and Unilever controls the economic part. The product quality and social missions are still largely controlled by the independent board of Ben & Jerry's Homemade, Inc.

It's a unique arrangement and a hard one to describe, which is why almost everyone missed it. It was much easier to believe the standard story of a big soulless company gobbling up a small, plucky firm, belching contentedly, and continuing on its relentless path. After all, that is what happened to the Body Shop, Aveda, Horizon Organics, Odwalla, Cascadian Farm, and many other socially responsible businesses founded in the 1970s and 1980s. But the people who work for Unilever are not soulless, and Ben & Jerry's did not surrender unconditionally. They kept trying.

**Soap and Margarine**

"The only reason we were successful in this acquisition is because Ben and Jerry became convinced that Unilever would honor its word," said Goldstein. "There was no point in buying the brand unless we could get the founders to agree that this is what they wanted." So in those early meetings, he listened and kept his position flexible.

Goldstein and Unilever had several advantages over Dreyer's, their chief rival in the competition for Ben & Jerry's. First, the long business relationship between Dreyer's and Ben & Jerry's had not exactly been warm or friendly. "When Dreyer's first made their offer in 1998, their guy read to us from a sheet of handwritten notes on a yellow pad," said Pierre Ferrari. "He made promises about the social mission that were very specific." But they didn't ring true. After more than a decade of haggling over distribution agreements and fact-checking business practices, Ben and his allies were convinced that a merger with Dreyer's would be strictly

**Shaping the Sale Agreements**

After Ben and Dick Goldstein had agreed in principle, Goldstein went to see the chief counsel of Unilever USA, Ronald Soiefer. "He told me I was going to work on this acquisition, and that it was going to be complicated," Soiefer said. "He said the job was to collaborate with them to create a governance structure that would set our bid apart from any others."

It wasn't hard to figure out each side's goals. Unilever mainly wanted to buy the company and operate it in a way that was consistent with their policies, said Soiefer. They also needed to retain the loyalty of Ben & Jerry's customers, win the competition with Dreyer's, and overcome the general suspicion some Ben & Jerry's board members felt toward multinational corporations. A contract that protected the three-part mission might help achieve the last three goals without interfering with the main ones.

Ben & Jerry's wanted to stay independent, but if that was impossible, the company wanted to preserve its historical mission and the integrity of the brand forever. "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses," Soiefer said. "The board of Ben & Jerry's is not going away. They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent. It isn't like Unilever can run out the clock."

The legal structure Soiefer suggested was a "close corporation." "It's basically a corporation that has only one stockholder," said Howie Fuguet, the lawyer for Ben & Jerry's. "And in the case of Ben & Jerry's, the stockholder grants certain powers to the board. One of the board's powers is to appoint new members without the shareholder's approval. This means that the shareholder can never fire the board." These non-Unilever directors control nine of the board's eleven seats.

and they call upon Unilever to develop its own system of social assessments.

The agreements require Ben & Jerry's to maintain a corporate presence and substantial operations in Vermont for at least five years, and they prohibit layoffs and benefit cuts for two years. They require Unilever to contribute $1.1 million a year to the Ben & Jerry's Foundation, plus adjustments to ensure that its contribution will increase in step with inflation and increased sales. They call for a new product development unit to be headed by Ben Cohen for as long as he remains a member of the board and an employee of Ben & Jerry's. And they require all board members and employees to sign Unilever's Code of Business Conduct and abide by the company's financial, accounting, and legal procedures. This provision puts boundaries on how Ben & Jerry's people do their jobs, and what they can and can't say about their jobs in public.

It took a long time to settle on these points. "It was by far the most unique deal I have ever been involved in," said Goldstein. "When we were getting toward the end of it, Ben used to call me at home at all hours. My wife would answer the phone and he'd say 'Yo, it's Ben.' She'd say, 'Ben, he's traveling. I'm going back to sleep.' And after we signed the deal, Jerry and his wife asked my wife and me to come to their house for dinner. I can't remember ever doing something like that. I was flattered."

On January 25, Unilever sent the board a cash offer of $36 a share, with an offer to sign the sale agreements as a sweetener. But Ben and Terry Mollner were still looking for a funder for their preferred plan to take Ben & Jerry's private. They had found a prospect in Todd Berman, who ran a venture fund called Chartwell Investments. Berman had no interest in the social mission. In fact, he was exactly the kind of guy Ben gave speeches against. In 2005, Berman was even