**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BEN & JERRY'S HOMEMADE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-05681 |
| | ) | |
| CONOPCO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY**
**INJUNCTIVE RELIEF**

Ben & Jerry's Homemade Inc., ("Ben & Jerry's" or "Plaintiff") submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunctive relief to preserve the status quo (the "Application"). The Application is supported by the Declaration of Bennett "Ben" Cohen, dated July 4, 2022 ("Cohen Decl."); the Declaration of Jerry Greenfield, dated July 4, 2022 ("Greenfield Decl."); the Declaration of Jennifer Henderson, dated July 4, 2022 ("Henderson Decl."); the Declaration of Andy Ross, dated July 3, 2022 ("Ross Decl."); and the Declaration of Drew Dean ("Dean Decl."), dated July 5, 2022, all of which have been filed concurrently with the Application.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ 3

I.    INTRODUCTION ............................................................................................... 4

II.   FACTUAL BACKGROUND ............................................................................. 5

    A.   From its founding, Ben & Jerry's Social Mission has been integral to the company's identity. .............................................................................................5

    B.   For two decades, Unilever and the Independent Board work cooperatively under the Merger Agreement. ...........................................................................6

    C.   On June 29, 2022, Unilever unilaterally announced a transfer of Ben & Jerry's trademark and brand rights, usurping the Independent Board's authority as "custodians" of the brand:  a violation of the Merger Agreement and Shareholder Agreement. .....................7

III.  STANDARD FOR INJUNCTIVE RELIEF ...................................................... 8

IV.   ARGUMENT ...................................................................................................... 9

    D.   Ben & Jerry's is entitled to injunctive relief to enforce the Merger Agreement. .............9

    E.   Ben & Jerry's is entitled to a temporary restraining order and preliminary injunction to preserve the status quo and its essential brand integrity....................................................10

        1.   Unilever breached the Merger Agreement and the Shareholders Agreement. ........ 10

        2.   Ben & Jerry's will suffer irreparable harm if the Transaction is not enjoined ........ 15

        3.   The balance of hardships favors Ben & Jerry's ...................................................... 17

        4.   Preserving Ben & Jerry's right to control its brand will serve the public interest... 17

    F.   Either no bond or a nominal bond is appropriate in this case. ......................................19

V.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broker Genius, Inc. v. Volpone*,
  313 F. Supp. 3d 484 (S.D.N.Y. 2018) ..................................................................... 9

*Corning Inc. v. PicVue Elecs., Ltd.*,
  365 F.3d 156  (2d Cir. 2004). ............................................................................. 19

*Dong v. Miller*,
  2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018)................................................. 8, 9, 17

*Greendige v. Allstate Ins. Co.*,
  No. 02-cv-9796 (JCF), 2003 WL 22871905 (S.D.N.Y. Dec. 3, 2003),.................... 17

*Gucci America, Inc. v. Weixing Li*,
  768 F.3d 122 (2d Cir. 2014) ................................................................................ 8

*Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*,
  754 F. Supp. 2d 616 (S.D.N.Y. 2010) ............................................................. 19, 20

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995). ............................................................................. 15, 16

*U.S. Nonwovens Corp. v. Pack Line Corp.*,
  4 N.Y.S.3d 868 (Sup. Ct. Suffolk Cnty. 2015) ...................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................... 8

**Legislation, Statutes, and Rules**

Federal Rule of Civil Procedure 65 ....................................................................... 8, 19

## I.    INTRODUCTION

Since its founding in 1978, Ben & Jerry's has always been a unique company.  Unlike most ice-cream companies, Ben & Jerry's does not simply focus on quality and profit; instead, Ben & Jerry's spends considerable resources and effort on trying to "make the world a better place."  It is this "Social Mission" that has turned Ben & Jerry's into a household name and one of the most beloved companies in the United States.  Because of Ben & Jerry's reputation and loyal following, Defendant Unilever sought to acquire the company in 1999.  After nearly a year and a half of negotiations, Ben & Jerry's agreed to a merger in April 2000, but only after Unilever agreed to include certain contractual provisions safeguarding Ben and Jerry's brand integrity.

Like Ben & Jerry's, the parties' Merger Agreement was unique.  As a condition of the merger, Ben & Jerry's founders insisted on the inclusion of explicit language to ensure the brand's integrity was not diluted.  That language appears in Section 6.14 of the Merger Agreement, which provides that an Independent Board of Directors ("Independent Board") would retain certain clearly delineated authority post-merger.  (*See* Cohen Decl., Exh. 1 (Merger Agreement), § 6.14.) Specifically, the Independent Board would serve as "the ***custodians*** of the Ben & Jerry's brand image" and would have "***primary responsibility*** for ***safeguarding*** the integrity of the essential elements of the Ben & Jerry's brand-name." (*Id.* § 6.14(f).)  Furthermore,  "[T]he Company Board may prevent any action by the CEO in the licensing or other use of the Ben & Jerry's trademark that . . . a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand." (*Id.*)  Pursuant to the terms of the Merger Agreement, the parties

executed a Shareholders Agreement dated August 3, 2000, which adopted the scope and delegation of authority agreed to in Section 6.14.  (*See* Cohen Decl., Exh. 2 (Shareholders Agreement), § 1.) [1]

Despite the Merger Agreement's clear delegation of authority to the Independent Board, Unilever announced on Wednesday, June 29, 2022 that it had unilaterally entered into a transaction transferring certain rights to Ben & Jerry's brand to an unapproved third-party.  Not only does Unilever's conduct constitute a breach of the Merger Agreement, it also usurps the Independent Board's authority over Ben & Jerry's brand integrity, reputation, and goodwill.  Unilever's unauthorized transfer—which would cause the Independent Board to lose control over the brand they have "primary responsibility for safeguarding" and are the "custodians" of—poses an imminent threat of irreparable injury unless immediate temporary relief is granted.

## II.     FACTUAL BACKGROUND[2]

### A. From its founding, Ben & Jerry's Social Mission has been integral to the company's identity.

Soon after they founded Ben & Jerry's in 1978, Ben Cohen and Jerry Greenfield decided that they wanted their company to have a positive impact on society.  (*See* Greenfield Decl. ¶¶ 4-5.)  What ensued was a four-decade commitment to social activism, from causes such as LGBTQ+ rights and climate change to campaign finance reform and Black Lives Matter.  (*See id.* ¶ 9; Cohen Decl. ¶ 14.)  Eventually, Ben & Jerry's became known as the "gold standard" for corporate activism.[3]

---

[1] In connection with any disputes arising under the Merger Agreement or the Shareholders Agreement, Unilever consented to the jurisdiction of the Court.  (*See* Cohen Decl., Exh. 1, § 9.10; Cohen Decl., Exh. 2, § 7.)

[2] While a fulsome background of facts is detailed in Ben & Jerry's Complaint, which Ben & Jerry's incorporates by reference, key facts relating to this case are briefly restated in this memorandum.

[3] *See* Compl. Exh. F, Alison Beard, *Why Ben & Jerry's Speaks Out* (Jan. 13, 2021) (https://hbr.org/2021/01/why-ben-jerrys-speaks-out).

Ben & Jerry's social integrity resonated with customers.  In 1999, a national survey found that Ben & Jerry's was ranked fifth amongst *all* companies in the United States in terms of reputation, a startling fact given that "the top four finishers (Johnson & Johnson, Coca-Cola, Hewlett-Packard, and Intel) were so much larger."[4]  This loyal following made Ben & Jerry's attractive to potential suitors, including Defendant Unilever.

In April 2000, after nearly a year and a half of negotiations, Ben & Jerry's agreed to a Merger Agreement, but only after Unilever inserted specific provisions "safeguarding" the brand's integrity via an Independent Board of Directors.  (Cohen Decl. ¶¶ 5-8; *see also* Henderson Decl. ¶¶ 9-11.)  Consistent with the terms of the Merger Agreement, the parties entered into a Shareholders Agreement, which formally delegated to Ben & Jerry's Board of Directors authority for: (i) "preserving and enhancing the historical social mission of the Company as they may evolve from time to time consistent therewith ('Social Mission Priorities')"; and (ii) "safeguarding the integrity of the essential elements of the Ben & Jerry's brand name ('Essential Elements of the Integrity of the Brand')."  (*See* Cohen Decl., Exh. 2, § 7.)

**B. For two decades, Unilever and the Independent Board work cooperatively under the Merger Agreement.**

Following the parties' merger, the Independent Board of Directors and Unilever worked together cooperatively for years.  (Henderson Decl. ¶ 13.)  For instance, in 2008, the Ben & Jerry's CEO—a Unilever appointee—proposed to close the Ben & Jerry's plant in Waterbury, Vermont, which was the Company's first factory, built in 1985.  The closure of that plant would have devastated the local economy.  (*Id.* ¶ 14.)  The Independent Board determined that the planned closing of the Waterbury plant was inconsistent with the company's Social Mission and expressed

---

[4] Compl. Exh. K, BRAD EDMONSON, ICE CREAM SOCIAL:  THE STRUGGLE FOR THE SOUL OF BEN & JERRY'S 150 (2014).

its objection to Unilever.  (*Id.*)  Unilever respected the Independent Board judgment and shelved the plant closing.  (*Id.*)  Today, Waterbury is one of the Company's most efficient plants.

Similarly, in the summer of 2021, after a thorough investigation (including the appointment of a special committee and a fact-finding mission), the Independent Board determined that it would be inconsistent with the essential elements of Ben & Jerry's brand integrity to continue selling its products in the West Bank.   In response, Unilever issued a public statement declaring that it had "*always recognised the right* of the brand and its independent Board to take decisions about its social missions."[5] (emphasis added.)

After Ben & Jerry's distributor in the West Bank sued the company and Unilever over the Independent Board's decision, Unilever continued to recognize the Independent Board's authority. Specifically, in April 2022, Unilever emphasized in public court filings that Ben & Jerry's "would clearly be harmed if forced to provide a license [to the distributor] against its will."[6] These Unilever statements simply acknowledged what Unilever and Ben & Jerry's had agreed to in their Merger Agreement and in the Shareholders Agreement:  a unique corporate structure which had governed their 22-year relationship.

**C. On June 29, 2022, Unilever unilaterally announced a transfer of Ben & Jerry's trademark and brand rights, usurping the Independent Board's authority as "custodians" of the brand:  a violation of the Merger Agreement and Shareholder Agreement.**

On Wednesday, June 29, 2022, Unilever abruptly reversed course, announcing that Ben & Jerry's "will be sold" in the West Bank and that certain elements of the Ben & Jerry's brand were

---

[5] *See* Compl. Exh. C, "Unilever statement on Ben & Jerry's decision." https://www.unilever.com/news/press-and-media/press-releases/2021/unilever-statement-on-ben-and-jerrys-decision/
[6] *See* Compl. Exh. D, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 5.

being transferred to a third-party distributor (the "Transaction.").[7]  Unilever's unilateral decision was made without the consent of Ben & Jerry's Independent Board, the entity contractually empowered to protect Ben & Jerry's brand.  On Friday, July 1, 2022, the Independent Board—as "custodians" of the Ben & Jerry's brand, tasked with "safeguarding" the brand's integrity—called a special meeting to address Unilever's actions.  By a majority 5-2 vote (with only the two Unilever appointees dissenting), the Independent Board passed a resolution authorizing the present action and request for emergency relief.[8]

### III.    STANDARD FOR INJUNCTIVE RELIEF

This Court has "inherent equitable authority" to issue preliminary injunctive relief where, as here, the plaintiff is "pursuing a claim for final equitable relief and the preliminary injunction is ancillary to the final relief."  *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 130–31 (2d Cir. 2014) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 219–20 (1945)).  Federal Rule of Civil Procedure 65 authorizes a preliminary injunction where a plaintiff "establish[es] [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Courts in this Circuit view these requirements holistically. Thus, "[i]n the Second Circuit, a movant may obtain a preliminary injunction" even if its likelihood of success on the merits is unclear, if it demonstrates "the existence of 'serious questions going to the merits to make them a fair ground for litigation'" and "'a balance of hardships tipping decidedly toward the party

---

[7] *See* Compl. Exh. E, "Unilever reaches new business arrangement for Ben & Jerry's in Israel" https://www.unilever.com/news/press-and-media/press-releases/2022/unilever-reaches-new-business-arrangement-for-ben-jerrys-in-israel/.
[8] *See* Compl. Exh. J, Resolutions of the Board of Directors of Ben & Jerry's Homemade, Inc., dated July 1, 2022.

requesting the preliminary relief." *Dong v. Miller*, 2018 WL 1445573, at *5 (E.D.N.Y. Mar. 23, 2018) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).  "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent." *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

## IV.    ARGUMENT

### D.  Ben & Jerry's is entitled to injunctive relief to enforce the Merger Agreement.

Section 9.10 of the Merger Agreement grants Ben & Jerry's the right to injunctive relief and specific performance to enforce its rights under the Merger Agreement:

> The parties agree that ***irreparable damage*** would occur in the event that any of the provisions of any Transaction Agreement were not performed in accordance with their specific terms or were otherwise breached.  [T]he parties ***shall be entitled to an injunction*** or injunctions to prevent breaches of any Transaction Agreement and to enforce specifically the terms and provisions of each Transaction Agreement . . ..

Cohen Decl., Exh. 1 (Merger Agreement), § 9.10 (emphasis added).

As explained in greater detail below, Unilever's unilateral attempt to enter the Transaction is a breach of the Merger Agreement and the Shareholders Agreement in three ways.  First, it is a breach of the terms giving the Independent Board control over the essential integrity of Ben & Jerry's brand and its Social Mission.  *See* Merger Agreement, §§ 6.14(e)-(f); Shareholders Agreement §§ 1(e)-(f).  Second, it breaches the provisions of the Merger Agreement and Shareholders Agreement that expressly provide the Independent Board with veto powers over uses of the Ben & Jerry's brand that are inconsistent with the essential integrity of the company.  *See*

Merger Agreement, § 6.14(f); Shareholders Agreement § 1.(f).[9]  Finally, it breaches the provisions

of the Merger Agreement and Shareholders Agreement pursuant to which Unilever agreed that it

"shall not prevent [Ben & Jerry's] from fulfilling its obligations" with respect to the essential

integrity of the brand and its Social Mission. *See* Merger Agreement, § 6.14(i); Shareholders

Agreement § 1(i).  By violating Ben & Jerry's right to this independence and control, Unilever has

breached the Merger Agreement and the Shareholders Agreement.  Ben & Jerry's is accordingly

entitled to emergency relief per the plain terms of Section 9.10 of the Merger Agreement, and

Section 7 of the Shareholders Agreement.

### E. Ben & Jerry's is entitled to a temporary restraining order and preliminary injunction to preserve the status quo and its essential brand integrity.

Every factor for preliminary injunctive relief weighs in favor of Ben & Jerry's request for

an order preserving the status quo and the essential integrity of the Ben & Jerry's brand.

Accordingly, the Court should enter a temporary restraining order and preliminary injunction

enjoining Unilever from violating Section 6.14 of the Merger Agreement and Section 1 of the

Shareholders Agreement; from executing the Transaction; and from taking any action to further the

Transaction.

### 1.  Unilever breached the Merger Agreement and the Shareholders Agreement.

Under New York law, the elements of a breach of contract claim are (1) formation of a

contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to

---

[9] Merger Agreement, § 6.14 (f) provides: "The Company Board shall work together with the CEO to provide that the business of the Surviving Corporation is conducted in a manner that preserves and enhances the Essential Integrity of the Brand. As part of this responsibility, **the Company Board may prevent any action** by the CEO in the areas of new product introduction, the changing of product standards and specifications, **the approval of the content of marketing materials and the licensing or other use of the Ben & Jerry's trademark** that, in each case, a majority of **the Company Board** reasonably **determines to be inconsistent with the Essential Integrity of the Brand**." Similar language appears in Section 1.(f) of the Shareholders Agreement.

perform; and, (4) resulting damage.  *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 871 (Sup. Ct. Suffolk Cnty. 2015).

Here, there is no dispute that the parties entered into the Merger Agreement, that the parties adopted the Shareholders Agreement pursuant to the requirements of the Merger Agreement,  and that both parties have performed under both Agreements for the last two decades.  (*See* Henderson Decl. ¶¶ 13-15.)  But, as explained below, there is also little question that Unilever's recent actions breached the Merger Agreement and the Shareholders Agreement, causing damage to Ben & Jerry's.

> *a.  Unilever breached the express terms of the Merger Agreement.*

Section 6.14 of the Merger Agreement vests primary responsibility for the Ben & Jerry's brand image with the Independent Board, and authorizes the Independent Board to act when the essential integrity of the brand is threatened:

> The Company Board shall be the ***custodians*** of the Ben & Jerry's-brand image and shall have ***primary responsibility for safeguarding*** the integrity of the essential elements of the Ben & Jerry's brand-name (the "Essential Integrity of the Brand").  . . .  [T]he Company Board ***may prevent*** any action by the CEO in the licensing or other use of the Ben & Jerry's trademark that . . . a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand.

Cohen Decl., Exh. 1 (Merger Agreement), § 6.14(f) (emphasis added).

In addition, pursuant to Section 6.14(e) of the Merger Agreement, the Independent Board has "primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company . . ."  *Id.* § 6.14(e).  The Merger Agreement further provides that Unilever shall not interfere with this mission:

> [Unilever] shall not prevent [Ben & Jerry's] from fulfilling its obligations under this Section 6.14.

*Id.* § 6.14(i).[10]

Ben & Jerry's—through its Independent Board and consistent with the contractual authority outlined above—determined in 2021 that it would no longer conduct business in the West Bank. Unilever originally respected the Independent Board's decision, then suddenly reversed course last week, without the Independent Board's consent.[11] Apparently deciding to seek forgiveness rather than permission, Unilever usurped the Independent Board's authority by agreeing to sell Ben & Jerry's brand and trademark rights to Avi Zinger, the owner of American Quality Products Limited ("AQP"). As spelled out in Unilever's statement, this action would mean that AQP could sell Ben & Jerry's-branded ice cream in the West Bank. (*Id.*) Unilever's actions—using Ben & Jerry's brand in a manner the Independent Board had already rejected—directly violates Section 6.14 of the Merger Agreement, which gives the Independent Board authority over the Ben & Jerry's brand. If Unilever is allowed to transfer portions of Ben & Jerry's brand rights outright to AQP, Ben & Jerry's will permanently lose control of its brand and image in that area of the world and will suffer damage to its brand and image around the world.

Unilever's breach is underscored by the intent behind Section 6.14. Section 6.14 has been touted as a "unique and ground-breaking" provision precisely because Unilever promised Ben & Jerry's substantive—not nominal or rhetorical—power in carrying on its historical Social Mission and protecting the brand's integrity post-acquisition.[12] As Ronald Soiefer (former Chief Counsel of Unilever USA) summarized: "Perpetuity is what really distinguishes this deal from other deals

---

[10] Section 6.14(i) refers to "Conopco" and "the Surviving Corporation" respectively. The Merger Agreement refers to Ben & Jerry's both as the Company and, post-closing, the Surviving Corporation. Merger Agreement Preamble, § 1.03.
[11] *See* Compl. Exh. E, "Unilever reaches new business arrangement for Ben & Jerry's in Israel" https://www.unilever.com/news/press-and-media/press-releases/2022/unilever-reaches-new-business-arrangement-for-ben-jerrys-in-israel/.
[12] *See* Dean Decl., Exh. 1 (Antony Page; Robert A. Katz, "Freezing out Ben & Jerry: Corporate Law and the Sale of a Social Enterprise Icon," Vermont Law Review 35, no. 1 (Fall 2010): 211-250).

involving socially responsible businesses. The board of Ben & Jerry's is not going away.  They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent.  It isn't like Unilever can run out the clock."[13]  But that is precisely what Unilever is attempting to do through the AQP transfer.  Unilever's attempted yard sale of Ben & Jerry's brand and trademark rights directly undermines Section 6.14, a provision so critical to the Merger Agreement that without it, the deal would never have been consummated.  (*See* Cohen Decl. ¶ 12; Henderson Decl. ¶ 11.)

In essence, Section 6.14 reflects an embodiment of Ben & Jerry's independence on matters of brand image: an independence—specifically contemplated to remain post-merger—that is the cornerstone of the Company's success.  (*See* Cohen Decl. ¶ 8.)  Unilever's attempted transfer of portions of Ben & Jerry's brand beyond the Independent Board's purview directly conflicts with those bargained-for rights.  In fact, Unilever's attempted maneuverings, in and of themselves, constitute an independent breach of the Merger Agreement, which expressly bars Unilever from preventing the Independent Board from "fulfilling its obligations" with respect to the essential integrity of the brand and its Social Mission.  *See* Merger Agreement, § 6.14(i).  By suddenly reversing its position and selling Ben & Jerry's brand rights to AQP despite the Board's disapproval, Unilever deprives Ben & Jerry's of multiple rights anchored in Section 6.14 and violates the Merger Agreement's plain language.

b.   *Unilever breached the express terms of the Shareholders Agreement.*

Pursuant to the terms of the Merger Agreement, Ben & Jerry's and Conopco entered into the Shareholders Agreement to formalize the delegation of authority to the Ben & Jerry's

---

[13] *See* Exhibit K, Excerpts from BRAD EDMONSON, ICE CREAM SOCIAL:  THE STRUGGLE FOR THE SOUL OF BEN & JERRY'S (2014), at 170.

Independent Board of Directors.  Section 1(f) of the Shareholders Agreement thus provides that the Board of Directors "may prevent any action by the CEO in the licensing or other use of the Ben & Jerry's trademark that . . . a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand."  (*See* Cohen Decl., Exh 2 (Shareholders Agreement), § 1(f).)  Section 7 of the Shareholders Agreement also provides that:

> The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.   It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

*Id.* § 7.

The Shareholders Agreement was adopted by reference in the Company's Articles of Incorporation and its By-Laws, and thus represents the operative source of corporate governance of the Company.  Unilever's actions in breach of the Merger Agreement likewise constitute a breach of the Shareholders Agreement.

### c.   Unilever's actions harmed Ben & Jerry's

When Ben & Jerry's announced on July 19, 2021 that it would end sales in the West Bank, Unilever confirmed its right to do so under the Merger Agreement, publicly stating that it had "*always recognised the right* of the brand and its independent Board to take decisions about its social missions."[14] (emphasis added).  Unilever's about-face will cause confusion among customers and tarnish Ben & Jerry's brand integrity by undermining the Company's long-time commitment to peace and social justice, and threatens to unwind decades of goodwill if Ben & Jerry's is

---

[14] *See* Compl. Exh. C, "Unilever statement on Ben & Jerry's decision." https://www.unilever.com/news/press-and-media/press-releases/2021/unilever-statement-on-ben-and-jerrys-decision/.

perceived as flip flopping on its principled stances.   (*See* Ross Decl. ¶¶ 15-17; Greenfield Decl. ¶¶ 7, 10-11.)

> ### 2.   **Ben & Jerry's will suffer irreparable harm if the Transaction is not enjoined**

As an initial matter, Defendant has acknowledged that any breach of the Merger Agreement and the Shareholders Agreement would constitute irreparable harm through the explicit language of those agreements.  *See* Merger Agreement § 9.10; Shareholders Agreement § 7.  Even if this acknowledgment alone is not outcome determinative, it is particularly significant in the instant dispute, given Ben & Jerry's unique reputation and goodwill.

Unilever's acknowledgment that breach of these agreements would cause irreparable harm is amply confirmed by the real-world impacts of such breach.  Unilever's actions have already led to confusion about who owns the Ben & Jerry's trademark, placing Ben & Jerry's reputation and brand integrity outside of its control.  In fact, Unilever's announcement about the Transaction has already been mis-reported by media outlets as "Ben & Jerry's" decision.[15]   Moreover, misattributions by the media have already begun to spread to individual consumers on social media, including Twitter.[16]  Without immediate injunctive relief, this confusion will continue to spread and damage Ben & Jerry's essential brand integrity.

In addition to the actual harm Ben and Jerry's has already suffered, the Company can also demonstrate irreparable harm through the loss of prospective goodwill because it is the custodian of "a relatively unique product." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (finding irreparable harm where "the Power Rangers [were] a unique product with an established exceptional appeal to children" and although there were "other popular children's

---

[15] *See* Dean Decl., Exh. 2. (news article titled "Ben & Jerry's cancels plan to stop sales in Israel.")
[16] *See* Dean Decl., Exh. 3 (Tweet attributing Unilever's announcement to Ben & Jerry's)

characters," those characters were "not reasonably substitutable."). Here, what makes Ben & Jerry's unique is exactly the rights enshrined in Section 6.14: it's brand integrity and Social Mission. (*See* Ross Decl. ¶¶ 15-17; Greenfield Decl. ¶¶ 7, 10-11.). The loss of such features would be irreparable. *Id.*

Sans emergency relief, Ben & Jerry's would also be irreparably harmed by the permanent loss of bargained-for rights regarding its post-acquisition authority. The Merger Agreement and Shareholders Agreement specifically put control over Ben & Jerry's trademark- and trade dress-related intellectual property—its "brand"—exclusively in the hands of the Independent Board. *See* Cohen Decl., Exh 1 (Merger Agreement), § 6.14(f) (the "Board shall be the ***custodians*** of the Ben & Jerry's-brand image and shall have ***primary responsibility*** for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name . . . . [The] Board may ***prevent any action*** by the CEO in the areas of . . . licensing or other use of the Ben & Jerry's trademark that [the] Board reasonably determines to be inconsistent with the Essential Integrity of the Brand"). Permanently losing this authority over certain portions of its brand—as the unauthorized Transfer threatens— would be irreparable.

Finally, the Transaction not only threatens the Board's role in protecting the brand's integrity, but it effectively negates Ben & Jerry's corporate independence in dictating its Social Mission, which is the hallmark of its business. (*See* Greenfield Decl. ¶¶ 7, 10.) Without this Court's intervention, Unilever will be given the greenlight to discard the rights and very purpose of the Independent Board by selling off or transferring piecemeal the Company's intellectual property and

associated brand integrity.  Indeed, as Unilever itself argued in recent litigation against AQP,  "B&J **would clearly be harmed** if forced to provide a license to AQP against its will . . .."[17]

### 3.   The balance of hardships favors Ben & Jerry's

Once Unilever completes the sale to AQP, Ben & Jerry's will have lost control over its brand in Israel and the West Bank. That harm cannot be repaired.  By contrast, a temporary delay of the Transaction threatens no real harm to Unilever.  Moreover, as Unilever acknowledged in court filings less than four months ago (and prior to entering the Transaction that is the subject of this suit), the *status quo* with respect to the AQP license agreement is its ensuing expiration.[18]  In other words, the *status quo* prior to Unilever's breach was that the sale of Ben & Jerry's would halt in the West Bank.  This is the same outcome Ben & Jerry's seeks to preserve in this Application.  Accordingly, this factor weighs in favor of granting equitable relief.

### 4.   Preserving Ben & Jerry's right to control its brand will serve the public interest.

As an initial matter, the public interest factor may be *de minimis* here because Ben & Jerry's dispute with Unilever is a "purely private litigation." *See Greendige v. Allstate Ins. Co.*, No. 02-cv-9796 (JCF), 2003 WL 22871905, at *3 (S.D.N.Y. Dec. 3, 2003).

However, even if this factor is deemed applicable, it weighs decidedly in favor of Ben & Jerry's.  An injunction in this case will vindicate Ben & Jerry's bargained-for right to control its brand and maintain primary responsibility for its mission of social good. (*See* Cohen Decl. ¶ 12.)

---

[17] *See* Compl. Exh. D, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 5 (emphasis added).  Although Plaintiff is confident in its breach claims, even if its likelihood of success on the merits is unclear, Ben & Jerry's should still prevail on its request for injunctive relief because the language of Section 6.14 couple with the threat to the company's integrity, critical to its existence itself, is sufficient to demonstrate "the existence of 'serious questions going to the merits to make them a fair ground for litigation'" and "'a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *See Dong v. Miller*, 2018 WL 1445573, at *5 (E.D.N.Y. Mar. 23, 2018).

[18] *See* Compl. Exh. D, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 8.

The Company's brand image and integrity flow directly from Ben & Jerry's "decades of brand development around social activism."[19]  "Advancing social justice is part and parcel of Ben & Jerry's brand." (Greenfield Decl. ¶ 7.)

Allowing companies such as Ben & Jerry's to advance these interests—in *addition* to their for-profit objectives—has been a widely and recently recognized public good.  The rapid adoption of benefit corporation statutes in 35 states since 2010 demonstrates the progress that has been made in the movement to allow corporations to work for a variety of stakeholders, instead of just for financial gain.[20]

The Merger Agreement and Shareholders Agreement preserved the social mission and brand-image of Ben & Jerry's and placed it firmly in the hands of its Independent Board, not Unilever.  Unilever's unilateral and unauthorized Transaction threatens to rip that control from the Independent Board, even though retaining that very control was the linchpin of the Merger Agreement.  Because an injunction will vindicate Ben & Jerry's contractual rights and preserve its authority to control its brand and Social Mission, the "public interest" factor weighs strongly in favor of an injunction.  As Unilever correctly argued in the AQP litigation:  "Here, the public interest lies in the principle that agreements must be kept."[21]

Simply put, Ben & Jerry's is an American institution.  The public interest is served in preserving that institution's integrity.

---

[19] Compl. Exh. H, "Ben & Jerry's Showed America What Real Corporate Activism Looks Like," https://www.huffpost.com/entry/ben-jerry-ice-cream-corporate-activism_n_5f1b11dec5b6296fbf423019 .
[20] *See* Dean Decl., Exh. 4 (Social Enterprise Law Tracker webpage on Benefit Corps, available at https://socentlawtracker.org/#/bcorps)
[21] *See* Compl. Exh. D, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 12.

**F. Either no bond or a nominal bond is appropriate in this case.**

Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement in appropriate circumstances. *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004). In this case, there is good reason for the Court to dispense with the bond requirement, or to set a nominal bond. As an initial matter, Section 9.10 of the Merger Agreement and Section 7 of the Shareholders Agreement each provide that "the parties shall be entitled to an injunction or injunctions to prevent breaches of" those respective agreements, so Unilever has agreed an injunction should issue due to its breach without regard to the need for a bond.

Additionally, granting the injunction will actually *benefit* Unilever, and for the same reason Ben & Jerry's seeks it: an injunction will restore the company's brand integrity, the cornerstone of its goodwill. (Greenfield Decl. ¶ 7.) The value of that goodwill—and of Ben & Jerry's control of it—is exactly why Unilever originally sought to acquire Ben & Jerry's and why it agreed to the Independent Board maintaining "primary responsibility" over the Social Mission and brand integrity. An injunction will preserve this governance structure and will allow Ben & Jerry's to continue developing the goodwill it has been building for the last forty-four years. Importantly, as a wholly-owned subsidiary of Unilever, Ben & Jerry's reputation and goodwill *directly benefit Unilever financially*.

Finally, requiring a party to continue to perform its contractual obligations is not a cognizable harm, less a compensable one. *See Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 589 (W.D.N.Y. 2011) ("[a]ll that this injunction does is require [the enjoined party] to continue to perform under the contract, as it has been doing for years. That hardly constitutes a cognizable 'harm' to [the enjoined party]") (citation omitted); *see also Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("the 'damage'

to [defendant] is nonexistent, because being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law"). Because no harm is posed by an injunction, there is no reason for a bond to issue in this case.

## V.      CONCLUSION

Ben & Jerry's has shown it is likely to prevail on the merits of its contract claims and that it will suffer imminent and irreparable harm if Unilever is not enjoined from consummating the Transaction. Accordingly, the Court should enter a Temporary Restraining Order preserving the last peaceable *status quo*, which was before Unilever unilaterally entered the Transaction in violation of the Independent Board's contractual authority. Without this Court's intervention, the independence of Ben & Jerry's Board of Directors will be lost, and the Company's brand integrity—forty-four years in the making—forever tarnished.

Dated: July 5, 2022

Respectfully submitted,

**COHEN & GRESSER LLP**

By: <u>Mark Cohen</u>
Mark S. Cohen
Jeffrey I. Lang
Drew S. Dean
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514

**AHMAD, ZAVITSANOS & MENSING PC**

Shahmeer Halepota
John Zavitsanos (*pro hac vice* to be filed)
Joseph Y. Ahmad
Jane Robinson (*pro hac vice* to be filed)
Daryl Moore (*pro hac vice* to be filed)
Kelsi White (*pro hac vice* to be filed)
Thomas Frashier (*pro hac vice* to be filed)
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone:  (713) 655-1101
Fax:  (713) 655-0062

*Attorneys for Plaintiff Ben & Jerry's Homemade, Inc.*