UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

BEN & JERRY'S HOMEMADE, INC.

              Plaintiff,

  – against –

CONOPCO, INC.,

              Defendant.

Case No.:

---------------------------------------------------------------- x

## DECLARATION OF BEN COHEN

I, Ben Cohen, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein.

2. I am a co-founder of Ben & Jerry's Homemade, Inc. ("Ben & Jerry's" or the "Company"), which makes, distributes, and sells all-natural premium ice cream and related products in a wide variety of innovative flavors. Jerry Greenfield, my co-founder, and I created Ben & Jerry's in 1978, when we opened our first ice-cream shop in a converted gas station in Burlington, Vermont. Ben & Jerry's is now sold in more than 33 countries around the world.

3. In addition to being a co-founder, I have, at various times, served as director, officer and shareholder of Ben & Jerrys from its inception through 2000. During those times, I was actively involved in its management and in its mission.

### The Negotiation of a Sale of Ben & Jerry's to Unilever, Which Preserved Ben & Jerry's Board's Authority Over Its Social Mission and Brand Integrity

4.       In or around 1999, Ben & Jerry's was approached by Unilever with a potential purchase offer. At least two other interested parties also made offers to us. It was absolutely essential to me, as well as other members of the Ben & Jerry's Board at the time, that we would only agree to sell to a buyer whose values aligned with ours, and who would agree not only to maintain but also to expand Ben & Jerry's Social Mission. In addition, Ben & Jerry's had to maintain independent authority to safeguard the integrity of the essential elements of its brand.

5.       I took an active role in the negotiations with Unilever. During those negotiations, I expressly conveyed the importance to the Company, and to me personally, of Ben & Jerry's Social Mission. After extensive and specific negotiations about who would be the guardian of the Ben & Jerry's brand and its Social Mission, Ben & Jerry's and Unilever agreed to create a special corporate governance structure for Ben & Jerry's that would preserve the Company's Social Mission, and moreover, would vest responsibility in an independent board to protect and safeguard the integrity of the essential elements of the brand name. That arrangement is reflected in an Agreement and Plan of Merger ("Merger Agreement"), a true and correct copy of which is attached hereto as Exhibit 1. It is also memorialized in a Shareholders Agreement, a true and correct copy of which is attached hereto as Exhibit 2.

6.       Under the agreements we negotiated, the chief executive officer would be responsible for management of Ben & Jerry's, subject however to the Board's authority over two important areas: Social Mission and integrity of the essential elements of the brand name.

7. The Ben & Jerry's Board was given primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company as they evolve over time.

8. Additionally, the parties specifically negotiated and expressly agreed that the Ben & Jerry's Board would be responsible for safeguarding the Ben & Jerry's brand name, including the authority to veto certain financial and operational decisions made by management. Under the Merger Agreement and Shareholders Agreement, the Board is empowered to prevent any action by the chief executive officer that would impact, among other things, the licensing or other use of the Ben & Jerry's trademark in a way that is inconsistent with the integrity of the brand. This was the most critical provision in the contract for Jerry and me, and the sale would not have occurred but for its inclusion.

9. In connection with the Merger Agreement, Ben & Jerry's also negotiated a License Agreement with Unilever. Among other items, the License Agreement provides that Unilever, as the licensee of Ben & Jerry's trademarks, must ensure that products bearing those marks are developed, introduced, promoted, and marketed by Unilever in a manner that furthers the integrity of Ben & Jerry's brand, including the company's Social Mission.

10. These two facets of Ben & Jerry's business—its evolving Social Mission and the integrity of its brand and trademark—complement and reinforce each other in a virtuous cycle. Ben & Jerry's authentic commitment to its Social Mission has raised the profile of its brand—we stand for, and are known for, more than just the quality of our ice cream—and the strength of our brand has allowed us to make an even larger social impact.

11. That is why I and others at the company negotiated extensively with Unilever specifically to protect the Ben & Jerry's Social Mission and brand integrity in the Merger Agreement. We knew that, at the end of the day, these were the essence of the spirit of the brand and have become a critical part of its unique selling proposition.

12. In the absence of Unilever's express promise in the Merger Agreement that Ben & Jerry's Board would remain the guardian of Ben & Jerry's Social Mission and its brand identity, I would have never consented to the sale of the company to Unilever.

13. After Unilever acquired the company in 2000, Ben & Jerry's continued to be outspoken on social issues that mattered to the company and its stakeholders. Even after I left the Board, I remained very supportive of the Board's continued activism and engagement with such social issues.

14. For example, in 2020, the Ben & Jerry's Board issued a forceful statement on behalf of the company titled "We Must Dismantle White Supremacy," in the aftermath of the murder of George Floyd. In January 2021, the company denounced the actions of the January 6 capitol rioters. These actions were taken many years after Unilever acquired us, and they were made possible by the unique provisions in the painstakingly negotiated Merger Agreement, which preserved the Board's ability to protect the Social Mission and the integrity of the brand name.

15. In the nearly 22 years since we signed the Merger Agreement, Ben & Jerry's has enjoyed a cordial and productive relationship with Unilever. In fact, the respectful adherence by Ben & Jerry's and Unilever to these terms of the Merger Agreement, notwithstanding the occasional disagreement, has been in my view the secret behind the continued success and growth of Ben & Jerry's.

**The Board's Determination to Cease Sales in the Occupied Palestinian Territory**

16.   On July 18, 2021, the Board and Ben & Jerry's CEO determined that the sale of Ben & Jerry's ice cream in the Occupied Palestinian Territory ("OPT") was contrary to the historical Social Mission of the company and inconsistent with Ben & Jerry's values. The Board and the Company's management sought to cease sales of Ben & Jerry's ice cream in the OPT after an underlying license agreement expired.

17.   I was not a member of the Ben & Jerry's Board at the time of that decision and did not participate in the Board's consideration of that resolution. Based on my experience, however, the Board's consideration of the issue and its determination is consistent with Ben & Jerry's Social Mission and protection of the integrity of the brand, as well as the types of positions that Ben & Jerry's has adopted in past years.

18.   Moreover, the corporate-governance process unfolded exactly as contemplated by the parties in the Merger Agreement and the Shareholders Agreement. Regardless of my own thoughts on this particular issue, the Board's determination falls squarely within its authority to preserve and expand the Company's Social Mission and to safeguard the integrity of the brand.

19.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 4, 2022
Williston, Vermont

_____
Ben Cohen