**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| BEN & JERRY'S HOMEMADE, INC. |
| <div align="right">Plaintiff,</div> |
| v. |
| CONOPCO, INC., |
| <div align="right">Defendant.</div> |

Case No. 1:22-cv-05681 (ALC)

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT CONOPCO, INC.**
**IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY**
**INJUNCTIVE RELIEF**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Conopco, Inc.*

July 11, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................5

     A.     Parties..............................................................................5

     B.     Acquisition and Merger Agreement.......................................6

     C.     Articles of Incorporation and Bylaws ....................................7

     D.     Shareholders Agreement ......................................................7

     E.     Consent Decree ...................................................................8

     F.     Decision To Let the License Agreement Expire.......................9

     G.     Alleged Impact on Mr. Zinger ............................................11

     H.     ICA Investigation .............................................................11

     I.     Litigation Against Unilever ................................................12

     J.     Divestments from Unilever.................................................12

     K.     Unilever's Review of Ben & Jerry's Operations in Israel .........13

     L.     Sale of Assets to Blue & White ..........................................14

     M.     Closing of the Transaction .................................................14

     N.     This Case........................................................................15

ARGUMENT ............................................................................................16

I.     The Requested Injunction is Moot...............................................16

II.     Plaintiff's Motion Should be Denied for Failure to Join a Necessary Party..........17

III.     Plaintiff Has No Reasonable Chance of Success on the Merits and Cannot Show Serious Questions Going to the Merits. .....................................20

IV.     Plaintiff Cannot Show Irreparable Harm. ............................................23

V.     The Balance of Equities and Public Interest Weigh Against an Injunction...........24

CONCLUSION............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Founders Holding, LLC v. Magellan Health, Inc.*,
  2018 WL 1247405 (E.D.N.Y. Mar. 9, 2018)...............................................................19

*Bank of New York Co. v. Northeast Bancorp*,
  9 F.3d 1065 (2d Cir. 1993)..........................................................................................16

*Ben Ami v. Ben & Jerry's Homemade, Inc.*
  DC (CT), 45950-07-21 (Isr.)........................................................................................12

*Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*,
  2003 WL 282144 (S.D.N.Y. Feb. 7, 2003)...................................................................18

*Brad H. v. City of New York*,
  17 N.Y. 3d 180 (2011) .................................................................................................21

*Carvel Farms Corp. v. Nathan*,
  1966 WL 7122 (S.D.N.Y. June 10, 1966) ....................................................................16

*City of St. Clair Shores Police and Fire Ret. Sys. v. Unilever PLC, et al.*,
  No. 1:22-cv-05011 (S.D.N.Y.).....................................................................................12

*Clonus Assocs. v. Dreamworks, LLC*,
  417 F. Supp. 2d 248 (S.D.N.Y. 2005)..........................................................................23

*Conn. State Police Union v. Rovella*,
  36 F.4th 54 (2d Cir. 2022) ...........................................................................................20

*Fein v. Sec. Banknote Co.*,
  157 F. Supp. 146 (S.D.N.Y. 1957) ..............................................................................17

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ..............................................................................19

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*,
  903 N.Y.S.2d 346 (N.Y. App. Div. 1st Dep't 2010) ....................................................22

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
  2021 WL 535485 (S.D.N.Y. Feb. 12, 2021).................................................................24

*Hope v. Board of Trustees of Operative Plasterers*,
  2006 WL 1763682 (E.D.N.Y. June 23, 2006) ..............................................................20

*Ins. Co. of the State of Penn. v. Lakeshore Toltest JV, LLC*,
   2015 WL 8488579 (S.D.N.Y. Nov. 30, 2015) .......................................................2, 16

*Kamerling v. Massanari*,
   295 F.3d 206 (2d Cir. 2002)..........................................................................................23

*Known Litig. Holdings, LLC v. Navigators Ins. Co.*,
   934 F. Supp. 2d 409 (D. Conn. 2013) ...........................................................................18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ................................................................25

*Litwin v. OceanFreight, Inc.*,
   865 F. Supp. 2d 385 (S.D.N.Y. 2011)............................................................................24

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
   75 F. Supp. 3d 592 (S.D.N.Y. 2014)........................................................................16, 24

*Marcy Playground, Inc. v. Capitol Records, Inc.*,
   6 F. Supp. 2d 277 (S.D.N.Y. 1998) ...............................................................................23

*McFarlane v. Altice USA, Inc.*,
   524 F. Supp. 3d 264 (S.D.N.Y. 2021)............................................................................22

*Melnitzky v. Jones*,
   2008 WL 3884361 (S.D.N.Y. Aug. 21, 2008)...............................................................17

*NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*,
   262 F. Supp. 2d 134 (S.D.N.Y. 2003)............................................................................16

*Ram v. Lal*,
   906 F. Supp. 2d 59 (E.D.N.Y. 2012) .............................................................................18

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1998)...........................................................................................23

*S.E.C. v. Cavanagh*,
   1 F. Supp. 2d 337 (S.D.N.Y. 1998) ...............................................................................25

*Spigelman v. Ben & Jerry's Homemade, Inc.*
   DC (Jer.), 45950-07-21 (Isr.) ........................................................................................12

*Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr. 2006-FF6*,
   368 F. Supp. 3d 723 (S.D.N.Y. 2019)......................................................................16, 25

*Sunset Homeowners Ass'n, Inc. v. DiFrancesco*,
   386 F. Supp. 3d 299 (W.D.N.Y. 2019) ..........................................................................18

*TMT Co. Ltd. v. JPMorgan Chase Bank*,
   2018 WL 1779378 (S.D.N.Y. Mar. 28, 2018) ...........................................................18

*Zinger et al. v. Ben & Jerry's Homemade, Inc., et al.*,
   No. 2:22-cv-01154-ES-JBC (D.N.J.) ...........................................................................12

**Statutes & Rules**

Fed. R. Civ. P. 19 ...............................................................................................................18

Fed. R. Civ. P. 65 ...............................................................................................................25

Defendant Conopco, Inc. ("Conopco"), respectfully submits this memorandum in opposition to the motion for a preliminary injunction filed by Ben & Jerry's Homemade, Inc. ("Plaintiff").

## PRELIMINARY STATEMENT

This case concerns a belated effort by a majority of the Ben & Jerry's limited-purpose board (the "Board") to stop its sole shareholder, Conopco, from "consummating" a transaction that has already closed, that the Board has no right to stop, and that was necessary to protect Conopco, its shareholders, and Ben & Jerry's itself. The Board's motion is untimely, unsupported by law and fact, and should be denied.

Conopco acquired Ben & Jerry's in 2000 and has been its sole (100%) shareholder for the last 22 years. Pursuant to the relevant merger and shareholder agreements, Conopco has the full power and authority to control Ben & Jerry's business, except that the Board has certain responsibilities it shares with Conopco (and the Ben & Jerry's CEO) concerning the "social mission" of Ben & Jerry's and the "essential integrity" of Ben & Jerry's brand. For the better part of two decades, Conopco and the Board fulfilled their respective duties in a cooperative and productive manner. But the Board's insistence on ending Ben & Jerry's 34-year relationship with its manufacturing licensee and distributor in Israel for political reasons created an untenable situation for Ben & Jerry's, Conopco, and Conopco's parent, Unilever PLC (together with Unilever IP Holdings B.V., "Unilever").

Although Conopco had initially hoped to be able to respect the Board's politically charged decision without having to step in and assert its own rights to protect Ben & Jerry's and its parents, it became clear earlier this year that it could no longer do so. The Board's desire to cease Ben & Jerry's activity in the West Bank in protest of the Israeli government's policies has subjected Unilever, Conopco, and Ben & Jerry's to multiple lawsuits, claims that they are in

violation of Israeli law and the laws or policies of several U.S. states, and significant shareholder divestitures.  Faced with these threats, Unilever and Conopco concluded that a limited sale of Ben & Jerry's business in Israel to a partner with a three-decade commitment to Ben & Jerry's mission was the best way for it to balance the competing concerns at play and protect the interests of Unilever, Conopco, and Ben & Jerry's.  Thus, at the end of June 2022, Unilever exercised its power to sell to Blue & White Ice-Cream Ltd. ("Blue & White"), a company owned by Avi Zinger, Ben & Jerry's long-time Israeli licensee, a small piece of Ben & Jerry's global business, thereby alleviating the many risks that the impasse with the Board had created. Specifically, Unilever sold a limited set of rights and assets in Israel and the disputed territories in the West Bank (the "Territories"), including rights to only the Hebrew versions of the Ben & Jerry's trademarks and rights to register Arabic versions of the trademarks.[1]  Neither Plaintiff Ben & Jerry's nor Defendant Conopco was a party to the agreement for that transaction.

By this lawsuit and the present motion for a preliminary injunction, the Board seeks unprecedented relief:  to enjoin preliminarily a transaction that has already closed and that the seller was fully empowered to consummate, all without joining either the purchaser or the seller.  To obtain any preliminary injunction, Plaintiff bears a significant burden of proof.  As Plaintiff itself acknowledges, to obtain the relief it seeks Plaintiff must show (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  (Br. at 8-9.)  That burden is particularly heavy in a case such as this, where the movant is seeking an order that would *change*, rather than maintain, the status quo.  *See Ins.*

---

[1] Unilever PLC caused its subsidiary, Unilever IP Holdings B.V. ("UIP"), a Netherlands private limited liability company, to make the sale.

*Co. of the State of Penn. v. Lakeshore Toltest JV, LLC*, No. 15 CIV. 1436 (ALC), 2015 WL 8488579, at *1 (S.D.N.Y. Nov. 30, 2015). Plaintiff has come nowhere close to meeting this burden for at least five independent reasons:

The requested injunction is moot. To begin, Plaintiff seeks to enjoin Conopco from "entering into or consummating any transaction that permits or would permit the licensing, sale, distribution, or use of Ben & Jerry's products in the West Bank" and performing any act under any agreement to permit the same. (Dkt. 7 at 7.) However, Plaintiff seeks to enjoin a sale that has already occurred and that the Board chair knew was set to occur nearly a week before closing. The sale closed on June 29, 2022. As of that date, Unilever sold to Blue & White the rights to do business in Israel and the Territories under Hebrew Ben & Jerry's trademarks, which are now owned exclusively by Blue & White.[2] Thus, Plaintiff's request for relief is moot. (*See* Section I below.)

Plaintiff failed to join necessary parties. Although Plaintiff seeks to prevent Mr. Zinger and his affiliates from continuing to do business in Israel and the Territories, Plaintiff sued neither Mr. Zinger nor his affiliates, Blue & White and American Quality Products Ltd. ("AQP"). In the absence of the seller, Unilever, or the current owner of the relevant assets, the Court is not able to provide the requested relief. An injunction against Conopco cannot stop a sale that has already closed, nor stop Mr. Zinger from continuing to sell ice cream in Israel and the Territories under the trademarks registered to his affiliated companies. Thus, the requested preliminary injunction should be denied for failure to join necessary parties. (*See* Section II below.)

---

[2] Unilever also sold to Blue & White the rights to register Arabic Ben & Jerry's trademarks.

<u>There's no reasonable probability of success on the merits.</u>  Plaintiff accuses Conopco of breaching the Merger Agreement and the Shareholder Agreement by selling the disputed assets.  However, the agreements reserve all rights over asset sales to Conopco, as sole shareholder, and give the Board no rights over asset sales.  In fact, the agreements specifically limit the Board's authority to "those powers and functions expressly granted to it" in the agreements, and reserve to Conopco "all other powers and functions", including responsibility over "the financial and operational aspects" of Ben & Jerry's.  Plaintiff's claims depend on a distortion of the Board's limited and shared rights to protect Ben & Jerry's "social mission" and brand "integrity".  Despite both agreements' limitation on the Board's powers to those expressly granted to it, the Board asks the Court to read into the contracts an implicit power to prevent—or even unwind—an asset sale.  No such power exists in either contract.  (*See* Section III below.)

<u>Plaintiff cannot show irreparable harm.</u>  There is no credible threat of irreparable harm requiring urgent relief because, even in the absence of the transaction the Board seeks to enjoin, Ben & Jerry's long-time distributor would have continued to sell Ben & Jerry's products in Israel and the Territories at least through the end of its license agreement on December 31, 2022, a fact the Board has long known and never sought to alter.  Therefore, even under the Board's theory, the alleged harms would not occur until at least 2023.  Moreover, there is no reason to believe that the continued sale of ice cream in Israel and the Territories would injure Ben & Jerry's social mission or its brand; the ice cream has been sold there for more than three decades by a distributor that has honored both Ben & Jerry's social mission and its brand.  Plaintiff's contention that irreparable harm should simply be presumed is mistaken as a matter of law (and tacitly acknowledged in its brief), and any such presumption would be rebutted by the fact that Plaintiff faces no actual risk of irreparable harm.  (*See* Section IV below.)

<u>The balance of equities and the public interest weigh against an injunction.</u>  The balance of equities disfavors a preliminary injunction where, as here, the proponent cannot show either a likelihood of success on the merits or irreparable harm, and the opposing party can show genuine hardships that would arise if the requested relief is granted.  The issuance of a preliminary injunction would cause substantial harm to Unilever, Conopco, and Ben & Jerry's itself by prolonging an impasse—namely, whether to continue Ben & Jerry's operations in Israel and/or the Territories beyond 2022—that has subjected the parties to litigation, regulatory investigation, divestitures of their stock, and intense public criticism.  (*See* Section V below.)

As discussed below, Plaintiff's motion should be denied, and the Court should set a briefing schedule for a motion to dismiss and the submission of counterclaims.

### STATEMENT OF FACTS[3]

### A.    Parties

Plaintiff manufactures, distributes and sells ice cream.  (Close Decl. ¶ 3.)  Plaintiff is a Vermont closed corporation headquartered in Burlington, Vermont, and is a wholly owned subsidiary of Defendant Conopco.  (*Id.*)  Conopco, a New York corporation headquartered in Englewood Cliffs, New Jersey, manufactures and sells food, personal care and household products.  (*Id.* ¶ 4.)  Conopco is an indirect, wholly owned subsidiary of Unilever.  (*Id.*)

Unilever is a global company that employs 148,000 people across the world with over 400 brand names in over 190 countries.  (*Id.* ¶ 5.)  Unilever's mission is to be a global leader in sustainable business with a purpose-led, future-fit business model.  (*Id.*)  In June 2022, Unilever was ranked first for the 12th consecutive year in the GlobeScan SustainAbility Leaders

---

[3] The exhibits cited herein are the Exhibits to the Declaration of David Kumagai.  Citations are to the Declarations of Matt Close and Mattan Meridor.

Survey, which asks sustainability experts around the world to name the companies showing the greatest commitment to integrating sustainability into their business strategies.  (*Id.*)

      **B.**      **Acquisition and Merger Agreement**

      On April 11, 2000, Unilever's subsidiary, Conopco, executed an Agreement and Plan of Merger with Ben & Jerry's (as amended and restated on July 5, 2000, the "Merger Agreement").  (Ex. A.)  Pursuant to the Merger Agreement, Conopco became the sole shareholder of Ben & Jerry's.  (*Id.* § 4.03.)  (Vermont All Natural Expansion Company was also party to the Merger Agreement, but its involvement is not at issue here.)

      Section 6.14 of the Merger Agreement provided for the creation of an independent Ben & Jerry's Board of Directors with two "primary responsibilit[ies]": "preserving and enhancing the objectives of the historical social mission of the Company" (the "Social Mission Priorities") and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" (the "Essential Integrity of the Brand").[4]  (*Id.* §§ 6.14(d)-(f).)  Section 6.14(j) of the Merger Agreement expressly limited the contemplated Board's powers to those set forth in Section 6.14, and further provided that "Conopco shall have primary responsibility for the financial and operational aspects of [Ben & Jerry's] and the other aspects of [Ben & Jerry's] not allocated to the Company Board".  (*Id.* § 6.14(j).)

      Pursuant to Section 6.14(d) of the Merger Agreement, the Ben & Jerry's CEO is responsible for presenting an annual business plan to the Board and Conopco, and these entities must then consult in good faith to review the CEO's proposal and attempt to agree on the plan.

---

[4] Section 6.14(f) provides that the Board "may prevent any action by the CEO in the areas of . . . the licensing or other use of the Ben & Jerry's trademark that . . . a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand".  (Ex. A, §§ 6.14(f).)

In the event that the Board and Conopco cannot reach agreement, "the ultimate determination of [the annual business plan] shall be [made] by Conopco". (*Id.* § 6.14(d).)

In connection with the acquisition, Plaintiff and Unilever N.V. executed a Trademark Sale Agreement, dated December 22, 2000, under which Plaintiff sold to Unilever N.V. all rights to the Ben & Jerry's trademarks. (Exs. D-F.) In 2020, Unilever N.V. was dissolved as part of a corporate restructuring at the Unilever group of companies, and UIP became the owner of the rights to Ben & Jerry's trademarks. (Close Decl. ¶ 8.)

### C.  Articles of Incorporation and Bylaws

Plaintiff's Articles of Incorporation, which are attached to the Merger Agreement as Exhibit A, provide examples of the company's Social Mission Priorities, for which the Board is primarily responsible. (Ex. A (Ex. A).) While the Merger Agreement provides that the Ben & Jerry's "objectives . . . may evolve from time to time", this evolution must be "consistent" with Ben & Jerry's "historical social mission". (*Id.* § 6.14(e).) The Social Mission Priorities articulated in the governing documents include "packaging improvement efforts" to "achiev[e] a compostable pint"; creating a "sustainability 'footprint'" to help protect the environment; opposing the use of growth hormones and GMOs; and donating to philanthropic causes. (*Id.* Schedule 6.14.) None of the listed Social Mission Priorities or future aims involves boycotting any country or region for political reasons.

Plaintiff's Bylaws, which were adopted on August 3, 2000, reiterate that "[t]he Board of Directors shall only have such corporate powers as are expressly provided to it in the Shareholders Agreement". (Ex. B, § 3.1.)

### D.  Shareholders Agreement

Section 6.14 of the Merger Agreement was implemented through an August 3, 2000 Shareholders Agreement ("SHA") entered into between Conopco and Plaintiff. (*See*

Ex. C.)  The SHA, by its terms, "regulates the exercise of corporate powers and the management of the business and affairs of the Company and limits and restricts as provided herein the powers and functions of the Company Board".  (Ex. C, § 1(a).)

Section 1(a) of the SHA provides that the "Board shall have only those powers and functions *expressly* granted to it in this Agreement.  All other powers and functions are reserved to the Shareholder."  (*Id.* (emphasis added).)  Section 1(e) provides the Board with "primary" responsibility for the Social Mission Priorities, and Section 1(f) similarly provides the Board with "primary" responsibility for the Essential Integrity of the Brand.  (*Id.* §§ 1(e)-(f); *see also*, *id.* (Ex. B).)  The SHA does not expressly or impliedly confer on the Board authority over any sale of assets, nor any authority to boycott any country or region for political reasons.

Section 1(j) of the SHA provides Conopco with "primary responsibility for the financial and operational aspects of [Ben & Jerry's] and the other aspects of [Ben & Jerry's] not allocated to the Company Board".  (*Id.* § 1(j).)

### E.    Consent Decree

At the time of the acquisition in 2000, Ben & Jerry's had an existing licensing relationship dating back to 1987 with Avi Zinger and his affiliated companies, including American Quality Products Ltd. ("AQP").  (Ex. G, ¶¶ 4–7)  Ben & Jerry's license agreement with AQP (as amended, the "License Agreement") provided AQP with the exclusive right to manufacture and distribute Ben & Jerry's ice cream throughout Israel, including the Territories. (*Id.* ¶¶ 20–23.)  Because Unilever owned other ice cream companies that conducted business in Israel, the merger with Ben & Jerry's was reviewed by the Israel Antitrust Authority, now known as the Israel Competition Authority ("ICA").  (*Id.* ¶ 13)

On December 16, 2001, the ICA issued a consent decree (the "Consent Decree") that approved the Merger Agreement subject to certain conditions.  (*Id.* Ex. 4.)  Among the

8

conditions set forth in the Consent Decree was that any change in the license granted to AQP must be approved by the ICA.  (*Id.*)

### F.   Decision To Let the License Agreement Expire

As it had for more than 13 years prior to the merger, AQP continued for more than two decades after the merger to sell Ben & Jerry's ice cream throughout Israel and the Territories under its License Agreement with Ben & Jerry's.  (*Id.* ¶¶ 29–50.)

The Board has claimed it became aware that there were organizations calling for Ben & Jerry's to reconsider its sale of ice cream in the Territories in and around 2014, and by 2015, the Board purportedly sent a delegation to Israel to examine the situation firsthand.  (Close Decl. ¶ 9.)  Starting around 2018, however, Ben & Jerry's reportedly experienced increasing pressure to stop selling ice cream in the West Bank, and members of the Board began to examine Ben & Jerry's role in Israel and the Territories.  (*Id.*.)  In July 2020, the Board purported to pass a resolution directing the Ben & Jerry's CEO to cease selling products in the Territories, and in October 2020, the License Agreement was amended to change the definition of the licensed "Territory" to include only "the State of Israel" and to excise references to the Territories.  (*Id.* ¶ 10.)  Despite this amendment, AQP continued to sell Ben & Jerry's products in the Territories as it had done for the prior three decades.  (Ex. G, ¶ 52.)  For the year following the Board's purported resolution in July 2020, Unilever, Conopco, Ben & Jerry's CEO and the Board continued to debate whether and how to implement the Board's desired changes to the company's long-established operations in Israel and the Territories.  (Close Decl. ¶ 11.)

In 2021, the Board increased its pressure on the Ben & Jerry's CEO to reach a new agreement with their longstanding distributor, Mr. Zinger, that would end the sales of Ben & Jerry's products in the Territories.  (*Id.* ¶ 12.)  Unilever became more actively involved in the Board's efforts to find an alternative arrangement in Israel and the Territories.  (*Id.*)  Unilever's

goal was to find an outcome that mitigated the risks to Unilever while also respecting the Board's new position regarding business in Israel and the Territories.  (*Id.*)  In July 2021, Anuradha Mittal, Chair of the Board, told Unilever that the Board intended to announce that Ben & Jerry's products would no longer be sold in the Territories.  (*Id.* ¶ 13.)  At the time, Unilever determined that it would be in the best interests of all stakeholders for the company to work with the Board to try to reach a positive outcome, without damaging Unilever's 20-year working relationship with the Board.  (*Id.*)  Accordingly, Unilever did not immediately challenge the Board's decision to tell AQP that Ben & Jerry's would not renew the License Agreement when it expired at the end of 2022, particularly given that Ben & Jerry's CEO was actively pursuing alternative arrangements to ensure Ben & Jerry's products would continue to be made available in Israel past 2022.  (*Id.*)

On July 19, 2021, Ben & Jerry's notified AQP by letter that Ben & Jerry's had decided to "let the License Agreement . . . expire on December 31, 2022".  (Ex. G (Ex. 11 (the "July 2021 Letter") at 1).)  Ben & Jerry's further told AQP in the July 2021 Letter that the "business relationship remains a priority for Ben & Jerry's until the expiration of the License Agreement".  (*Id.*)

That day, Ben & Jerry's released the following statement on its website:

> We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners.

> We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year.  (Ex. I.)

Also on July 19, 2021, Unilever released the following statement on its website:

The Israeli-Palestinian conflict is a very complex and sensitive situation. As a global company, Unilever's brands are available in more than 190 countries and in all of them, our priority is to serve consumers with essential products that contribute to their health, wellbeing and enjoyment.

We remain fully committed to our presence in Israel, where we have invested in our people, brands and business for several decades.

Ben & Jerry's was acquired by Unilever in 2000. As part of the acquisition agreement, we have always recognised the right of the brand and its independent Board to take decisions about its social mission. We also welcome the fact that Ben & Jerry's will stay in Israel. (Ex. J.)

The only substantive difference between the two statements was the commitment in Unilever's statement to remain in Israel. The independent Board members later issued their own statement purporting to challenge Unilever's authority to make this commitment. (Ex. K.)

### G.      Alleged Impact on Mr. Zinger

Mr. Zinger asserted in a now-settled litigation (*see* Ex. Z) against Ben & Jerry's that:  after Ben & Jerry's announced its decision not to renew the License Agreement with AQP, sales of Ben & Jerry's ice cream plummeted throughout Israel (Ex. G, ¶ 65); there have been posts on social media encouraging people to boycott Mr. Zinger's business, and his equipment has been attacked and destroyed (*Id.* ¶ 67); government bodies, organizations, institutions, and private companies have all distanced themselves from Mr. Zinger (*Id.*); competitors have poached Mr. Zinger's employees (*Id.* ¶ 68); Mr. Zinger's reputation and goodwill have been harmed (*Id.* ¶ 67); and Mr. Zinger has found it difficult to receive credit from banks and suppliers (*Id.* ¶ 69).

### H.      ICA Investigation

On or around July 21, 2021, Mr. Zinger filed a complaint with the ICA regarding the Board's decision not to renew the License Agreement with Mr. Zinger's company, AQP, and

the ICA initiated an investigation by serving a request for information on Unilever in January 2022.  (Meridor Decl. ¶¶ 5–8.)  The ICA informed Unilever that it had determined that the Board's decision appeared to demonstrate a *prima facie* violation of the 2001 Consent Decree (also referred to as the Merger Decision).  (*Id.* ¶ 7.)  The ICA also determined that the October 2020 amendment to the License Agreement's definition of "Territories" might itself violate the Consent Decree, even though it was undisputed that the amendment did not effectuate any change in conduct.  (*Id.* ¶ 9.)

## I.     Litigation Against Unilever

Following the July 2021 announcements, Unilever and its affiliates were sued in the United States and Israel.

- On July 21, 2021, two class action complaints were filed in Israeli district courts against Ben & Jerry's, asserting that the decision not to sell in the Territories violated Israel's anti-discrimination laws.  DC (Jer.), 45950-07-21, *Spigelman v. Ben & Jerry's Homemade, Inc.* (Isr.); DC (CT), 45950-07-21, *Ben Ami v. Ben & Jerry's Homemade, Inc.* (Isr.).

- On March 3, 2022, as referenced in Section G, above, Mr. Zinger and AQP filed a complaint in the District of New Jersey against Ben & Jerry's, Conopco and Unilever United States, Inc., asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful termination and false light invasion of privacy.  *Zinger et al. v. Ben & Jerry's Homemade, Inc., et al.*, No. 2:22-cv-01154-ES-JBC (D.N.J.).

- On June 15, 2022, the City of St. Clair Shores Police and Fire Retirement System filed a complaint in the Southern District of New York, asserting securities claims against Unilever and its officers and directors.  *City of St. Clair Shores Police and Fire Ret. Sys. v. Unilever PLC, et al.*, No. 1:22-cv-05011 (S.D.N.Y.).

## J.     Divestments from Unilever

Setting aside whether the Board's position amounted to a boycott of Israel, or whether the Board's position in fact violated American state laws or policies against such boycotts, several state governments in the United States have divested (or announced plans to divest) their holdings of Unilever stock in the wake of the July 2021 announcement.  For

example, in December 2021, the State of New Jersey announced that it was divesting its Unilever stock.  (Ex. M.)  In October 2021, the New York State Controller announced that the New York State Common Retirement Fund, which had $111 million of Unilever equity, was divesting its Unilever stock.  (Ex. P.)  Florida, Texas, Illinois, Colorado and Arizona have also announced plans to divest their holdings of Unilever stock.  (*Id.* Exs. L, N, O, Q, R.)

### K.    Unilever's Review of Ben & Jerry's Operations in Israel

Based on the ICA's views, the divestitures of Unilever stock announced by several state governments and the risk of prolonged legal and regulatory actions against Unilever, there was an increased sense of urgency at Unilever to find a workable path forward.[5] (Close Decl. ¶ 16.)  Unilever's review of the Ben & Jerry's operations in Israel took several months and included extensive consultations with Mr. Zinger and the Israeli Government, as well as meetings with other stakeholders, including members of the Board.  (*Id.* ¶ 17.)

In April 2022, Maria Varsellona, Chief Legal Officer of Unilever, became involved for the limited purpose of trying to steer the parties toward a resolution.  (*See id.*)  In the interest of attempting to ensure a continued working relationship with the Board, Ms. Varsellona and Chair Mittal discussed options to try to resolve the issue.  (*Id.* ¶ 19.)  During these discussions, Chair Mittal expressed interest in the Israeli business being sold to Mr. Zinger, so that he could continue to sell ice cream in Israel, including the Territories, after the License Agreement expired on December 31, 2022, under a modified but similar brand name.  (*Id.*) Chair Mittal did not immediately find this option problematic from a social mission or brand integrity perspective.  (*Id.*)  Ms. Varsellona and Chair Mittal communicated further in June 2022,

---

[5] While the issues arising from Ben & Jerry's Israeli business were significant, they were not material to Unilever's global business as a whole.  (Close Decl. ¶ 16.)

during which time Unilever continued to review Ben & Jerry's operations in Israel, as well as the impact that the impasse was having on the various parties.  (*Id.*)

As a result of the company's review, Unilever decided that the interests of Conopco, Ben & Jerry's, Unilever's shareholders and Unilever's other business units would be best served by a sale to Mr. Zinger of the company's Hebrew-language Ben & Jerry's trademarks and the rights to register certain other Ben & Jerry's trademarks in Hebrew and Arabic, solely for use in Israel and the Territories (the "Assets" or "Asset Sale").  (*Id.* ¶ 20.)  Ms. Varsellona kept Chair Mittal and the Board apprised of Unilever's decision-making process.  (*Id.* ¶ 21.)  For example, on June 23, 2022, Ms. Varsellona informed Chair Mittal of the planned Asset Sale; on June 25, 2022, Ms. Varsellona sent Chair Mittal a summary of the transaction in a document addressed to the full Board; and on June 26, 2022, Ms. Varsellona sent Chair Mittal a draft of the statement Unilever intended to release to announce the transaction.  (*Id.*)

**L.      Sale of Assets to Blue & White**

On June 27, 2022, Unilever and Mr. Zinger's company, Blue & White, executed an agreement to memorialize the Asset Sale.  (Ex. W; Close Decl. ¶ 22; *see also* Ex. Y.)  Pursuant to the Asset Sale agreement, the closing of the Asset Sale was to occur immediately upon the ICA's approval and to be accomplished by the exchange of two deliverables:  *first,* the execution and delivery by each of UIP and Blue & White of the bill of sale for the Assets; and *second,* the execution and delivery by each of UIP and Blue & White of the trademark assignment agreement evidencing the sale and assignment of the Hebrew trademarks to Blue & White.  (Ex. W § 2.2; Close Decl. ¶ 22.)

**M.      Closing of the Transaction**

On June 29, 2022, the ICA notified Unilever and Blue & White that the ICA approved the Asset Sale.  (Meridor Decl. ¶ 10; Ex. V.)  The ICA indicated, however, that certain

limitations of the Consent Decree needed to remain in force and effect.  (Meridor Decl. ¶ 10.)

Accordingly, any attempt to reverse the transaction would also require the approval of the ICA.

(*Id*. ¶¶ 11-13.)  Following receipt of the ICA approval, Unilever and Blue & White closed the

Asset Sale by exchanging the two closing deliverables.  (Ex. S; Ex. X; Close Decl. ¶ 23.)  All of

Unilever's rights to the Hebrew and Arabic versions of the Ben & Jerry's trademarks in Israel

and the Territories were sold to Mr. Zinger's company, Blue & White, as of June 29, 2022.  (Ex.

S.)  Unilever and Mr. Zinger issued statements on June 29, 2022, announcing the transaction.

(Close Decl. ¶ 24; Exs. T-U.)  Mr. Zinger's company, Blue & White, is now free to sell ice

cream under its own fully owned trademarks throughout Israel and the Territories.  (Close Decl.

¶ 24.)

     **N.**    **This Case**

     On July 1, 2022, the Board purportedly passed resolutions forming a special

committee "authorized" to initiate legal action on behalf of Ben & Jerry's.  (Compl. Ex. J.)  On

July 5, 2022, Plaintiff filed its Complaint (Dkt. 1), Proposed Order to Show Cause (Dkt. 7), and

Application for Temporary Restraining Order and Preliminary Injunctive Relief (Dkt. 9), seeking

to enjoin Conopco from (i) "entering into or consummating any transaction that permits or would

permit the licensing, sale, distribution, or use of Ben & Jerry's products in the West Bank" and

(ii) "performing any act under any agreement they have entered into that would permit the

licensing, sale, distribution or use of Ben & Jerry's products in the West Bank".  (Dkt. 7 at 7.)

Later that day, counsel for Conopco told counsel for the Board the transaction had already

closed, and the requested relief was moot, but the Board elected not to modify its motion.  That

same day, this Court denied Ben & Jerry's request for a temporary restraining order, directed

Conopco to show cause as to why a preliminary injunction should not issue, and scheduled a

hearing for July 14, 2022.  (Dkt. 18.)

**ARGUMENT**

To obtain a preliminary injunction, Ben & Jerry's bears the burden of establishing, by a "*clear* showing":  "(i) a likelihood of irreparable harm; (ii) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (iii) that the balance of hardships tips in their favor regardless of the likelihood of success; and (iv) that the injunction is in the public interest." *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014).  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion".  *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019).  Courts apply a particularly high bar in a case such as this, where the movant is seeking an order that would alter the status quo.  *See Ins. Co. of the State of Penn.*, 2015 WL 8488579, at *1 ("When, as here, a party seeks a mandatory preliminary injunction that alters the status quo by commanding some positive act . . . it must carry an even heavier burden").

Plaintiff has failed to meet its heightened burden to obtain *mandatory* relief here because:  (1) the requested injunction is moot; (2) Plaintiff failed to join necessary parties; (3) Plaintiff has no reasonable probability of success on the merits; (4) Plaintiff cannot show irreparable harm; and (5) the balance of equities and the public interest weigh against entering a preliminary injunction.

## I.     THE REQUESTED INJUNCTION IS MOOT.

It is well established that a motion for preliminary injunction should be denied on mootness grounds where the thing to be enjoined has already occurred.  *See, e.g.*, *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 149 (S.D.N.Y. 2003) (denying preliminary injunction against a sale as moot "because the sale actually took place"); *Carvel*

*Farms Corp. v. Nathan*, No. 66 CIV. 958. 1966 WL 7122 at *3–4 (S.D.N.Y. June 10, 1966) (denying preliminary injunction as the injunction would have undone acts completed prior to the case being brought); *Bank of New York Co. v. Northeast Bancorp*, 9 F.3d 1065, 1067 (2d Cir. 1993) (denying preliminary injunction against the completion of a merger, as the consummation of the merger mooted the injunction); *Melnitzky v. Jones*, No. 07-CV-7380 (JGK), 2008 WL 3884361, at *8 (S.D.N.Y. Aug. 21, 2008) (denying preliminary injunction against a sale because "the uncontradicted affidavits indicate[d] that the art gallery ha[d] completed its sale[]"); *Fein v. Sec. Banknote Co.*, 157 F. Supp. 146, 148 (S.D.N.Y. 1957) (denying preliminary injunction as "the purpose of a preliminary injunction is to preserve the status quo pendente lite, not to undo completed transactions").

Here, Plaintiff seeks to enjoin the sale of the Assets.  Specifically, it seeks to enjoin Conopco from "entering into or consummating any transaction that permits or would permit the licensing, sale, distribution, or use of Ben & Jerry's products in the West Bank" and "performing any act under any agreement they have entered into that would permit the licensing, sale, distribution or use of Ben & Jerry's products in the West Bank". (Dkt. 7 at 7.)  However, the sale Plaintiff seeks to enjoin closed on June 29, 2022.  (Close Decl. ¶ 23.)  As of that date, Unilever sold, and Blue & White purchased, the Assets.  (*Id.* ¶¶ 22-23.)  Unilever and UIP exercised their rights to sell trademarks that UIP, not Ben & Jerry's, owned in Israel and the Territories (in Hebrew and Arabic but not English) to Blue & White.  (*See* Ex. A § 6.14(j).)  Thus, Plaintiff's request for relief is moot.

## II.   PLAINTIFF'S MOTION SHOULD BE DENIED FOR FAILURE TO JOIN A NECESSARY PARTY.

In addition to the fact it is moot, Plaintiff's motion for a preliminary injunction should be denied because Plaintiff failed to join necessary parties—namely, Mr. Zinger or his

affiliate, Blue & White, who became the owners of the Assets at issue when the transaction closed on June 29, 2022, as well as the seller, Unilever.

The law is clear that a preliminary injunction should not issue in the absence of a necessary party.  *See, e.g.*, *Sunset Homeowners Ass'n, Inc. v. DiFrancesco*, 386 F. Supp. 3d 299, 307 (W.D.N.Y. 2019) ("[T]he nonjoinder of a necessary party is grounds to deny a preliminary injunction for failure to demonstrate a likelihood of success on the merits."); *Ram v. Lal*, 906 F. Supp. 2d 59, 79–80 (E.D.N.Y. 2012) (denying preliminary injunction where "the parties necessary to effectuate that order are not before the Court").

Under Rule 19(a) of the Federal Rules of Civil Procedure, "an absent party is necessary where: (1) in the person's absence, complete relief cannot be accorded among existing parties, or (2) the person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may (A) as a practical matter impair or impede the person's ability to protect that interest, or (B) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the interest."  *TMT Co. Ltd. v. JPMorgan Chase Bank*, No. 16 Civ. 8757, 2018 WL 1779378, at *2 (S.D.N.Y. Mar. 28, 2018) (quoting Fed. R. Civ. P. 19(a)).  Courts routinely deny motions for preliminary injunctions where there is a threshold showing that a necessary party is absent under Rule 19(a), even without considering the factors listed in Rule 19(b).  *See, e.g., Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*, No. 03 Civ. 493 (RWS), 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of ... a necessary party under Rule 19(a) [], the merits may not be reached and a preliminary injunction may not be granted.")

Here, there is no question that Plaintiff has failed to join necessary parties under Rule 19(a), in whose absence an injunction may not issue:

- Plaintiff seeks to enjoin a sale of assets from Unilever to Mr. Zinger's company, Blue & White, though neither is a party to this case. *See, e.g., Sunset Homeowners Ass'n*, 386 F. Supp. 3d at 304–05 ("It is well established that a party to a contract which is the subject of the litigation is considered a 'necessary' party.") (quoting *Known Litig. Holdings, LLC v. Navigators Ins. Co.*, 934 F. Supp. 2d 409, 421 (D. Conn. 2013));

- In the absence of Blue & White (or its owner, Mr. Zinger) and Unilever, the Court could not accord complete relief among the existing parties. *See* F.R.C.P. 19(a)(1)(A). An injunction against Conopco would not bind Blue & White or Mr. Zinger, as neither has been sued or served. Nor would it give Plaintiff or Conopco a certain determination of its rights. *See Alpha Founders Holding, LLC v. Magellan Health, Inc.*, No. 17-CV-6225 (DLI) (RER), 2018 WL 1247405, at *10 (E.D.N.Y. Mar. 9, 2018) (denying injunction for failure to join party to disputed merger agreement because "a judgment rendered in [the party's] absence would be inadequate in that it could not prevent the merger of which Plaintiff complains");

- The requested injunction, if enforceable, would impair, impede and prejudice both Mr. Zinger's and Blue & White's rights to do business in Israel and the Territories, where Mr. Zinger has been Ben & Jerry's licensee since 1987. *See* F.R.C.P. 19(a)(1)(B)(i); *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 708 (S.D.N.Y. 1997) ("[A]s a practical matter, [the absent party's] interests could be impaired or impeded by this Court's resolution of a contract to which it is the primary signatory.");

- Entering an injunction without the necessary parties would be insufficient to achieve Plaintiff's stated purpose, as it seeks from Conopco what Conopco cannot give. *See* F.R.C.P. 19(a)(1)(A). If there were any merit to Plaintiff's claim (and there is not), then it could seek damages from Conopco for breach of contract or pursue an action against Blue & White or Mr. Zinger in Israel.

While Plaintiff's failure to join necessary parties is reason enough to deny its motion, that failure is compounded by the fact that the lawsuit was improperly brought by the Board on behalf of Ben & Jerry's. The Board acted *ultra vires* of its narrowly circumscribed authority when, on July 1, 2022, it purported to create and "authorize" a special committee to commence litigation against Unilever on behalf of Ben & Jerry's. Although the Ben & Jerry's Bylaws permit the Board to form committees, such powers are expressly limited to those "set forth in the Shareholder Agreement" (Ex. B § 3.1); and the Shareholder Agreement, in turn, expressly provides the Board with powers over *only* the "Appointment Committee" and "Social

Venture Committee" (Ex. C. §§ 1(c) and (e)).  The Board had no right to "authorize" a special

litigation committee to sue Conopco on behalf of Ben & Jerry's, and the process that the

Board followed to initiate this lawsuit is further reason to deny Plaintiff's motion.  Not only

did Plaintiff fail to join necessary parties, Plaintiff itself is not properly before this Court.

## III.    PLAINTIFF HAS NO REASONABLE CHANCE OF SUCCESS ON THE MERITS AND CANNOT SHOW SERIOUS QUESTIONS GOING TO THE MERITS.

Even if Plaintiff's motion were not moot <u>and</u> infirm for want of necessary parties,

it fails because Plaintiff cannot show that it is likely to succeed on the merits or that there are

serious questions going to the merits.  *See Conn. State Police Union v. Rovella*, 36 F.4th 54, 68

(2d Cir. 2022) (affirming decision to deny a preliminary injunction primarily because plaintiff

was unlikely to succeed on the merits of its claim); *Hope v. Board of Trustees of Operative

Plasterers*, No. CV-06-2245 (CPS), 2006 WL 1763682 at *3 (E.D.N.Y. June 23, 2006).

<u>First</u>, the Merger Agreement and Shareholders Agreement reserve all rights over

asset sales to Conopco, as sole shareholder; they give the Board no rights over asset sales.  (Ex.

A § 6.14(j); Ex. C, § 1(a).)  Specifically, the agreements limit the Board's authority to "those

powers and functions expressly granted to it" in the Agreements, and reserve to Conopco "all

other powers and functions", including responsibility over "the financial and operational aspects"

of Ben & Jerry's.  (Ex. C, § 1(a); *see also* Ex. A, § 6.14(j).)  The express rights provided to the

Board include responsibility for Ben & Jerry's social mission and the essential integrity of its

brand, but not the sales of assets.  (Ex. A, § 6.14(d)-(f); Ex. C, § 1(d)-(f).)  On the contrary,

Exhibit A to the Shareholder Agreement, read in conjunction with Section 1 of that Agreement,

makes clear that "the sale or encumbrance of assets with a book value over $100,000" is one of

Conopco's responsibilities.  (Ex. C, § 1(c)(i); *id.* (Ex. A).)  Under the plain language of the

Agreements, the right to sell assets, especially a very limited set of assets, applicable to a narrow

region of the world, belongs exclusively to Conopco, and exercising that right could not possibly be a breach of contract under the plain terms of the Agreements.  *See, e.g., Brad H. v. City of New York,* 17 N.Y. 3d 180, 185-86 (2011) (making clear that the plain meaning of the contract as a whole controls).  The Asset Sale is even further afield from the ambit of the Board's limited powers given that it was not even Conopco, but Unilever and UIP that made the Sale.

Plaintiff cites Section 6.14(f) of the Merger Agreement and Section 1(f) of the Shareholders Agreement for the proposition that the "Board of Directors 'may prevent any action by the CEO in the licensing or other use of the Ben & Jerry's trademark that . . . a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand'".  (Br. 14.)  However, the provisions only authorizes the Board to prevent actions "by the CEO", and the Asset Sale was not an action by the Ben & Jerry's CEO, but by Unilever.  Nor could the Asset Sale have constituted an action by the CEO given that the Assets were not even owned by Ben & Jerry's.  (Exs. D-F.)

Second, the Board effectively contends that its "primary" responsibilities for social mission and brand integrity imply the right to prevent a sale of assets.  But that argument not only ignores the Agreements' express allocation of responsibilities (stated immediately above), but also flies in the face of the Shareholder Agreement's express rejection of any attempt by the Board to claim unexpressed rights by implication.  The Shareholder Agreement states that "[t]he rights, powers and authority of the Company Board are set forth in their entirety in this Agreement, and the Company Board shall not have any rights, powers or authority, express or implied, except as specifically set forth in this Agreement".  (Ex. C, § 1(l).)  Even the Board's express powers over the social mission and brand integrity are limited by requirements that it "work together with the CEO" to advance the company's objectives.  (*Id.* §§ 1(e)-(f).)  Nothing

in the Agreements empowers the Board to assert control over the actions of Ben & Jerry's parents, Conopco or Unilever.  Moreover, construing the Board's limited rights as the Board does here would usurp rights beyond Conopco's  responsibility for asset sales; it would also interfere, for example, with Conopco's right to control the operational and financial aspects of the business.  Under the Board's theory, it could preclude Ben & Jerry's from selling in any state or territory unwilling to adopt a policy the Board favors, irrespective of the impact on Conopco or Ben & Jerry's operations and financial performance.  For example, if the State of Texas adopted a measure that conflicted with the Board's views on LGBTQ rights, gun rights or the environment, the Board's position suggests it could force Conopco to end its decades of operations in Texas.  The Board's interpretation of its rights has no limits, negates the powers of the company's sole shareholder, and runs counter to the well-established rule that contracts must be construed to be commercially reasonable.  *See, e.g.*, *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 277 (S.D.N.Y. 2021) ("a 'contract should not be interpreted to produce a result that is . . . commercially unreasonable[.]'") (quoting *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 1st Dep't 2010)).

Furthermore, with respect to Ben & Jerry's "social mission" power, the Articles of Incorporation provide examples of the company's Social Mission Priorities, for which the Board is responsible.  (Ex. A (Schedule 6.14).)  The Social Mission Priorities include "packaging improvement efforts" to "achiev[e] a compostable pint"; creating a "sustainability 'footprint'" to protect the environment; opposing the use of growth hormones and GMOs; and donating to philanthropic causes.  (*Id.*; *see also* Ex. C (Ex. B).)  Although the Merger Agreement contemplates that the Ben & Jerry's "objectives . . . may evolve from time to time", the evolution must be "consistent" with Ben & Jerry's "historical social mission", as reflected in the

enumerated list of priorities.  (*Id.* § 6.14(e).)  None of the listed Priorities or future aims could "evolve" so far as to capture boycotting any country or region for political reasons.

## IV.    PLAINTIFF CANNOT SHOW IRREPARABLE HARM.

Further foreclosing Plaintiff's motion is its inability to make the necessary showing of irreparable harm.  *See Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998) ("In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.").  As an initial matter, Plaintiff cannot show an injunction would avoid irreparable harm because any harm arising from the Asset Sale has already occurred.  *See Clonus Assocs. v. Dreamworks, LLC,* 417 F. Supp. 2d 248, 254-55, 256-57 (S.D.N.Y. 2005) (finding no irreparable harm in part because "[w]hatever harm [the activity at issue] might cause" "has already occurred"); *Marcy Playground, Inc. v. Capitol Records, Inc.,* 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998) (finding no material threat of irreparable injury because any potential injury "already has occurred" and thus, "a preliminary injunction here would be very much like locking the barn door after the horse is gone").

Moreover, alleged harm is not "irreparable" for purposes of granting a preliminary injunction where it is remote and/or speculative.  *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) ("[I]rreparable harm must be shown to be actual and imminent, not remote or speculative.").  Here, the alleged harm is remote because the Board has long known that Mr. Zinger would sell ice cream in the Territories through the expiration of the License Agreement in December 2022.[6]  (Ex. I.)  The alleged harm is speculative because there is no reason to believe that the sale of ice cream in the Territories (by the same group that has

---

[6] Although Ben & Jerry's and Mr. Zinger's company, AQP, executed an amendment in October 2020, modifying the definition of the License Agreement's territory to excise references to the disputed territories (Ex. H), the change in language was not accompanied by any change in conduct.  AQP continued to sell Ben & Jerry's ice cream in the Territories, and the Board never sought to enjoin AQP from doing so (Ex. G ¶ 52).

distributed Ben & Jerry's products for more than three decades) would cause immediate and irreparable injury to Ben & Jerry's social mission or brand.  That is especially so, in view of the fact that Mr. Zinger has sworn that he has fulfilled Ben & Jerry's social mission for decades, as witnessed by members of the Board.  (Ex. G ¶¶ 32, 38-41.)

Finally, Plaintiff suggests it is entitled to a presumption of irreparable harm because the Merger Agreement and the Shareholder Agreement contain a provision stating that "[t]he parties agree that irreparable damage would occur in the event that any of the provisions of [the Agreement] were . . . breached" and that "the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement".  (Ex. C § 7; *see also* Ex. A § 9.10.)  However, as Plaintiff appears to admit (Br. 15), such provisions are not dispositive,[7] and any presumption of harm is rebutted by the fact that the Board has long known that Mr. Zinger planned to continue selling Ben & Jerry's ice cream in Israel and the Territories through December 31, 2022.

## V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION.

Finally, the balance of equities and the public interest weigh against an injunction. *See Marblegate*, 75 F. Supp. 3d at 595  (denying preliminary injunction where balance of equities and public interest did not favor injunctive relief, even when plaintiffs would likely succeed on the merits); *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011) (denying preliminary injunction where "[t]he balance of equities . . . favors denial of plaintiffs' motion" and "public interest . . . would be disserved by issuance of the requested injunction").

---

[7] *See Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, No. 1:21-CV-00038-MKV, 2021 WL 535485, at *8 (S.D.N.Y. Feb. 12, 2021) ("Parties may not contractually circumvent an independent judicial determination of irreparable harm.").

Neither the equities nor the public interest favors the entry of a preliminary injunction where, as here, there is no likelihood of success and no irreparable harm.  *See, e.g.*, *Sterling*, 368 F. Supp. 3d at 729.  In addition, the issuance of a preliminary injunction would cause substantial harm to Unilever, Conopco and Ben & Jerry's by prolonging the parties' impasse over the future of Ben & Jerry's operations in Israel and/or the Territories, which has already subjected the parties to costly litigation, regulatory investigation, divestitures of their stock and intense public criticism.  *See S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 384 (S.D.N.Y. 1998) (denying preliminary injunction after finding that "there are cases where an injunction may do more harm than good" and that here "a preliminary injunction . . . would not be in the public interest").[8]

Moreover, the interests of comity disfavor an injunction where, as here, a foreign regulator (*i.e.*, the ICA) has already approved the transaction sought to be enjoined, and would likely refuse to allow the assets at issue to be sold back to the seller.  (Meridor Decl. ¶¶ 11-15.) *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541 at *98 (S.D.N.Y. Aug. 4, 2015) (finding that "[i]njunctive relief [was] especially inappropriate" in light of a foreign regulator's role which raised "issues of international comity").

## CONCLUSION

For the foregoing reasons, Plaintiff's application for a preliminary injunction should be denied.

---

[8]  Even if there were grounds to issue a preliminary injunction (and there are not), no injunction should issue absent the posting of bond by the authorizing board members, as they, not the company, made the decision to bring this case.  *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

Dated: July 11, 2022

CRAVATH, SWAINE & MOORE, LLP

by _____ s/ *David Marriott*
David Marriott
Gary Bornstein
Yonatan Even

Worldwide Plaza
825 Eighth Avenue
New York, NY
(212) 474-1000
dmarriott@cravath.com
gbornstein@cravath.com
yeven@cravath.com

*Attorneys for Defendant Conopco, Inc.*