**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEN & JERRY'S HOMEMADE, INC.,     ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | |
| v.     ) | Case No. 1:22-cv-05681-ALC |
|     ) | |
| CONOPCO, INC., UNILEVER IP     ) | |
| HOLDINGS B.V., and UNILEVER PLC,     ) | |
|     ) | |
| Defendants.     ) | |

## AMENDED COMPLAINT

Plaintiff Ben & Jerry's Homemade, Inc. ("Ben & Jerry's," the "Company," or the "Plaintiff"), by and through its undersigned attorneys, as and for its amended complaint (the "Amended Complaint") against defendants Conopco, Inc. ("Conopco"), Unilever IP Holdings B.V. ("UIP"), as successor-in-interest to Unilever N.V., and Unilever plc ("Unilever," and together with Conopco and UIP, "Defendants"), hereby alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This dispute concerns the autonomy of Ben & Jerry's Independent Board of Directors (the "Independent Board"), and the core values the Company has spent the last forty-four years establishing.

2.     From its stances on migrant justice and LGBTQ+ rights to Black Lives Matter and climate change, the Ben & Jerry's brand is synonymous with social activism. The Company's core values of advancing human rights and dignity, supporting social and economic justice for historically marginalized communities, and protecting and restoring the Earth's natural systems are integral to Ben & Jerry's identity.  So much so that when the Company

entered into an Agreement and Plan of Merger with Conopco, a wholly-owned subsidiary of Unilever, in 2000 (the "Merger Agreement"), Ben & Jerry's expressly reserved the "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" to an Independent Board of Directors.[1]  These terms were subsequently memorialized in a Shareholders Agreement between Ben & Jerry's and Conopco (the "Shareholders Agreement").[2]

3.     The Merger Agreement was conditioned on entry by Ben & Jerry's into a License Agreement with Unilever N.V. (succeeded by UIP) and Unilever (the "License Agreement").[3]  The License Agreement provided that Ben & Jerry's would retain ownership of its trademarks post-merger, thus ensuring that the Independent Board could effectively serve as the "custodian" of the Ben & Jerry's brand going forward.

4.     Pursuant to the terms of the Merger Agreement and Shareholders Agreement, Unilever, through its wholly-owned subsidiary Conopco, agreed to a unique corporate governance structure that preserved the independence and autonomy of Ben & Jerry's Board of Directors.  Specifically, an Independent Board of Directors was created and expressly authorized to protect against actions that, in its discretion, pose a risk to the integrity of the essential elements of the Ben & Jerry's brand name.  Although the chief executive officer of the Company, appointed by Conopco, has certain authority over financial and operational matters, his/her authority is subject to a critical limitation.  As part of its primary responsibility for safeguarding the integrity of the Ben & Jerry's brand, the Independent Board is authorized to "prevent any action by the CEO in the areas of . . . the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand." Exh. A, § 6.14(f); Exh. B, § 1(f).

---

[1] *See* Exhibit A, Merger Agreement, § 6.14(f).
[2] *See* Exhibit B, Shareholders Agreement.
[3] *See* Exhibit C, License Agreement.

5.      In 2021, the Independent Board determined that it would be inconsistent with the essential elements of Ben & Jerry's brand integrity for Ben & Jerry's ice cream to be sold in the West Bank.   In response, Unilever issued a public statement declaring that it had "*always recognised the right* of the brand and its independent Board to take decisions about its social missions."[4]  And, in April 2022, Unilever reiterated that Ben & Jerry's "would clearly be harmed if forced to provide a license . . . against its will."[5]

6.      On June 29, 2022, Unilever abruptly reversed course, announcing that Ben & Jerry's "will be sold" in the West Bank through a third-party distributor.[6]  Unilever's unilateral decision was made without the consent of Ben & Jerry's Independent Board, the entity contractually empowered with protecting Ben & Jerry's brand.   Moreover, on July 11, 2022, Conopco revealed that in 2000, mere months after the merger transaction was completed, Unilever had covertly caused the transfer of Ben & Jerry's trademarks to Unilever N.V., in direct violation of the License Agreement.   These actions breached the express terms of the Merger Agreement, Shareholders Agreement, and License Agreement, which were put in place to protect the brand and social integrity Ben & Jerry's has spent decades building.

## PARTIES

7.      Plaintiff Ben & Jerry's Homemade, Inc. is a Vermont corporation with its principal place of business in Burlington, Vermont.

8.      Defendant Conopco, Inc. is a New York corporation headquartered in Englewood Cliffs, New Jersey.

---

[4] *See* Exhibit D (emphasis added), "Unilever Statement on Ben & Jerry's Decision." Available at: https://www.unilever.com/news/press-and-media/press-releases/2021/unilever-statement-on-ben-and-jerrys-decision/.
[5] *See* Exhibit E, *Zinger v. Ben & Jerry's Homemade, Inc.*, Case No. 2:22-cv-01154, ECF No. 39, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, at 5.
[6] *See* Exhibit F, "Unilever reaches new business arrangement for Ben & Jerry's in Israel." Available at: https://www.unilever.com/news/press-and-media/press-releases/2022/unilever-reaches-new-business-arrangement-for-ben-jerrys-in-israel/.

9.     Defendant Unilever plc is a United Kingdom public limited company headquartered in London, England.

10.    Defendant Unilever IP Holdings B.V. is a Netherlands private limited liability company headquartered in Rotterdam, Netherlands.

## PERSONAL JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Conopco because Conopco has consented to personal jurisdiction in any federal court located in the State of New York under Section 9.10 of the Merger Agreement and Section 7 of the Shareholders Agreement.  Conopco is also subject to the general personal jurisdiction of this Court as a domestic corporation.  *See* N.Y. C.P.L.R. § 301.

12.    This Court has personal jurisdiction over Unilever because Unilever has consented to personal jurisdiction in any federal court located in the State of New York under Section 27(b) of the License Agreement dated April 11, 2000 by and among Plaintiff, Unilever, and the other parties thereto, with respect to claims being brought in this Amended Complaint.

13.    This Court has personal jurisdiction over UIP, as successor-in-interest to Unilever N.V., because Unilever N.V. consented to personal jurisdiction in any federal court located in the State of New York under Section 27(b) of the License Agreement dated April 11, 2000 by and among Plaintiff, Unilever N.V., and the other parties thereto, with respect to claims being brought in this Amended Complaint.

14.    Venue lies within this District pursuant to Section 9.10 of the Merger Agreement, Section 7 of the Shareholder Agreement, and Section 27(b) of the License Agreement.  On information and belief, venue also lies in this District under 28 U.S.C. § 1392(b)(2) because

Defendants Conopco, UIP and Unilever conduct, transact, and/or solicit substantial business in New York.

## SUBJECT MATTER JURISDICTION

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity among the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.  Specifically, Ben & Jerry's public image and brand integrity is likely to suffer damages in excess of $75,000 as a result of Defendants' conduct, and the value of Ben & Jerry's trademarks that Defendants wrongfully caused to be transferred from Ben & Jerry's control far exceeds $75,000, as described below.

## FACTUAL BACKGROUND

16.     Ben & Jerry's is an American institution.  An institution that is known for the principled, progressive stances it takes on various societal issues, both domestically and internationally.  This social integrity is as important to Ben & Jerry's as the ice cream it makes.

**A.     Ben & Jerry's Establishes a Brand Synonymous with Social Activism.**

17.     Ben Cohen and Jerry Greenfield grew up in Merrick, New York and have been friends since childhood.  In the late 1970s, Mr. Cohen and Mr. Greenfield decided to start an ice cream business.  They took a $5-correspondence course on ice cream making from Pennsylvania State University's creamery.  Soon after, the pair formed Ben & Jerry's and, on May 5, 1978, opened their first ice cream parlor in a renovated gas station in downtown Burlington, Vermont.

18.     In the early 1980s, as Ben & Jerry's grew, Mr. Cohen and Mr. Greenfield decided they wanted their business to be more than just an ice cream company.  So, they adopted a unique corporate model based on the concept of "linked prosperity."  As part of that model, Ben & Jerry's formally adopted a three-part mission, which incorporated the Company's core values

and became its guiding ethos.  In essence, Ben & Jerry's would seek to make high-quality ice cream (the "Product Mission"); operate the Company on a sustainable financial basis (the "Economic Mission"); and engage in progressive social change (the "Social Mission").

19.    When the "linked prosperity" model was originally being developed, there were internal company discussions regarding the hierarchy of the three missions.  After some debate, Ben & Jerry's ultimately decided that each mission would be of equal importance, with profit, quality, and social impact serving as co-equal principles.  These principles have driven the Company' decision making for more than four decades:



20.    Ben & Jerry's stayed true to its linked prosperity model.  As the Company became more financially successful in the late 1980s, it correspondingly expanded its social platform, taking leading stances on a number of societal issues.

21.    In 1988, for example, Mr. Cohen became disturbed by the Reagan administration's exorbitant spending on nuclear weapons, while one in five American children lived in poverty.  In response, he launched "1% for Peace," an initiative that advocated for the United States to redirect 1% of its defense budget to peace-promoting projects.  In support of

"1% for Peace," Ben & Jerry's launched a new product, the "Peace Pop," which included a wrapper directly challenging Cold War spending policy:

 

22.     Ben & Jerry's outspoken social advocacy continued throughout the 1990s.

23.     In 1990, for example, Ben & Jerry's printed "Support Farm Aid" messages on eight million ice cream pints in support of grassroots efforts to keep family farmers on their lands.  That same year, Ben & Jerry's co-sponsored a full-page ad in the *New York Times* opposing the United States' imminent invasion of Kuwait.  And, in 1990, Ben & Jerry's also started collaborating with Greyston Bakery, a bakery based in Yonkers, NY that provides homeless people and other people who struggle to find employment with jobs making brownies, cheesecakes, and torts, among other baked goods.  Greyston Bakery uses its profits to provide transitional housing, counseling, and training for its employees to break the cycle of homelessness and continues to provide the brownies Ben & Jerry's uses in its ice cream to this day.

24.     In 1991, Ben & Jerry's became an outspoken advocate for LGBTQ+ rights and began offering benefits to the same-sex partners of its employees.  Three years later, in 1994,

Ben & Jerry's highlighted its dedication to social activism by honoring eight famous advocates of social change—Pete Seeger, Michelle Shocked, Buffy Sainte-Marie, Dolores Huerta, Daniel Berrigan, Bobby Seale, Spike Lee, and Carlos Santana—in a new advertising campaign:



25.     Nearly two decades after its inception, Ben & Jerry's "linked prosperity" corporate model came full circle in 1998 when the Company successfully lobbied the Vermont legislature to pass a law that authorizes corporate directors to consider issues beyond shareholder wealth maximation when making company decisions (often referred to as the "Ben & Jerry's Law").

26.     Ben & Jerry's social integrity resonated with its customers.  In 1999, a national survey found that Ben & Jerry's ranked fifth among *all* companies in the United States in terms of reputation, a startling fact given that "the top four finishers (Johnson & Johnson, Coca-Cola,

Hewlett-Packard, and Intel) were so much larger."[7]  This loyal following made Ben & Jerry's attractive to potential suitors, including Defendant Unilever.

**B.     Ben & Jerry's Enters into a Merger Agreement with Unilever on the Condition that an Independent Ben & Jerry's Board Would Be Responsible for Advancing Its Social Mission and Protecting the Integrity of its Brand.**

27.     In 1999, several potential buyers became interested in acquiring Ben & Jerry's, including industry rivals Dreyer's Ice Cream and Defendant Unilever.

28.     Unilever knew that in order to beat out the competition for Ben & Jerry's, it had to respect the brand's unique social integrity.  Ronald Soiefer (General Counsel of Unilever USA and Chief Counsel in 2000) was instructed that his "job was to collaborate with" Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."[8]

29.     During the next year and a half of negotiations, Ben & Jerry's made clear that any potential merger must expressly include contract language that reflected the brand's social mission and provide for the creation of an independent board of directors.  The resulting Merger Agreement, executed in the summer of 2000, was described by Richard Goldstein (former Chief Executive Officer of Unilever North America) as the "most unique" deal he had ever been involved in: "I never did another deal that was remotely like it."[9]

30.     The bespoke governance structure created by the Merger Agreement is primarily reflected in Section 6.14, which expressly empowers an Independent Board of Directors:

- Section 6.14(e) provides that the Board "shall have ***primary responsibility*** for ***preserving and enhancing*** the objectives of the historical ***social mission*** of the Company . . . ."

- Section 6.14(f) prescribes that the Board "shall be the ***custodians of the Ben & Jerry's-brand image*** and shall have ***primary responsibility for safeguarding the***

---

[7] *See* Exhibit G, Excerpts from BRAD EDMONSON, ICE CREAM SOCIAL:  THE STRUGGLE FOR THE SOUL OF BEN & JERRY'S (2014), at 150.
[8] *Id*. at 170.
[9] *Id*. at 156, 172.

***integrity of the essential elements of the Ben & Jerry's brand-name*** (the 'Essential Integrity of the Brand')." And, that "[a]s part of this responsibility, ***the Company Board may prevent any action*** by the CEO in the areas of new product introduction, the changing of product standards and specifications, . . . and the ***licensing or other use of the Ben & Jerry's trademark that***, in each case, a majority of the Company Board reasonably determines to be ***inconsistent with the Essential Integrity of the Brand***." Exh. A, § 6.14(f).

- Section 6.14(d) provides that although Ben & Jerry's will be managed by a Unilever-appointed CEO, that management is expressly "[***s]ubject to*** Sections 6.14(e) and 6.14(f), which place ***primary responsibility*** for ***Social Mission*** priorities and the ***Essential Integrity of the Brand . . . with the Company Board***." Exh. A, § 6.14(d).

- And, although Defendant Conopco is provided certain "financial and operational" authority over Ben & Jerry's under Section 6.14(j), **Section 6.14(i)** bars Unilever from taking any action that may prevent the Independent Board of Directors from "fulfilling its obligations." Exh. A, § 6.14(i).

- Finally, Section 9.10 provides the "[e]nforcement" mechanism for breaches of Section 6.14, stating that "irreparable damage would occur in the event that any of the provisions of any Transaction Agreement [defined as the Merger Agreement, License Agreement, and Stock Option Agreement] were not performed in accordance with their specific terms" and that Ben & Jerry's would "be entitled to an injunction" to "prevent breaches" and "enforce specifically the terms and provisions" of the Merger Agreement. Exh. A, § 9.10.

31.    The Merger Agreement recognized that Ben & Jerry's business reputation and the substantial goodwill associated with its name depended on fidelity to Ben & Jerry's historical Social Mission and preservation of the Essential Integrity of the Brand.  Moreover, the Merger Agreement also recognized that the mechanism for preserving Ben & Jerrys business reputation and goodwill was to maintain the autonomy of the Independent Board of Directors over all matters regarding the Social Mission and Essential Integrity of the Brand.

32.    The Merger Agreement also acknowledged that a breach of Conopco's obligation to preserve the autonomy and authority of the Independent Board would cause irreparable harm to Ben & Jerry's business reputation and goodwill.   Section 9.10 provides the "[e]nforcement" mechanism for breaches of Section 6.14, stating that "irreparable damage would occur in the

event that any of the provisions of [the Merger Agreement] were not performed in accordance with their specific terms" and that Ben & Jerry's would "be entitled to an injunction" to "prevent breaches" and "enforce specifically the terms and provisions" of the Merger Agreement.  Exh. A, § 9.10.

33.    Section 6.14(l) of the Merger Agreement expressly required the parties to amend the Company's post-merger Charter and Bylaws "to the extent necessary to implement the provisions contained in this Section 6.14."  Exh. A, § 6.14(l).

34.    The Merger Agreement was also conditioned upon entry by Ben & Jerry's into a License Agreement with Unilever N.V. and Unilever plc.  The License Agreement ensured that Ben & Jerry's would retain ownership of its trademarks post-merger, so that the Independent Board could effectively serve its function as "custodian" of the Ben & Jerry's brand.

**C.    Ben & Jerry's and Conopco Enter into a Shareholders Agreement, Which Formalizes the Independent Board's Oversight Powers and Duties.**

35.    As required by Section 6.14(l) of the Merger Agreement, Conopco and Ben & Jerry's entered into the Shareholders Agreement dated August 3, 2000, which incorporated *mutatis mutandis* the provisions of Section 6.14.  *See* Exh. B, Section 1.  The Shareholders Agreement was incorporated by reference into the Company's post-merger Charter and By-Laws, and thus operationalizes the Section 6.14 provisions as an integral part of the Company's corporate governance structure.   Consistent with the terms of the Merger Agreement, the Shareholders Agreement assigns authority to the Ben & Jerry's Board of Directors for preserving the Company's Social Mission and safeguarding the integrity of its brand.   In particular:

- Section 1(e) provides that the Board "shall have ***primary responsibility*** for ***preserving and enhancing*** the objectives of the historical ***social mission*** of the Company . . . ."

- Section 1(f) prescribes that the Board "shall be the *custodians of the Ben & Jerry's-brand image* and shall have *primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name* (the 'Essential Integrity of the Brand')." And, that "[a]s part of this responsibility . . . *the Company Board may prevent any action* by the CEO in the areas of . . . the *licensing or other use of the Ben & Jerry's trademark that*, in each case, a majority of the Company Board reasonably determines to be *inconsistent with the Essential Integrity of the Brand*."

- Section 1(d) provides that although Ben & Jerry's will be managed by a Unilever-appointed CEO, such management is expressly "[*s*]*ubject to* Sections 1(e) and 1(f), which place *primary responsibility* for *Social Mission Priorities* and the *Essential Integrity of the Brand . . . with the Company Board*."

- And, although Conopco retains certain "financial and operational" authority over Ben & Jerry's under Section 1(j), **Section 1(i)** bars Conopco from taking any action that may prevent the Independent Board of Directors from "fulfilling its obligations" under Section 1 of the Shareholders Agreement.

- Finally, Section 7 provides the "[e]nforcement" mechanism for breaches of the Shareholders Agreement, stating that "irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached" and that Ben & Jerry's would "be entitled to an injunction" to "prevent breaches" and "enforce specifically the terms and provisions" of the Shareholders Agreement.

## D.    As a Critical Condition of the Merger, Ben & Jerry's and Unilever Execute a License Agreement for Ben & Jerry's International Trademarks.

36.    As an express condition to the Merger Agreement, Ben & Jerry's, along with its affiliate, Ben & Jerry's Homemade Holdings, Inc. ("B&J Holdings"),[10] entered into a License Agreement dated April 11, 2000 with Unilever N.V. and Unilever plc with respect to Ben & Jerry's international trademarks.  *See* Exh. A, p. 2; *see* Exh. C.  The License Agreement served two important purposes:  it confirmed that Ben & Jerry's trademarks were and would remain owned by Ben & Jerry's (as opposed to a Unilever entity); and it licensed the trademarks to Unilever, subject to the Independent Board's oversight and terms ensuring that use of the trademarks was consistent with Ben & Jerry's social mission and the integrity of its brand. The

---

[10] B&J Holdings was merged with and into Ben & Jerry's in December 2005 and no longer has a separate legal existence.

License Agreement governed the global use of Ben & Jerry's licensed marks (aside from use in the United States, Japan, and certain Caribbean countries) (*see* Exh. C, Recitals), including the use of its marks in Israel. *See id.* § 9(d). The License Agreement was signed by Perry Odak in his capacities as CEO of Ben & Jerry's and Vice President of B&J Holdings; by R.W. Chamberlin and G. Dijkstra on behalf of Unilever N.V.; and by Stephen J. Williams on behalf of Unilever plc. *See id.* at 25.

37.     The License Agreement had an initial ten-year term and was subject to automatic renewal for successive five-year terms. *See* Exh. C, § 3. Upon information and belief, the License Agreement remains in full force and effect.

38.     The License Agreement was an express condition and critical component of the Merger Agreement because its terms enabled the Ben & Jerry's Board to exercise post-merger oversight and control over Ben & Jerry's international marks, and thereby protect and promote the Company's Social Mission and the Essential Integrity of the Brand. The Merger Agreement's integration clause explicitly identifies the License Agreement as part of the larger merger transaction. *See* Exh. A, § 9.07 ("The Transaction Agreements [defined as the License Agreement, the Merger Agreement, and the Conopco stock option agreement], taken together with the Company Disclosure Letter and the Conopco Disclosure letter, [] constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the Transactions.") Both the Merger Agreement and Shareholders Agreement directly refer to the License Agreement for the definitions of "Products" and "Principal Licensed Mark," which are used in calculating Ben & Jerry's annual charitable contributions. *See* Exh. A, § 6.14(h); Exh. B, § 1(h)).

39.     The License Agreement also formed the basis for a number of representations, warranties, and covenants under the Merger Agreement, further demonstrating its centrality to the merger between Ben & Jerry's and Conopco.  Among other things, Ben & Jerry's was required under the Merger Agreement to represent that it had "duly executed and delivered each Transaction Agreement to which it is a party," including the License Agreement, and that "each Transaction Agreement to which it is a party constitutes its legal, valid and binding obligation." *See* Exh. A, § 3.04(a).  In addition, each of the parties to the Merger Agreement agreed to use its "best efforts" to ensure "(iv) the execution and delivery of any additional instruments necessary to consummate the Transactions and to <u>fully carry out the purposes of the Transaction Agreements</u>."  Exh. A, § 6.03(a) (emphasis added).  Moreover, Conopco agreed in the Merger Agreement that, "irreparable damage would occur in the event that <u>any of the provisions of any Transaction Agreements were not performed in accordance with their specific terms or were otherwise breached</u>."  Exh. A, § 9.10. (emphasis added).

40.     The License Agreement serves two essential functions that directly support the Independent Board's stewardship of Ben & Jerry's Social Mission and brand integrity, as provided for under the Merger Agreement and Shareholders Agreement.  First, the License Agreement's terms are meant to ensure that all relevant trademark rights of Ben & Jerry's would continue to reside with Ben & Jerry's—and *not* a Unilever entity—after the merger, and therefore remain under the supervision of the Independent Board.  Unilever acknowledged under the License Agreement that Ben & Jerry's (together with B&J Holdings) is the "owner of all right, title and interest in and to the Licensed Mark in the Territory under this Agreement" (§ 11(a)), and agreed that it would not, "<u>at any time, do any act or thing which will materially impair the rights of [Ben & Jerry's] in and to the Licensed Mark</u> or any registrations thereof or

which will materially depreciate the value of the Licensed Mark." *Id.* (emphasis added). Unilever further agreed under the License Agreement that even if, due to foreign regulations, Unilever or one of its affiliates was required to register a particular Ben & Jerry's trademark abroad, Unilever would "not acquire proprietary rights in respect to the Licensed Mark" as a result, and that all such marks would be assigned, transferred, and conveyed back to Ben & Jerry's upon termination of the License Agreement. *Id.* § 12(a).

41.     Second, the License Agreement creates a detailed structure for monitoring and managing Unilever's use of the Ben & Jerry's international marks, in order to ensure the Independent Board retained adequate control and oversight over Ben & Jerry's brand image. Among other things, the License Agreement contains comprehensive terms governing the quality standards that Unilever must maintain for products bearing Ben & Jerry's marks and the need for Unilever to "regularly consult with" Ben & Jerry's concerning Unilever's business plans for the marks. *See* Exh. C, §§ 4, 5.  The License Agreement also contains an entire section devoted to Ben & Jerry's "Social Mission," which is, tellingly, the longest section of the entire agreement. *See* Exh. C, § 7.  Under the Social Mission provisions, Unilever agrees to develop, promote, and market products "in a manner so as to further the Essential Integrity of the Principal Licensed Mark," (*id.* § 7(a)), and Unilever acknowledges that "performance . . . of its obligations in this Section 7 is a material and fundamental element of this Agreement and is essential to preserve the Essential Integrity of the Principal Licensed Mark." *Id.* § 7(d).  In exchange for the rights to use Ben & Jerry's mark, Unilever was to pay Ben & Jerry's a 5% royalty of net sales of products sold under the marks. *Id.* § 6(a).  Taken together, these terms ensured that Unilever kept the Independent Board appropriately informed regarding its use of the marks, and that the

Independent Board had the means to fulfill its obligations under the Merger Agreement and Shareholders Agreement.

42.     The License Agreement also contains an indemnification provision requiring Unilever to indemnify Ben & Jerry's and its directors for losses—including reasonable attorneys' fees—caused by Unilever's breach of the agreement:

> Licensee [Unilever N.V. and Unilever plc] shall defend, indemnify and hold harmless Licensor [Ben & Jerry's and B&J Holdings] and its respective officers, directors and employees . . . from and against any and all claims, losses, damages, liabilities, obligations, costs and expenses, including reasonable attorneys' fees . . . arising out of or resulting from a breach by Licensee of any provision of this Agreement.

*See id.* § 15(a).

43.     Finally, the parties agreed in Section 31 of the License Agreement that the License Agreement reflected "the complete understanding of the parties with respect to the subject matter hereof," and that the License Agreement "may not be modified, discharged or terminated except by a written instrument signed by both Licensee [Unilever N.V. and Unilever plc] and Licensor [Ben & Jerry's Homemade, Inc. and B&J Holdings]." *See id.* § 31.

44.     In sum, the License Agreement was designed to work hand-in-glove with the Merger Agreement and Shareholders Agreement as a source of substantive rights for the Ben & Jerry's Independent Board, as custodian of the Ben & Jerry's trademarks, to ensure the protection of the Company's Social Mission and brand integrity following the merger.

**E.     Unilever Publicly Confirms the Board's Authority Was to Be Preserved, in Perpetuity, under the Terms of the Merger Agreement, Shareholders Agreement, and License Agreement.**

45.     Unilever expressly acknowledged the importance and effect of Ben & Jerry's unique Board protections as set forth in the Merger Agreement, Shareholders Agreement, and License Agreement.  As Richard Goldstein, Unilever's then-Chief Executive Officer of North America, described: "The only reason we were successful in the acquisition is because Ben and

Jerry became convinced that Unilever would honor its word. There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."[11]

46.     Similarly, Unilever's then-Chief Counsel, Soiefer, recognized: "Perpetuity is what really distinguishes this deal from other deals involving socially responsible businesses. The board of Ben & Jerry's is not going away.  They will always be pushing to integrate the social mission throughout the company and keep the company's operations transparent.  It isn't like Unilever can run out the clock."[12]

47.     Goldstein and Soiefer's analyses were echoed in 2021 by Ben & Jerry's current CEO, Matthew McCarthy (a Unilever appointee):

> We may disagree at times, but this acquisition, which happened 20 years ago, has been so successful in part because Unilever got a good schooling from [co-founder] Jerry [Greenfield] and Ben about what they had created and what we're still trying to drive forward. They were also very smart, shrewd guys who put into the sales agreement a certain level of autonomy that would exist in perpetuity, including the creation of an independent board of directors that I sit on and am also partly accountable to. So, there's a certain level of independence baked in.[13]

F.     **Shortly After Closing the Merger, Unilever, Unbeknownst to the Board, Breaches the Transaction Documents and Transfers Ownership of the Trademarks to Itself.**

48.     Upon securing ownership of Ben & Jerry's, Unilever, unbeknownst to the Independent Board, purported to cause the transfer of Ben & Jerry's trademarks to a Unilever entity, thereby breaching the terms of the License Agreement, Merger Agreement, and Shareholders Agreement.

49.     In November 2000, only a few months after the merger closed, Unilever fired the CEO of Ben & Jerry's, Perry Odak, and replaced him with a Unilever executive, Yves Couette. Ben Cohen and Jerry Greenfield issued a statement at the time expressing their disapproval of

---

[11] Exhibit G at 159.
[12] *Id*. at 170.
[13] *See* Exhibit H, Alison Beard, *Why Ben & Jerry's Speaks Out* (Jan. 13, 2021). Available at: https://hbr.org/2021/01/why-ben-jerrys-speaks-out.

the change in leadership, which was rooted in their concerns over Couette's lack of commitment to the Social Mission: "We strongly supported a different candidate, a longtime member of Ben & Jerry's board of directors whose commitment to our social policies was clear and established."[14]

50.   The founders' concerns over Couette's appointment as CEO appear to have been well-founded.   Upon information and belief, with Perry Odak removed as CEO, Unilever, through its subsidiaries and affiliates, including Unilever N.V. (succeeded by UIP) and Conopco, began to take actions to evade the very protections that Ben & Jerry's had secured in the Merger Agreement, Shareholders Agreement and License Agreement.

51.   The extent of Unilever's actions was only recently revealed to the Ben & Jerry's Independent Board.   In its Memorandum of Law in Opposition to Plaintiff's Application for Preliminary Injunctive Relief, filed on July 11, 2022, Conopco stated that, "In connection with the acquisition [of Ben & Jerry's by Unilever], Plaintiff and Unilever N.V. executed a Trademark Sale Agreement, dated December 22, 2000, under which Plaintiff sold to Unilever N.V. all rights to the Ben & Jerry's trademarks."  (ECF No. 30, at 12).  However, "Plaintiff"— i.e., Ben & Jerry's Homemade, Inc.—was not a party to any agreement transferring the trademarks to Unilever N.V.  These agreements were instead executed by B&J Holdings, an entity that Unilever operated, post-merger, without direct oversight from the Independent Board.

52.   In support of its allegation that the Ben & Jerry's trademarks had been transferred to Unilever, Conopco appended as exhibits three documents: (1) a Trademark Sale Agreement dated December 22, 2000 between B&J Holdings and Unilever N.V. (Exhibit J); (2) a Supplement to the Trademark Sale Agreement dated December 29, 2000 between B&J Holdings

---

[14] *See* Exhibit I, "Ben & Jerry's co-founders protest new CEO," https://www.dairynetwork.com/doc/ben-jerrys-co-founders-protest-new-ceo-0001

and Unilever N.V. (Exhibit K); and (3) a Deed of Assignment dated May 16, 2001 assigning certain Israeli trademarks from B&J Holdings to Unilever N.V. (Exhibit L) (Exhibits J, K, and L are collectively referred to herein as the "Trademark Transfers").[15]

53.     The License Agreement was premised on Ben & Jerry's retaining ultimate ownership and control of its own trademarks, but the Trademark Transfers purported to essentially nullify those terms.  The Merger Agreement and Shareholders Agreement explicitly provide that the Independent Board "may prevent any action by the CEO in the areas of . . . the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand."  Exh. A, § 6.14(f); Exh. B, § 1(f).  But by transferring the marks out of Ben & Jerry's control, Unilever, UIP and Conopco attempted to eliminate the Board's authority as custodian of the marks.

54.     Conopco has stated that the Trademark Transfers were executed "[i]n connection with the acquisition" (ECF No. 30, at 12), but that is flatly untrue.  Unlike the License Agreement, which was an express condition of the Merger Agreement, and which confirmed Ben & Jerry's continued ownership of the trademarks, the Trademark Transfers were not "Transaction Agreements" under the Merger Agreement and are nowhere mentioned in any of the merger documents.  Indeed, the Trademark Transfers were executed without Ben & Jerry's approval or inclusion as a party, and were entered into months after the merger had closed, although the Trademark Sale Agreement was backdated to be effective as of the time of the acquisition.  *See* Exh. J.  Far from forming part of the merger transaction, the Trademark Transfers sought to undo an essential piece of that transaction—the License Agreement—by

---

[15] According to Conopco, "In 2020, Unilever N.V. was dissolved as part of a corporate restructuring at the Unilever group of companies, and UIP [Unilever IP Holdings B.V., a subsidiary of Unilever plc] became the owner of the rights to Ben & Jerry's trademarks." (ECF No. 30, at 12).

removing the relevant trademarks from Ben & Jerry's control and placing them with Unilever N.V.  Because the terms of the License Agreement were critical to the Independent Board's ability to preserve Ben & Jerry's Social Mission and brand integrity abroad as "custodian" of the Ben & Jerry's marks pursuant to the Merger Agreement and Shareholders Agreement, the Trademark Transfers impaired Ben & Jerry's rights under those agreements.

55.     The Ben & Jerry's Independent Board was not consulted on any of the Trademark Transfers in 2000 and 2001, and the Board's approval for entry into the Trademark Transfers was not sought or obtained.  Members of the Independent Board were not provided with copies of the Trademark Transfers or even aware of their existence until Conopco attached them as exhibits to its July 11, 2022 Memorandum of Law.  It is revealing that while former CEO Perry Odak signed the License Agreement on behalf of both Ben & Jerry's and B&J Holdings as joint "Licensor" of the Ben & Jerry's trademarks, Unilever, a month after removing Odak, caused only B&J Holdings to sign the Trademark Transfers.  By leaving Ben & Jerry's off of the Trademark Transfers, Unilever evaded review by the Independent Board.

56.     Upon information and belief, Unilever caused B&J Holdings to execute the Trademark Transfers without the Independent Board's knowledge or consent as an attempted end-run around Ben & Jerry's rights and protections under the License Agreement, Merger Agreement, and Shareholders Agreement.

**G.     The Independent Board of Directors Continues Ben & Jerry's Social Mission.**

57.     Following the merger, Ben & Jerry's Independent Board of Directors continued the Company's long history of social activism consistent with the terms of the Merger Agreement and Shareholders Agreement.

58.     For instance, in 2008, the Ben & Jerry's CEO—a Unilever appointee—proposed to close the Ben & Jerry's plant in Waterbury, Vermont, which was the Company's first factory, built in 1985.  The closure of that plant would have devastated the local economy.

59.     The Independent Board of Directors determined that the planned closing of the Waterbury plant was inconsistent with the Company's Social Mission and expressed its objection to Unilever.  Unilever respected the Independent Board of Director's judgment, shelving plans to shut down the Waterbury plant.  In a letter dated March 14, 2009, Michael B. Polk (Unilever's President of Americas & Global Customer Development) made clear:  "Unilever respects the Board's concerns about the community of Waterbury and of course will abide by the final decision of the Board."  Today, Waterbury is one of the Company's most efficient plants.

60.     The Board also progressed Ben & Jerry's social activism in other areas.  In 2009, for example, Ben & Jerry's initiated a five-year plan to ensure that all its ingredients would be free of genetically modified organisms (GMOs), a goal it accomplished in 2014.  That same year, Ben & Jerry's joined the "Fight for the Reef" campaign, a partnership with the Australian Marine Conservation Society to help protect the Great Barrier Reef.

61.     Three years later, in 2017, Ben & Jerry's continued its international social activism—and its longstanding advocacy for LGBTQ+ rights—by announcing it would no longer serve two scoops of the same ice cream flavor in Australia due to the Australian government's refusal to legalize same-sex marriage:[16]

---

[16] *See* Exhibit M, "Ben & Jerry's Bans 'Same-Flavor Scoops' in Australian Same-Sex Marriage Push." https://www.nbcnews.com/feature/nbc-out/ben-jerry-s-bans-same-flavor-scoops-australian-same-sex-n764791.



62. Ben & Jerry's social activism continued into the next decade.

63. In 2018, the Company launched "Pecan Resist" to promote political activism in the United States and challenge the Trump administration's policies. It later launched "Change is Brewing" to encourage Black voter turnout.

64. Along with supervising the introduction of new products to further its social mission, the Independent Board also made decisions regarding where its products would be sold. For example, the Independent Board decided against distributing its products in China because of human rights concerns and potential ramifications on Ben & Jerry's social mission and brand integrity.

65. In 2020, after the murder of George Floyd, Ben & Jerry's became one of the most prominent brands to speak out in support of Black Lives Matter. The Company delivered a blunt message:



66.     Ben & Jerry's vocal, unequivocal support for the Black Lives Matter movement drew praise: "Among the flood of bland and empty corporate platitudes, the post stood out.  It was no viral fluke but the product of decades of brand development around social activism."[17] As a result of its decades of advocacy, Ben & Jerry's had become the "gold standard" for corporate activism.[18]

**H.     The Independent Board of Directors Determines Selling Ben & Jerry's in the West Bank is Inconsistent with The Brand's Essential Integrity; Unilever Publicly Acknowledges the Board's Authority to Make Such a Decision.**

    **i.     The Independent Board Responds to Mounting Public Criticism Regarding Ben & Jerry's Sales in the West Bank.**

67.     As early as 2013, the Ben & Jerry's Independent Board had begun receiving complaints regarding the human rights implications of selling its products in the West Bank.  The Independent Board did not take the issue lightly, choosing instead to organize multiple visits to the region, and appointing a special committee in 2018 to investigate the issue thoroughly.

68.     Following the appointment of the special committee, a group of Ben & Jerry's representatives organized a factfinding mission in 2019.   The group included:   Matthew

---

[17] *See* Exhibit N, "Ben & Jerry's Showed America What Real Corporate Activism Looks Like," https://www.huffpost.com/entry/ben-jerry-ice-cream-corporate-activism_n_5f1b11dec5b6296fbf423019 .
[18] *Id.*

McCarthy (CEO); Mike Graning (Chief Financial Officer); Dave Rapp (Global Social Mission Officer); and Anuradha Mittal (Board Chair).   These representatives met with a variety of stakeholders, including members of the Israeli government, human rights organizations such as Human Rights Watch, former Israeli soldiers, local farmers, Palestinian representatives, and UN agencies.

69.     In the meantime, pressure continued to grow on Ben & Jerry's, with hundreds of emails being sent to Mr. McCarthy and the Ben & Jerry's social mission team expressing concerns regarding the human rights implications of Ben & Jerry's continued sales in the West Bank.  Notably, Mr. McCarthy failed to inform the Ben & Jerry's Board about the number of emails.

70.     In addition to the emails, pressure began to mount on social media.  For example, in June 2020, Ben & Jerry's experienced a 204% increase in mentions relating to its business in the West Bank and Palestinian rights.   When the Board questioned Mr. McCarthy about these external calls for action, he was more interested in learning who had informed the Independent Board about them—including whether discussions had occurred "offline" between Ben & Jerry's management and the Board—rather than acting upon them.

71.     Pressure continued to mount on Ben & Jerry's throughout 2019 and 2020.  During this period, Ms. Mittal repeatedly pushed Unilever and Mr. McCarthy to take action regarding Ben & Jerry's sales in the West Bank.  For example, on June 15, 2020, Ms. Mittal wrote:  "We will need to focus on this issue . . . before this turns into a huge campaign against us."  On June 26, 2020, Ms. Mittal again emphasized the need for action:  "[O]ur concern is the slow pace on this . . . [it] is becoming a threat to the business, social mission, and brand integrity . . . . Unilever will face this pressure as well around BnJ in Europe."

72.     Ben & Jerry's employees shared Ms. Mittal's concerns, with one noting, "I don't think I can overstate just how much of a danger this issue is to our activism in Europe." Similarly, a group of 28 Ben & Jerry's managers wrote to Mr. McCarthy expressing their disappointment:  "We believe that our activities in Israel contravene our social mission and values, and seriously impede our activism work. The current response and inaction of the business over the years is not reflective of the three-part mission, which we publicly say guides all our decisions . . .   [W]e are also seeing backlash from activists, fans and Ice Academy participants. This backlash is already limiting our activism affecting both the credibility of what we can do and the ability to work with progressive partners on campaigns and projects."

73.     As the Ben & Jerry's Global Social Mission Officer succinctly summarized:  "I believe this is getting quite urgent."

74.     Given the threats to Ben & Jerry's social mission and brand integrity, and the absence of action and communication from Unilever and Mr. McCarthy, the Independent Board moved forward with a unanimous resolution in July 2020, instructing Ben & Jerry's management to "immediately" develop a plan regarding ceasing Ben & Jerry's business in the occupied West Bank.  Even Kevin Havelock, Unilever's appointee to the Board, voted in favor of the resolution.

75.     In response to the Board's resolution, Mr. McCarthy wrote on July 27, 2020: "After 32 years and with all the developments it is clearer than ever that some new progress needs to be made."  Despite this acknowledgment, for approximately the next year, both Mr. McCarthy and Unilever continued to drag their feet.

**ii.       The Board Does What Unilever and Mr. McCarthy Failed to Do:  Act.**

76.     Approximately ten months after passing their resolution, the Board determined it had to act to protect Ben & Jerry's Social Mission and the integrity of the brand.

77.     In May 2021, the Board informed Mr. McCarthy that it would be releasing a public statement that Ben & Jerry's would no longer sell its products in the West Bank.  The Board emphasized the importance of discussing the statement with Mr. Zinger and Mr. Alan Jope (Unilever's CEO) prior to release so neither was blindsided.

78.     For the remainder of May and throughout June 2021, the Board consulted with Defendants regarding the language of the public statement, providing Unilever and Mr. McCarthy with time to reach an amicable resolution with Mr. Zinger.

79.     On July 9, 2021, the Board wrote to Mr. Jope regarding the lack of progress: "We've . . . been discussing in earnest a way forward since the beginning of May, though the board resolution on this was in fact passed in June last year. Throughout, we've been anxious to make our intentions clear publicly, with the full support of Unilever.  Regrettably, as of today reliable information has still not been provided and we're left dealing with mixed messages and our brand under constant attack."

80.     Four days later, on July 13, 2021, the *Boston Globe* published an expose,[19] highlighting the mounting public criticism on Ben & Jerry's, and the company's lack of response:  "On Twitter, user after user from across the country flooded the comment section . . . with criticism of Ben & Jerry's business dealings in the West Bank and East Jerusalem . . . . Even as Ben & Jerry's feeds sit dormant, past posts continue to fill with comments from those calling out what they see as 'half-baked activism.'"

81.     Following release of the *Boston Globe* story, Mr. Jope wrote to the Ben & Jerry's Chair about his gameplan to play "hardball" with Mr. Zinger.  Unilever and Mr. McCarthy's

---

[19] *See* Exhibit O, "It's been nearly two months since Ben &Jerry's posted on social media. Here's how its silence may be tied to the Middle East."  Available at: https://www.bostonglobe.com/2021/07/15/metro/its-been-58-days-since-ben-jerrys-posted-social-media-heres-how-their-silence-may-be-tied-middle-east/

negotiation tactics—despite the immense public pressure—resulted in squandering the opportunity to reach an amicable business resolution with Mr. Zinger.

82.    Enough was enough.  Approximately seven years after the Board began receiving negative feedback regarding Ben & Jerry's sales in the West Bank, three years after they established a special committee to analyze the issue, two years after their fact-finding visit, one year after they passed a resolution asking for management to devise a plan of action, and two months after informing Unilever and Mr. McCarthy that they would be releasing a public statement, on June 19, 2021, the Independent Board publicly announced that it would be halting sales of its products in the West Bank.

83.    Ben & Jerry's founders supported the Independent Board's decision.  As Mr. Cohen and Mr. Greenfield explained in a July 28, 2021 guest essay for the *New York Times*, they "unequivocally support[ed] the decision of the company . . ."[20]  The Ben & Jerry's founders further added that they were "proud" of the Company's action; believed "it is on the right side of history"; and viewed it as "one of the most important decisions the company has made in its 43-year history."[21]

84.    Ten days prior to the *New York Times* piece, Unilever had published its own statement confirming it had "*always recognised the right* of the brand and its independent Board to take decisions about its social missions."[22]  And, in April 2022, Unilever emphasized in public court filings that Ben & Jerry's "would clearly be harmed if forced to provide a license [to Mr. Zinger] against its will."[23]  Unilever's statements simply acknowledged what Unilever and Ben

---

[20] *See* Exhibit P, "We're Ben and Jerry. Men of Ice Cream, Men of Principle." Available at: https://www.nytimes.com/2021/07/28/opinion/ben-and-jerry-israel.html.
[21] *Id.*
[22] *See* Exhibit D.
[23] *See* Exhibit E.

& Jerry's had agreed to in their Merger Agreement, a unique corporate structure which had governed their 22-year relationship.

85.    Following the Board's decision, Unilever continued to publicly support Ben & Jerry's, including touting the company's economic performance.  For example, on February 10, 2022, Unilever's CEO praised Ben & Jerry's 9% growth and its status as one of Unilever's "billion-euro brands."[24]

**I.    Unilever Reverses Course, Disregards the Merger and Shareholders Agreements, and Upsets the Equilibrium the Parties Had Maintained for More Than Two Decades.**

86.    Abruptly, on June 23, 2022, Unilever notified the Chair of Ben & Jerry's Independent Board that it planned to transfer certain Ben & Jerry's trademarks and brand rights in Israel to Mr. Zinger, who would use the Ben & Jerry's namesake to sell products in Israel and the West Bank.   Stunned, Ms. Mittal attempted to engage in discussions with Unilever, requesting a copy of the transfer agreement and time for the Independent Board to review.  She received neither.

87.    On June 29, 2022, Unilever unilaterally announced that Ben & Jerry's "will be sold" in the West Bank through a third-party distributor.[25]   Unilever's press release claimed that the sale was premised on its purported financial/operational authority over Ben & Jerry's.  To this day, however, Defendants have failed to disclose to the Independent Board how much Ben & Jerry's intellectual property was sold for, likely because of the embarrassingly low sum.

---

[24] *See* Exhibit Q, "Unilever highlights Ben & Jerry's and Hellmann's growth following brand purpose criticism."
Available at: https://www.marketingweek.com/unilever-ben-jerrys-hellmanns-growth/
[25] *See* Exhibit E.

News articles suggest that the sale was made for "peanuts" and that Mr. Zinger "made the deal of his life . . ."[26]

88.     Unilever's decision was made without the approval of Ben & Jerry's Independent Board of Directors, the "custodians of the Ben & Jerry's-brand image" and the entity with "primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name" per the Merger Agreement.

89.     On July 1, 2022, the Board held a special meeting in response to Unilever's decision.  In a 5-2 decision (with the two Unilever appointees dissenting), Ben & Jerry's Independent Board authorized this litigation.[27]  With no other recourse, on July 5, 2022, the Independent Board filed its original complaint and an order to show cause against Conopco. (ECF Nos. 1, 7).

90.     In response to the Independent Board's suit, Conopco finally divulged the extent to which Unilever had acted to evade the Independent Board's oversight.  In its Memorandum of Law in Opposition to Plaintiff's Application for Preliminary Injunctive Relief filed on July 11, 2022, Conopco disclosed that it had already purported to transfer Ben & Jerry's trademarks in Israel to Mr. Zinger, who would then continue selling Ben & Jerry's ice cream in the West Bank. Conopco attached a copy of the Business Transfer Agreement (with the price term redacted) that purportedly effected this transfer; a copy had never been provided to the Independent Board before that time. The Business Transfer Agreement also purportedly obligates Ben & Jerry's to transfer future intellectual property—including trade secrets, recipes, and ingredients—to Mr. Zinger in contravention of the Board's authority under Section 6.14.

---

[26] *See* Exhibit S, "Meet the Israeli Who Wants to Rename Ben & Jerry's Chunky Monkey 'Judea and Samaria.'" Available at: https://www.haaretz.com/israel-news/2022-07-06/ty-article-magazine/.highlight/meet-the-israeli-who-wants-to-rename-chunky-monkey-to-judea-and-samaria/00000181-d27b-df27-a7b7-da7f9f110000
[27] *See* Exhibit R, Resolutions of the Board of Directors of Ben & Jerry's Homemade, Inc., dated July 1, 2022.

91.     In that same filing, Conopco also disclosed that in 2000 and 2001, Unilever had caused B&J Holdings to effect the Trademark Transfers and transfer Ben & Jerry's marks to Unilever N.V., in violation of the License Agreement.  (*See* ECF No. 30, at 12).  On the basis of the Trademark Transfers, Conopco argued that Ben & Jerry's claim that Unilever had no authority to transfer its Israeli marks was moot, because those marks were no longer Ben & Jerry's property, but Unilever's.  (*See id.*)  But in making this argument, Conopco admitted to an even more fundamental breach: that Unilever effected the Trademark Transfers immediately following the merger to circumvent the Independent Board's authority.

92.     Defendants' admission also shed light on their attempts to hide the Trademark Transfers.  For example, in its public press releases, Unilever has premised the sale of Ben & Jerry's intellectual property to Mr. Zinger on Conopco's financial and operational authority under the Merger Agreement, rather than on Unilever's purported ownership of the marks because of the Trademark Transfers.

93.     To add insult to injury, Defendants initiated additional efforts to diminish the Board's authority.  Although Section 6.14 bars Defendants from taking any action that may prevent the Independent Board from "fulfilling its obligations" and also prevents Defendants from removing any Class I Directors, Defendants have actively attempted to undermine the Board's rights via the following illustrative examples:

- Unilever's CEO (Alan Jope) has attempted to countermand Ben & Jerry's social mission, and suggested that the company should stay out of "geopolitics";

- Defendants have made statements on behalf of Ben & Jerry's that the Board had expressly rejected, while concurrently refusing to allow the Board to make statements regarding Ben & Jerry's social mission;

- Defendants have thwarted communication between Ben & Jerry's management and the Independent Board, as well as between franchisees and the Independent Board, regarding product quality and other concerns;

- Defendants have abruptly cancelled Board meetings and attempted to bend Board rules regarding quorum;

- Defendants have threatened to shut the Board out of critical decisions and limit the Board's authority should the Board continue with this lawsuit;

- Defendants have refused to elect properly nominated Class I Directors;

- Defendants have refused to disburse Ben & Jerry's revenues meant for charities;

- Defendants have eliminated or combined certain Ben & Jerry's employment positions affecting the product mission;

- Defendants have refused to recognize and implement the Board's decisions regarding new product design and introduction;

- Defendants have marketed products without receiving the Board's approval;

- and, Defendants have refused to pay Class I Directors' compensation.

The last issue is particularly egregious given the security threats that Board members have faced, leaving individual Board members to pay for their own security measures—including relocation—while not being compensated

**J.     The Board Has Authority to Pursue the Company's Claims.**

94.     The Independent Board is empowered to bring suit on behalf of the Company to enforce the Company's rights under the Merger Agreement, Shareholders Agreement, and License Agreement as they relate to Ben & Jerry's Social Mission and brand integrity.  The Independent Board has properly authorized and initiated this litigation against the Defendants.

95.     Conopco acknowledged in the Shareholders Agreement that the Company possesses the ability to file an action for breach and seek injunctive relief.   Section 7 (Enforcement) of the Shareholders Agreement provides in relevant part:

> The parties agree that irreparable damage would occur in the event that <u>any of the provisions of this Agreement were not performed in accordance with their specific terms</u>

or were otherwise breached.  It is accordingly agreed that <u>the parties shall be entitled to an injunction or injunctions</u> to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement <u>in any New York state court or any Federal court located in the State of New York</u>, this being in addition to <u>any other remedy to which they are entitled at law or in equity</u>. (emphasis added)

96.     The Shareholders Agreement formalizes Conopco's authority over financial and operational matters of the Company, and the Independent Board's authority over matters pertaining to the Company's Social Mission and brand integrity.  The Company is entitled to be governed in accordance with this division of authority.  However, because Conopco appoints and controls the management of Ben & Jerry's, including its CEO, in the event of any breach of the authority delegated to the Independent Board, the Independent Board necessarily must be able to seek judicial enforcement of those rights under Section 7 of the Shareholders Agreement for the Company's benefit.  Indeed, Section 7 cannot be read as exclusively enabling Ben & Jerry's management to uphold the Company's rights under the Shareholders Agreement, because that would render the Independent Board's authority toothless: it cannot be the case that the Independent Board must rely upon Ben & Jerry's CEO, who is appointed by Conopco, to sue Conopco under Section 7 for breaches of the Shareholders Agreement affecting the Independent Board's delegated authority.  Moreover, certain of the Independent Board's key duties under the Shareholders Agreement, including the Independent Board's ability to prevent the Ben & Jerry's CEO from taking certain actions regarding the use of Ben & Jerry's trademarks, explicitly displace the rights of the CEO.  It would defy logic and the intent of the Shareholders Agreement for the Independent Board to have to rely upon Ben & Jerry's CEO to police, and litigate, his own infringement of the Independent Board's authority.

97.     The Independent Board is similarly empowered to defend the Company's interests under the Merger Agreement and the License Agreement.  Section 9.10 (Enforcement) of the Merger Agreement provides in relevant part:

> The parties agree that irreparable damage would occur in the event that <u>any of the provisions of any Transaction Agreement [including the Merger Agreement and License Agreement] were not performed in accordance with their specific terms or were otherwise breached.</u>  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of any Transaction Agreement and to enforce specifically the terms and provisions of any Transaction Agreement in any New York state court or any Federal court located in the State of New York, this being in addition to any other remedy to which they are entitled at law or in equity. (emphasis added)

98.     As with the enforcement provision of the Shareholders Agreement, this provision necessarily empowers the Independent Board to enforce the Company's rights under the Merger Agreement and License Agreement as they relate to the Independent Board's oversight of Ben & Jerry's Social Mission and brand integrity.  Indeed, the unique corporate governance structure authorized by the Merger Agreement, including the creation of the Independent Board, would be entirely frustrated if Conopco-controlled management had unilateral authority to determine whether to enforce the Company's rights that are safeguarded by the Independent Board. Similarly, under the License Agreement, the Company is entitled to benefit from the Independent Board's supervision of the licenses granted to Unilever.  In the event of a breach of the License Agreement, the Independent Board, having been delegated authority to supervise the Ben & Jerry's trademarks on behalf of the Company, must be able to enforce that right on behalf of the Company.  Otherwise, the License Agreement would effectively be a nullity, with the Company having certain governance rights allocated to the Independent Board and exclusive of Conopco, but Conopco possessing sole authority to decide whether to exercise those rights on behalf of the Company.

## CAUSES OF ACTION:

## COUNT I:  BREACH OF THE MERGER AGREEMENT
### (Against Conopco)

99.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

100.    Plaintiff and Conopco entered into the Merger Agreement in 2000.

101.    Plaintiff has performed all of its material obligations under the Merger Agreement.

102.    Subject to Section 6.14 of the Agreement, Ben & Jerry's Independent Board of Directors are the "custodians of the Ben & Jerry's-brand image," and primarily responsible for "preserving and enhancing the objectives of the historical social mission of the Company" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name."  Under Section 6.14(i), Conopco agreed not to prevent Plaintiff from fulfilling its obligations under Section 6.14.

103.    Conopco deprived Plaintiff of these contractually bargained for rights via its June 29, 2022 announcement, attempting to usurp the Board's contractual authority and nullify its previous decision prohibiting the sale of Ben & Jerry's products in the West Bank.

104.    Conopco also deprived Plaintiff of these contractually bargained for rights by transferring certain Ben & Jerry's intellectual property to a purchaser for the express purpose of selling Ben & Jerry's products in the West Bank, including future intellectual property.

105.    Without Plaintiff's authorization and with knowledge of Plaintiff's well-known and publicly acknowledged rights, Conopco breached Section 6.14 of the Merger Agreement when it unilaterally decided to engage in a deal directly infringing on the "essential elements of the Ben & Jerry's brand-name."

106.    Conopco has also breached its obligation under Section 6.14, including Section 6.14(i), by freezing the Board's compensation and undermining the Board's authority (including regarding product quality concerns).

107.    Conopco's breaches undermine the parties' intent as expressed in the Merger Agreement and destroy the brand and social integrity Ben & Jerry's has spent decades building. The Merger Agreement recognized that Conopco's breach of Section 6.14 would cause irreparable harm to Ben & Jerry's business reputation and its goodwill, and therefore would be grounds for injunctive relief.

108.    Based on Conopco's actions as alleged herein, Plaintiff is entitled to permanent injunctive relief, damages for the harm that Plaintiff has sustained and will sustain as a result of Conopco's breaches of contract, and all gains, profits, and advantages obtained by Conopco as a result thereof, enhanced discretionary damages, reasonable attorney's fees and costs, and any other remedies as the Court deems appropriate.

**COUNT II:  IN THE ALTERNATIVE, BREACH OF THE MERGER AGREEMENT'S**
**IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Conopco)**

109.    Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

110.    Pursuant to Section 6.14 of the Merger Agreement, Ben & Jerry's Independent Board of Directors are the "custodians of the Ben & Jerry's-brand image," and primarily responsible for "preserving and enhancing the objectives of the historical social mission of the Company" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name."

111.   As an express condition of the Merger Agreement, Plaintiff entered into the License Agreement with the other parties thereto.   The terms of the License Agreement, including provisions requiring that Ben & Jerry's marks remain under the control of Ben & Jerry's, supported the Independent Board's ability to serve as custodian of Ben & Jerry's brand image and advance its Social Mission under the Merger Agreement.

112.   Implied in the Merger Agreement is a covenant of good faith and fair dealing requiring that the parties to the Merger Agreement not do anything that will have the effect of destroying or impairing the other party's ability to receive the benefits of the contract.

113.   Conopco breached the implied covenant of good faith and fair dealing implied in the Merger Agreement by causing B&J Holdings to execute the Trademark Transfers without the Independent Board's involvement, knowledge or consent.   Conopco's actions attempted to place Ben & Jerry's marks outside of the Independent Board's control, thereby undermining the terms of the License Agreement and the Independent Board's control over the marks.

114.   Conopco also breached the implied covenant of good faith and fair dealing implied in the Merger Agreement by freezing the Board's salaries and taking other measures to diminish the Board's authority.

115.   Based on Conopco's actions as alleged herein, Plaintiff is entitled to permanent injunctive relief, damages for the irreparable harm that Plaintiff has sustained and will sustain as a result of Conopco's breaches of contract, and all gains, profits, and advantages obtained by Conopco as a result thereof, enhanced discretionary damages, reasonable attorneys' fees and costs, and any other remedies as the Court deems appropriate.

## COUNT III:  BREACH OF THE SHAREHOLDERS AGREEMENT
### (Against Conopco)

116.    Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

117.    Plaintiff entered into the Shareholders Agreement with Conopco dated August 3, 2000.

118.    Plaintiff has performed all of its material obligations under the Shareholders Agreement.

119.    Pursuant to Section 6.14(l) of the Merger Agreement, the Shareholders Agreement adopted the corporate governance provisions set forth in Section 6.14 of the Merger Agreement.  Consistent with those provisions, the Shareholders Agreement delegated to the Ben & Jerry's Board of Directors authority for:  (i) "preserving and enhancing the historical social mission of the Company as they may evolve from time to time consistent therewith ('Social Mission Priorities')"; and (ii) "safeguarding the integrity of the essential elements of the Ben & Jerry's brand name." Under Section 1(i) of the Shareholders Agreement, Conopco agreed not to prevent Plaintiff from fulfilling its obligations under Section 1 of the Shareholders Agreement.

120.    Conopco breached the Shareholders Agreement via the sale to Mr. Zinger as well as through its attempts to undermine the Board's authority, as more fully articulated above.

121.    The parties to the Shareholders Agreement recognized that Conopco's breach of the agreement would pose irreparable harm to Ben & Jerry's.  Section 7 of the Shareholders Agreement thus provides that:

> The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.   It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

122.     The Shareholders Agreement was incorporated by reference in the Company's Articles of Incorporation and its By-Laws.

123.     Based on Conopco's actions as alleged herein, Plaintiff is entitled to permanent injunctive relief, damages for the harm that Plaintiff has sustained and will sustain as a result of Conopco's breaches of contract, and all gains, profits, and advantages obtained by Conopco as a result thereof, enhanced discretionary damages, reasonable attorneys' fees and costs, and any other remedies as the Court deems appropriate.

### COUNT IV: IN THE ALTERNATIVE, BREACH OF THE SHAREHOLDER AGREEMENT'S IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (Against Conopco)

124.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

125.     Subject to Section 1 of the Shareholders' Agreement, Ben & Jerry's Independent Board of Directors are the "custodians of the Ben & Jerry's-brand image," and primarily responsible for "preserving and enhancing the objectives of the historical social mission of the Company" and "safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name."

126.     As an express condition of the Merger Agreement, Plaintiff entered into the License Agreement with the other parties thereto.   The terms of the License Agreement, including provisions requiring that Ben & Jerry's marks remain under the control of Ben & Jerry's, were instrumental to the Independent Board's ability to serve as custodian of Ben & Jerry's brand image and advance its Social Mission, post-merger, pursuant to the terms of the Merger Agreement and the Shareholders Agreement.

127.     Implied in the Shareholders Agreement is a covenant of good faith and fair dealing requiring that the parties to the Shareholders Agreement not do anything that will have the effect of destroying or impairing the other party's ability to receive the benefits of the contract.

128.     Conopco breached the implied covenant of good faith and fair dealing implied in the Shareholders Agreement by causing B&J Holdings to execute the Trademark Transfers without the Independent Board's involvement, knowledge or consent.   Conopco's actions attempted to place Ben & Jerry's marks outside of the Independent Board's control, thereby undermining the terms of the License Agreement and the Independent Board's control over the marks.

129.     Based on Conopco's actions as alleged herein, Plaintiff is entitled to permanent injunctive relief, damages for the irreparable harm that Plaintiff has sustained and will sustain as a result of Conopco's breaches of contract, and all gains, profits, and advantages obtained by Conopco as a result thereof, enhanced discretionary damages, reasonable attorneys' fees and costs, and any other remedies as the Court deems appropriate.

### COUNT V:  BREACH OF THE LICENSE AGREEMENT
#### (Against UIP and Unilever plc)

130.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

131.     Plaintiff, along with B&J Holdings, entered into the License Agreement with Unilever N.V. (succeeded by UIP) and Unilever plc on April 11, 2000.

132.     Plaintiff has performed all of its material obligations under the License Agreement.

133.    The License Agreement's terms were meant to ensure that all relevant trademark rights of Ben & Jerry's would continue to reside with Ben & Jerry's—and *not* a Unilever entity—after the merger, and therefore remain under the supervision of the Independent Board. UIP and Unilever plc acknowledged under the License Agreement that Ben & Jerry's (together with B&J Holdings) is the "owner of all right, title and interest in and to the Licensed Mark in the Territory under this Agreement" (§ 11(a)), and agreed that they would not, "at any time, do any act or thing which will materially impair the rights of [Ben & Jerry's] in and to the Licensed Mark or any registrations thereof or which will materially depreciate the value of the Licensed Mark."

134.    UIP and Unilever plc breached Section 11 of the License Agreement by participating in and/or causing the sale of Ben & Jerry's trademarks by B&J Holdings to UIP through execution of the Trademark Transfers in 2000 and 2001.  These actions by UIP and Unilever plc, which were taken without the involvement, knowledge, or consent of the Independent Board, effectively repudiated the License Agreement by undermining its core principle that the trademarks were to remain with Ben & Jerry's and within the control of the Independent Board.

135.    UIP and Unilever plc also breached Section 31 of the License Agreement by entering into and/or causing the execution of the Trademark Transfers.  The Trademark Transfers purported to amend or terminate the License Agreement by transferring ownership of the Ben & Jerry's marks to Unilever N.V., but pursuant to Section 31, modifications or terminations of the License Agreement required the signature of all parties to the original agreement, including Ben & Jerry's Homemade, Inc.  Because Ben & Jerry's did not sign the Trademark Transfers, they constituted an invalid attempt to amend the License Agreement.

136.    Plaintiff's claims under the License Agreement relate to Ben & Jerry's ownership of the Licensed Marks under the License Agreement and therefore are properly brought before this Court.  *See* Exh. C, § 27(b).

137.    Pursuant to Section 15 of the License Agreement, Ben & Jerry's and its directors are entitled to indemnification, including coverage of their reasonable attorneys' fees, by UIP and Unilever plc arising out of UIP and Unilever plc's breaches of the License Agreement.

138.    Based on the actions by UIP and Unilever plc as alleged herein, Plaintiff is entitled to permanent injunctive relief, damages for the irreparable harm that Plaintiff has sustained and will sustain as a result of UIP and Unilever plc's breaches of the License Agreement, and all gains, profits, and advantages obtained by UIP and Unilever plc as a result thereof, enhanced discretionary damages, reasonable attorneys' fees and costs, and any other remedies as the Court deems appropriate.

139.    Plaintiff is also entitled to a mandatory injunction compelling UIP to return to Ben & Jerry's all trademarks that are currently in UIP's or its affiliates' possession which were invalidly transferred to Unilever N.V. pursuant to the Trademark Transfers.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Ben & Jerry's respectfully requests judgment in its favor and against Defendants:

1.    That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

      a.   Taking any further action with American Quality Products Ltd., or any other entity, that would facilitate the sale of Ben & Jerry's products or the use of

Ben & Jerry's Marks in the West Bank without prior approval of Ben & Jerry's Independent Board;

b.   Taking any further action to facilitate the distribution or sale of Ben & Jerry's products or the use of Ben & Jerry's Marks in the West Bank without prior approval of Ben & Jerry's Independent Board;

c.   Taking any further action to transfer additional intellectual property, including future trade dress and know how, without the prior approval of Ben & Jerry's Independent Board.

d.   Acting in any other manner that is contrary to Section 6.14 of the Merger Agreement or Section 1 of the Shareholders Agreement without prior approval of Ben & Jerry's Independent Board.

e.   Taking action to prevent the election of properly nominated Class I Directors to the Independent Board.

2.   Entry of an Order that Defendants:

a.   Return to Ben & Jerry's all trademarks that were transferred to Unilever N.V. pursuant to the Trademark Transfers, to the extent such trademarks remain within the possession and control of UIP (as successor to Unilever N.V.) or its affiliates;

b.   Take all steps necessary to prevent links between the Plaintiff and the Defendants' unilateral, illegal, and infringing decision.

3.   Award damages for the breaches articulated above;

4.   That Plaintiff be awarded its reasonable attorney's fees and costs; and

5.   Award any and all other relief that this Court deems just and proper.

Dated:  September 30, 2022
New York, New York

Respectfully submitted,

**COHEN & GRESSER LLP**

By: *<ins>/s/ Mark S. Cohen</ins>*
Mark S. Cohen
Jeffrey I. Lang
Drew S. Dean
800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514

**AHMAD, ZAVITSANOS & MENSING PC**

Shahmeer Halepota
John Zavitsanos (*pro hac vice*)
Joseph Y. Ahmad
Jane Robinson (*pro hac vice* to be filed)
Daryl Moore (*pro hac vice*)
Kelsi White (*pro hac vice* to be filed)
Thomas Frashier (*pro hac vice*)
1221 McKinney, Suite 2500
Houston, Texas 77010
Phone:  (713) 655-1101
Fax:  (713) 655-0062

*Attorneys for Plaintiff Ben & Jerry's
Homemade, Inc.*